1  Aaron L. Agenbroad (State Bar No. 242613)
   alagenbroad@jonesday.com
2  JONES DAY
   555 California Street, 26th Floor
3  San Francisco, CA  94104
   Telephone:     (415) 626-3939
4  Facsimile:     (415) 875-5700

5  Attorneys for WASHINGTON GROUP
   INTERNATIONAL, INC., A DIVISION OF URS
6  CORPORATION

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  | **IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION** | **Case No. MISC. NO. 08-CV-80007MISC (PJH)** |
    |---|---|
12

13  **PERTAINS TO MR-GO**

    **WASHINGTON GROUP INTERNATIONAL, INC.'S MEMORANDUM IN OPPOSITION TO MOTIONS OF MR-GO PLAINTIFFS TO QUASH, TO "REMIT," AND IN SUPPORT OF CROSS-MOTION TO COMPEL COMPLIANCE WITH THE SUBPOENA**

14  **(PENDING IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AS CIVIL ACTION NO. 05-4182 "K" (2) BEFORE HON. STANWOOD R. DUVAL, JR.,**

15

16

17

18  Date:        March 12, 2008
    Time:        9:00 a.m.
19  Courtroom: 3, 17th Floor
    Judge:       Hon. Phyllis J. Hamilton

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF OPPOSITION AND CROSS-MOTION ................................................................... 1

REQUESTED RELIEF........................................................................................................... 1

FACTS AND BACKGROUND ............................................................................................... 1

ARGUMENT ...................................................................................................................... 8

    I.    Plaintiffs' "Remit" Motion Has No Support in the Law, And Therefore, Should Be Denied. ................................................................................................ 8

    II.   Plaintiffs' Motions Are Untimely, and Are Therefore Improper. ......................... 10

    III.  Plaintiffs Simply Do Not Have Standing to Bring Either the Motion to Quash or "Remit," And As Such, Both Motions Should Be Rejected................. 11

    IV.  WGII's Cross-Motion to Compel Compliance With the Subpoena Should Be Granted. ...................................................................................................... 13

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

Page

## Cases

*Burroughs Corp. v. Dataware Sources, Inc.*
1987 WL 10190, at *1-2 (D. Mass. Apr. 28, 1987) .................................................. 11

*Diamond State Ins. Co. v. Rebel Oil Co.*
157 F.R.D. 691 (D. Nev. 1994) ................................................................................. 12

*E.E.O.C. v. Danka Indus., Inc.*
990 F. Supp. 1138 (E.D. Mo. 1997) ......................................................................... 12

*Estate of Ungar v. Palestinian Auth.*
400 F. Supp. 2d 541 (S.D.N.Y. 2005) ...................................................................... 11

*In re Sealed Case*
141 F.3d 337 (D.C. Cir. 1998) .................................................................................... 9

*McCoy v. Southwest Airlines Co.*
211 F.R.D. 381 (C.D. Cal. 2002) .............................................................................. 14

*Nova Prod., Inc. v. Kisma Video, Inc.*
220 F.R.D. 238 (S.D.N.Y. 2004) .............................................................................. 11

*See In Re: Katrina Canal Breaches Consol. Litig.*
Civil Action No. 05-4182 (E.D. La.), Docket Entry No. 9121. ............................ 2, 5

*Smith v. Midland Brake, Inc.*
162 F.R.D. 683 (D. Kan. 1995) ................................................................................ 13

*Tutor-Saliba Corp. v. United States*
30 Fed. Cl. 155 (Ct. Fed. Cl. 1993) .......................................................................... 11

*Union Pac. R.R. Co. v. Mike's Train House, Inc.*
2006 WL 1134781, at *3 (D. Neb. Apr. 25, 2006) ................................................... 10

*Windsor v. Martindale*
175 F.R.D. 665 (D. Colo. 1997) ............................................................................... 13

## Rules

Federal Rule of Civil Procedure 26(c) ......................................................................... 9

Federal Rule of Civil Procedure 37 ............................................................................. 9

Federal Rule of Civil Procedure 37(a)(1) ..................................................................... 9

Federal Rule of Civil Procedure 45 .................................................................... passim

Federal Rule of Civil Procedure 45 (a)(2)(C) .............................................................. 9

Federal Rule of Civil Procedure 45(c)(2) ................................................................... 11

Federal Rule of Civil Procedure 45(c)(2)(B) ............................................................. 13

Federal Rule of Civil Procedure 45(c)(3)(A) ................................................... 9, 10, 13

**TABLE OF AUTHORITIES**
(continued)

**Page**

United States Court of Federal Claims Rule 45 ............................................................. 11

<u>**Other**</u>

9 James Wm. Moore et al.,
   *Moore's Federal Practice* § 45.50[4] (3d ed. 2007)................................................. 9, 10, 12, 14

9A Charles Alan Wright & Arthur R. Miller,
   *Federal Practice and Procedure* § 2463.1 (3d ed. 2008) ........................................... 10

1

## NOTICE OF OPPOSITION AND CROSS-MOTION

2   TO PLAINTIFFS, PLAINTIFFS' COUNSEL OF RECORD, AND COUNSEL FOR UC-

3   BERKELEY:

4   PLEASE TAKE NOTICE that Washington Group International, Inc. ("WGII"), a division

5   of URS Corporation, opposes the motions of the MR-GO Plaintiffs ("Plaintiffs") to quash WGII's

6   November 19, 2007 Subpoena for the Production of Documents to the Independent Levee

7   Investigation Team ("ILIT"), led by the University of California at Berkeley ("UC-Berkeley")

8   and funded in part by the University of California at Berkeley Center for Technology Research in

9   the Interest of Society ("CITRIS") ("Subpoena" or "WGII Subpoena") and to "remit" the motion

10   to quash to the United States District Court for the Eastern District of Louisiana ("Pl. Quash

11   Mot." or "Pl. Remit Mot.").

12   PLEASE TAKE FURTHER NOTICE that on March 11, 2008 at 9:00 a.m., or as soon as

13   the matter may be heard, in the courtroom of the Honorable Phyllis J. Hamilton, WGII will bring

14   on for hearing its Cross-Motion to compel UC-Berkeley to comply with the lawfully executed

15   and properly served Subpoena.

16

## REQUESTED RELIEF

17   WGII requests that the Court deny Plaintiffs' motions to quash WGII's November 19,

18   2007 Subpoena for the Production of Documents to ILIT and/or to "remit" the motion to quash to

19   the United States District Court for the Eastern District of Louisiana.

20   WGII further requests that the Court grant WGII's cross-motion to compel UC-Berkeley

21   to comply with the lawfully executed and properly served Subpoena.

22

## FACTS AND BACKGROUND

23   On November 19, 2007, acting pursuant to Federal Rule of Civil Procedure 45 and the

24   deadlines established in Case Management and Scheduling Order No. 4 and subsequent

25   amendments thereto ("CMO No. 4) (attached to Pl. Remit Mot. at Ex. A), WGII served a third-

26   party subpoena upon the "Independent Levee Investigation Team, led by the University of

27   California at Berkeley and funded in part by the University of California at Berkeley Center for

28   Technology Research in the Interest of Society." *See* WGII Subpoena attached at Ex. 1 to

1

1   accompanying Declaration of Shannon M. Kasley ("Kasley Dec."). The Subpoena was returnable

2   December 19, 2007. *Id.* The Subpoena was served at 281 Hearst Memorial Mining Building at

3   UC-Berkeley on Forrest Rulison Monroe, a "Student Assistant Authorized to Accept Legal

4   Documents." *Id.*[1] WGII served ILIT at UC-Berkeley for a number of reasons, including:

5           i)  the multi-volume report drafted by ILIT presenting opinions on

6           the performance of certain flood protection systems in and around

7           New Orleans during and after Hurricane Katrina ("ILIT Report")

8           notes within its very first few pages that ILIT was "University of

9           California at Berkeley led" (*see* Kasley Dec., Ex. 2 (excerpts from

10          ILIT Report));

11          ii)  of the 35 members identified in the ILIT Report, thirteen (13)

12          are denoted as UC-Berkeley professors (R. Bea, J. Bray, D. Farber,

13          W.M. Hanneman, K. Inkabi, J. Pestana, M. Riemer, K. Roberts, R.

14          Seed) and students (A. Athanasopoulos, C. Cheung, D. Cobos-Roa,

15          J. Cohen-Waeber), and no other entity identified more than five (5)

16          ILIT representatives (*id.*);

17          iii)  two UC-Berkeley professors, Raymond B. Seed and Robert G.

18          Bea, are widely-recognized as the co-authors of the ILIT Report

19          and are prominently identified as such in the UC-Berkeley Civil

20          and Environmental Engineering Department website (*see* Kasley

21          Dec., Ex. 3 (www.ce.berkeley.edu/news/view.php?item=47));

22          iv)  in addition to the thirteen (13) UC-Berkeley professors and

23          students specifically identified in the ILIT Report as ILIT team

24          members, the UC-Berkeley Civil and Environmental Engineering

25          Department website identifies two additional UC-Berkeley students

26  _____

27          [1] When the Subpoena was served, WGII provided notice of same to all parties, including
    Plaintiffs, by filing it in the record in the Eastern District of Louisiana, as required by CMO No. 4.
    *See In Re: Katrina Canal Breaches Consol. Litig.*, Civil Action No. 05-4182 (E.D. La.), Docket

28  Entry No. 9121.

1    (R. Storesund and X. Vera-Grunauer) who were listed in the ILIT

2    Report as members, but not specifically affiliated with UC-

3    Berkeley —thus raising the number of UC-Berkeley representatives

4    on ILIT to fifteen (15) out of the total 35—almost half (*id.*);

5    v)  just sixteen (16) days after Hurricane Katrina passed New

6    Orleans, the University touted on its website the important role the

7    University, through CITRIS, would play in connection with ILIT

8    (*see* Kasley Dec., Ex. 4 (www.berkeley.edu/news/media/

9    releases/2005/09/12 _katrina.shtml) ("We need to go to ground zero

10   to gather data and preserve the things that can get trashed or lost (in

11   the recovery effort) . . . .  CITRIS can help to preserve and analyze

12   this data.") (quoting Prof. Robert Bea at p. 2));

13   vi)  the July 31, 2006 Final Report issued by ILIT, as well as two

14   prior drafts in May, 2006 and November, 2005, are all available on

15   the "ILIT DOWNLOAD CENTER" via the UC-Berkeley Civil and

16   Environmental Engineering Department website (*see* Kasley Dec.,

17   Ex. 5 (www.ce.berkeley.edu/~new_orleans/));

18   vii)  as early as October, 2005, just weeks after the passing of

19   Hurricane Katrina, UC-Berkeley reported via its website that it was

20   providing "funding to help support travel for some [ILIT]

21   investigators" through the "UC Berkeley-based Center for

22   Information Technology Research in the Interest of Society

23   (CITRIS)" (*see* Kasley Dec., Ex. 6 (www.universityofcalifornia.

24   edu/news/article/7524)); and

25   viii)  upon the release of ILIT's Final Report dated July 31, 2006,

26   the UC-Berkeley Civil and Environmental Engineering Department

27   website further elaborated on the relationship between the

28   University and ILIT, reporting that ILIT was "sponsored by the

1    National Science Foundation and UC Berkeley's Center for

2    Technology Research in the Interest of Society (CITRIS)" (*see*

3    Kasley Dec., Ex. 3 (www.ce.berkeley.edu/news/view.

4    php?item=47)).

5   In light of the foregoing information, and in an effort to avoid the disruption that might be caused

6   by serving numerous professors and students individually at the University, WGII drafted the

7   Subpoena so that it would include UC-Berkeley professors, as well as students:

8    3.    "ILIT" means the Independent Levee Investigation Team,

9    led by the University of California at Berkeley and funded in part

10    by the University of California at Berkeley's Center for Technology

11    Research in the Interest of Society ("CITRIS"); any of ILIT's

12    ***members***, employees, affiliates, ***representatives***, ***advisors***, agents,

13    attorneys or associates; ***or any other person acting on behalf of the***

14    ***ILIT*** in any capacity.

15    4.    "You," or "Your" means the ILIT and/or the University of

16    California at Berkeley's Center for Technology Research in the

17    Interest of Society ("CITRIS"), its predecessors, parents,

18    subsidiaries, affiliates, and any of its present or former directors,

19    officers, agents, employees, designees, assignees, ***representatives***

20    ***or other persons acting on its behalf***.

21   Kasley Dec., Ex. 1 (Subpoena at Schedule A at p. 2) (emphasis added).

22    At no time during the fourteen (14) day period mandated by Federal Rule of Civil

23   Procedure 45 did UC-Berkeley serve written objections to the Subpoena.  Instead, counsel for

24   UC-Berkeley contacted counsel for WGII for the first time on December 6, 2007 to discuss the

25   Subpoena.  *See* Kasley Dec., Ex. 7 (12/6/07 E-mail).  At that time, UC-Berkeley counsel

26   requested, and WGII granted, an extension of the December 19, 2007 deadline set in the

27   Subpoena until January 18, 2008 (four additional weeks) for the University to respond to the

28

4

1  Subpoena.  *Id.*[2]  UC-Berkeley counsel also mentioned the University's belief that ILIT "is not a

2  University of California at Berkeley entity," but stated that the University would, "however,

3  canvass UC Berkeley personnel who were members of the ILIT team to locate responsive

4  documents."  *Id.*[3]

5       WGII did not hear from UC-Berkeley counsel again until January 15, 2008, just days

6  before the already-extended January 18, 2008 deadline, at which time the University sought an

7  additional four-week extension, until February 8, 2008.  *See* Kasley Dec., Ex. 8 (1/15/08 E-mail).

8  UC-Berkeley counsel also stated that the University would not be producing documents from Prof.

9  Robert Bea, a co-author of the ILIT Report, because Prof. Bea had been retained by Plaintiffs in

10  connection with the *In Re: Katrina* litigation.  *Id.*  Counsel for WGII responded on January 18,

11  2008 that while WGII generally did not have an objection to the additional four weeks, because of

12  its concern with the timing of the request and fast-approaching fact discovery deadlines (*see, e.g.,*

13  CMO No. 4 (attached to Pl. Remit Mot. at Ex. A at p. 26 (setting March 20, 2008 for Final

14  Witness and Exhibit List Disclosures)), WGII requested that UC-Berkeley counsel represent that

15  the University had requested the extension in good faith—that it needed the extension in order to

16  collect responsive documents and not to get more time so that a motion to quash could be drafted.

17  *See* Kasley Dec., Ex. 9 (1/18/08 Ltr.).  Counsel for WGII also informed UC-Berkeley counsel that

18  WGII was not seeking any documents in Prof. Bea's possession, custody, or control as an expert

19  in the litigation, but instead, WGII sought only those documents in Prof. Bea's possession,

20

21       [2] While UC-Berkeley counsel's December 6, 2007 e-mail (Kasley Dec., Ex. 7) identifies

22  "January 19, 2007" as the extension deadline, that is obviously not correct.  The extension
granted by WGII was until Friday, January 18, 2008, not Saturday, January 19, 2008, as now
argued by Plaintiffs.  *See* Pl. Quash Mot. at p. 1.

23       [3] In an effort to avoid any further dispute as to the relationship between ILIT and UC-

24  Berkeley, on January 30 and 31, 2008, WGII served third-party subpoenas in connection with *In
re: Katrina Canal Breaches Consol. Litig.*, Civil Action No. 05-4182 (BARGE) (E.D. La.) on

25  four (4) UC-Berkeley professors identified as ILIT team members:  i) Robert Bea; ii) Raymond
Seed; iii) Jonathan Bray; and iv) Michael Riemer.  A fifth UC-Berkeley professor and ILIT team

26  member (Juan Pestana) was served on February 4, 2008.  These subpoenas were served in the
BARGE category of Hurricane Katrina cases (to which WGII is also a defendant), as opposed to

27  the MR-GO category of cases in which WGII served the instant Subpoena.  These BARGE
subpoenas were served on each individual as a member of ILIT, and with respect to Robert Bea,

28  made clear that the subpoena directed to him was not served in connection with or seeking
documents concerning his role as an expert retained by any party to the litigation.

SFI-578013v2

5

1    custody, or control as an ILIT member and co-author of the ILIT Report.  *Id.*

2        UC-Berkeley counsel was unwilling to make the requested representation.  *See* Kasley

3    Dec., Ex. 10 (1/18/08 E-mail).  Instead, UC-Berkeley counsel responded on January 18, 2008 by

4    arguing that the University had somehow been given the approval for unlimited extensions no

5    matter what the circumstances.  *Id.*  UC-Berkeley counsel also informed WGII for the very first

6    time on January 18, 2008 (two months after receiving the Subpoena) that ILIT "no longer exists,

7    and the subpoena is therefore defective."  *Id.*  WGII soon received confirmation of what it had

8    suspected—that UC-Berkeley counsel requested the additional four-week extension until

9    February 8, 2008 not for the University to continue to collect responsive documents (a good faith

10   request), but instead, so that Plaintiffs' counsel could finalize a motion to quash, a draft copy of

11   which WGII counsel received the evening of January 18, 2008, after the close of business, and

12   only after requesting some explanation from Plaintiffs' counsel.  *See* Kasley Dec., Ex. 11

13   (1/18/08 E-mail exchange and attached draft motion to quash).[4]

14       On January 22, 2008, counsel for WGII again attempted to explain to both Plaintiffs'

15   counsel and to UC-Berkeley counsel that WGII was not seeking any documents from Prof. Bea as

16   an expert in this litigation.  *See* Kasley Dec., Exs. 12 (1/22/08 E-mail) and 13 (1/22/08 Ltr.).  In

17   this regard, counsel for WGII explained to UC-Berkeley counsel that Prof. Bea had testified in a

18   deposition as recently as November 19, 2007, that he had spent over 5,000 pro bono hours in

19   connection with his ILIT work, that his ILIT work continued as of that date, and that he was not

20   retained by Plaintiffs as an expert until March, 2007.  *Id.  See also* Kasley Dec., Ex. 14 (excerpts

21   of 11/19/07 Bea Tr. at 125:22-126:8 (testifying that he had billed a total of 750 hours to Plaintiffs

22   in this litigation since being hired as an expert in March, 2007); 126:23-127:2 (testifying that the

23

---

24       [4] The draft motion to quash provided by Plaintiffs' counsel to WGII on the evening of
     January 18, 2008 contains the same assertion contained in Plaintiffs' Quash Motion filed in this
25   Court that "an additional agreement [between WGII and UC-Berkeley counsel] allowed for a
     further extension until February 8, 2008" and that WGII had somehow "rescinded" that
26   agreement.  *See* Kasley Dec., Ex. 11 (draft motion at p. 2) and Pl. Quash Mot. at p. 1.  This is
     nothing more than a complete fabrication—no such agreement was ever reached.  *See* Kasley
27   Dec., Exs. 9 and 10.  It is unclear why Plaintiffs have made such an unsupportable
     misrepresentation, other than in an effort to discredit WGII before this Court, but no such
28   agreement was ever made.  In fact, the University has conceded that no such agreement ever
     existed.  *See* Kasley Dec., Ex. 17 (1/22/08 E-mail).

1    hours he had spent "on the ILIT report" were not hours he was billing to Plaintiffs); 127:6-15

2    (testifying that he keeps track separately of his hours as an expert and his ILIT hours, which at the

3    time of his deposition totaled "[a]pproximately 5,530"); and 128:6-13 (testifying that his 5,000-

4    plus hours of ILIT time are pro bono)).  In response, Plaintiffs asserted that WGII had somehow

5    created a "hostile environment" (*see* Kasley Dec., Ex. 15 (1/22/08 E-mail)) and further, that

6    WGII "call off the dogs" because the Plaintiffs had "filed appropriate motions" (*see* Kasley Dec.,

7    Ex. 16 (1/23/08 E-mail)).  UC-Berkeley counsel responded again that "[t]here is no 'ILIT' at the

8    University of California from which documents could be produced" and notified WGII that given

9    the parties' "inability to reach agreement on terms for the voluntary collection of documents from

10   individual UC Berkeley personnel," that UC-Berkeley counsel "will inform those individuals that

11   they may discontinue their collection efforts."   *See* Kasley Dec., Ex. 17 (1/22/08 E-mail).

12        As of January 23, 2008, WGII still had no confirmation, despite its best efforts, of any

13   filing in the Northern District of California, and as such, counsel for WGII responded to the

14   University.  Specifically, WGII recounted that it had already agreed in good faith to eight (8)

15   weeks for the University to respond to the Subpoena even ***after*** the fourteen-day window for

16   written objections had passed under Federal Rule of Civil Procedure 45, and once again,

17   reiterated that it was not seeking any documents from Prof. Bea after his retention as an expert in

18   this litigation in March, 2007, and that WGII remained willing to enter into a stipulation to that

19   effect.  *See* Kasley Dec., Ex. 18 (1/23/08 Ltr.).  Given that WGII at least understood that motion

20   practice had been initiated, WGII informed UC-Berkeley counsel that it would seek appropriate

21   relief with this Court (which it is now doing), and that with respect to counsel's instruction to

22   individual UC-Berkeley professors and possibly others "that they may discontinue collection

23   efforts," WGII reserved its rights concerning possible spoliation of evidence.  *Id.*

24        On January 23, 2008, UC-Berkeley counsel responded that WGII had "grossly

25   misunderstood" counsel's instruction to individual UC-Berkeley professors and possibly others

26   concerning document collection efforts and notified WGII that "UC Berkeley personnel who

27   were on the ILIT (with the exception of Prof. Bea) will continue to collect documents responsive

28   to [a] similar subpoena issued by Lafarge North America, Inc., which has agreed to a February 8,

1   2008, response date."  Kasley Dec., Ex. 19 (1/23/08 Ltr.).  On January 24, 2008, WGII finally

2   received confirmation from Plaintiffs of the filing of Plaintiffs' motions.  *See* Kasley Dec., Ex. 20

3   (1/24/08 E-mail and attachments).

4        The motion practice, including WGII's cross-motion to compel, commenced thereafter.

5                                    **ARGUMENT**

6        Plaintiffs' motions are so procedurally and factually flawed that WGII almost does not

7   know where to begin.  Some of WGII's arguments in opposition overlap between Plaintiffs'

8   motions (for example, if Plaintiffs' Quash Motion is deficient, then arguably, there is nothing to

9   consider "remitting"), and WGII will do its best to identify where arguments apply to one motion,

10  the other, or both.  The most logical place to start for purposes of this introduction is with the

11  "Remit" Motion because if the Court decides to "remit" the Quash Motion, which WGII

12  respectfully submits it should not, then WGII's arguments with respect to the deficient Quash

13  Motion will likely not be resolved by this Court.

14       As to the "Remit" Motion, the Court should deny the motion because it:  i) has no basis in

15  the law; ii) is untimely (as is the Quash Motion); and iii) Plaintiffs' unsupported assertions to the

16  contrary, Plaintiffs do not have standing to bring the Quash Motion, and as such, Plaintiffs do not

17  have standing to bring the "Remit" Motion.

18       As to the Quash Motion, WGII respectfully submits that the Court should deny the motion

19  because it:  i) is untimely; and ii) Plaintiffs' arguments do not demonstrate that Plaintiffs have

20  standing to bring the Quash Motion and further, do not provide any legal basis to support the

21  Quash Motion.

22       WGII also counter-moves to compel UC-Berkeley to comply with the Subpoena for the

23  following reasons:  i)  UC-Berkeley has waived any objections to the Subpoena; ii) even if UC-

24  Berkeley had not waived its objections, the objections are meritless; and iii) UC-Berkeley should

25  be compelled to comply with the Subpoena because it seeks relevant and critical documents.

26  **I.**   **Plaintiffs' "Remit" Motion Has No Support in the Law, And Therefore, Should Be**

27       **Denied.**

28       Interestingly, while the WGII Subpoena was served upon UC-Berkeley pursuant to

1  Federal Rule of Civil Procedure 45, as required by CMO No. 4, Plaintiffs' "Remit" Motion does

2  not cite Rule 45 even once in its analysis.  Instead, Plaintiffs rely on Federal Rules of Civil

3  Procedure 37 and 26.  *See* Pl. Remit Mot. at p. 2 (citing Fed. R. Civ. P. 37(a)(1) and 26(c)).

4  Inexplicably, Plaintiffs ignore the plain language of Rule 45 which requires in pertinent part that

5  "[o]n timely motion, ***the court by which a subpoena was issued*** shall quash or modify the

6  subpoena," Fed. R. Civ. P. 45(c)(3)(A) (emphasis added), and instead cite to provisions governing

7  "an application for an order to a ***deponent*** who is not a party" and "matters relating to a

8  ***deposition***."  Pl. Remit Mot. at 2 (emphasis added).  Quite simply, the Rules cited by Plaintiffs

9  concerning depositions are not applicable.  Plaintiffs ignore the plain language of Rule 45 and

10 ignore clear black letter law that "[i]f a subpoena is issued by a district court other than the one in

11 which the case is pending, ***the proper court*** in which to file a motion to quash or modify the

12 subpoena ***is the issuing court***, ***not the court in which the action is pending***."  9 James Wm.

13 Moore et al., *Moore's Federal Practice* § 45.50[4], at 45-81 (3d ed. 2007) (emphasis added)

14 (citations omitted).

15     The Subpoena (Kasley Dec., Ex. 1) clearly reflects that it was ***not*** issued by the Eastern

16 District of Louisiana; instead, WGII properly caused it to be issued from the Northern District of

17 California because that is where the University is located and from where production would be

18 made.  *See* Fed. R. Civ. P. 45 (a)(2)(C).  Yet, the relief sought by Plaintiffs in the "Remit"

19 Motion—to have the court in which the case is pending (the Eastern District of Louisiana), as

20 opposed to the court that issued the subpoena (this Court), quash or modify the WGII

21 Subpoena—directly contravenes the plain language of Rule 45 and long-standing treatment of

22 Rule 45.  Therefore, because Plaintiffs' "Remit" Motion seeks to have relief granted that is not

23 contemplated by Rule 45, the Rule applicable to the Subpoena, WGII respectfully requests that

24 this Court reject the "Remit" Motion as improper.  *In re Sealed Case*, 141 F.3d 337, 341 (D.C.

25 Cir. 1998) (granting mandamus, noting the "text [of Rule 45] offers no authorization to transfer a

26 motion to quash and seems at least implicitly to forbid it" and "[a]ll of this language [of Rule 45]

27 suggests that ***only the issuing court has the power to act on its subpoenas***") (emphasis added);

28 *Union Pac. R.R. Co. v. Mike's Train House, Inc.*, 2006 WL 1134781, at *3 (D. Neb. Apr. 25,

1    2006) (holding "Rule 45 clearly delegates the responsibility of enforcing, quashing, or modifying

2    subpoenas to 'the court by which [the] subpoena was issued'") (citing Fed. R. Civ. P.

3    45(c)(3)A)).[5]

4    **II.    Plaintiffs' Motions Are Untimely, and Are Therefore Improper.**

5         Plaintiffs mention in both the "Remit" and the Quash Motions that the WGII Subpoena to

6    ILIT is somehow a "subversive" effort to gain access to expert discovery ahead of the deadlines

7    set in CMO No. 4.  *See, e.g.,* Pl. Remit Mot. at pp. 1 and 3; Pl. Quash Mot. at pp. 1 and 3.  Putting

8    aside for the moment that WGII has now ***repeatedly*** assured Plaintiffs' and UC-Berkeley counsel

9    that WGII does not seek a single shred of paper from Prof. Bea in his capacity as an expert after

10   his retention in March, 2007, Plaintiffs received notice of the WGII Subpoena on November 19,

11   2007, but did nothing about the Subpoena until January 22, 2008—a full two months later.  There

12   is nothing "subversive" about a subpoena Plaintiffs have known about for months.  Moreover,

13   Rule 45 makes clear:  "the court by which a subpoena was issued shall quash or modify the

14   subpoena" only upon a "***timely*** motion."  Fed. R. Civ. P. 45(c)(3)(A) (emphasis added).  Because

15   Plaintiffs waited to file their motions until ***after*** the January 18, 2008 production date, Plaintiffs'

16

17         [5] Although not raised by Plaintiffs at all, WGII recognizes that "there is authority that a
     motion to quash or modify a subpoena may be ***transferred*** from the issuing court to the court in

18   which the action is pending."  *Moore et al.*, *supra*, § 45.50[4], at 45-81 (citations omitted)
     (emphasis added).  However,

19
                   That interpretation contravenes the text of Rule 45, and is
20                 problematic because the requirement to seek relief in the issuing
                   court is designed to serve the convenience of the person [actually]
21                 subject to the subpoena, who is presumably in the forum of the
                   issuing court[, as is true here].  Transferring the dispute to the
22                 district in which the underlying action is pending undermines the
                   convenience rationale, . . . .  Accordingly, there is contrary and
23                 preferable authority that a motion to quash or modify may not be
                   transferred, at least not over the objection of the person subject to
24                 the subpoena, and instead must be heard and resolved by the issuing
                   court.

25   *Id.* at 45-81-82.  Given that Plaintiffs have offered no sound legal support for the "Remit" Motion,
     UC-Berkeley has not consented to any such "remit," and in light of the "contrary and preferable
26   authority" that this Court is the only proper court to consider Plaintiffs' Quash Motion, the
     "Remit" Motion should be denied.  *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal*
27   *Practice and Procedure* § 2463.1, at 485 (3d ed. 2008) (noting it "makes considerable sense" and
     is "now . . . clear that motions to quash, modify, or condition the subpoena are to be made in the
28   district court of the district from which the subpoena issued").

SFI-578013v2                                    10         WASHINGTON GROUP INTERNATIONAL, INC.'S
                                                            NOTICE AND MEMORANDUM IN OPPOSITION TO
                                                            MOTIONS AND CROSS-MOTION TO COMPEL

1    motions (both "Remit" and Quash) are not timely, and as such, this Court should reject them.  *See*

2    *Burroughs Corp. v. Dataware Sources, Inc.*, 1987 WL 10190, at *1-2 (D. Mass. Apr. 28, 1987)

3    (denying motion to quash and ruling, under prior version of Rule 45 requiring that a motion to

4    quash be filed "promptly," that the "motion was not made promptly" because "[i]t was not served

5    until a month after the subpoena issued and only four days before the date on which production

6    was to take place . . . ."; and noting that "[t]he purpose of the requirement that such motions be

7    made 'promptly' is to avoid last-minute filings which have the effect of delaying the . . .

8    document production").  *See also Tutor-Saliba Corp. v. United States*, 30 Fed. Cl. 155, 156 (Ct.

9    Fed. Cl. 1993) (holding that the "most reasonable construction of [Rule 45 of the Rules of the

10   United States Court of Federal Claims, which mirrors Rule 45 of the Federal Rules of Civil

11   Procedure] is to read [Rule 45(c)(2), which sets fourteen (14) days following service of a

12   subpoena as the deadline for written objections, and Rule 45(c)(3)'s timeliness requirement]

13   together; thus, motions to quash must be filed within fourteen days of service").

14   **III.    Plaintiffs Simply Do Not Have Standing to Bring Either the Motion to Quash or**
     **"Remit," And As Such, Both Motions Should Be Rejected.**

15

16          In both the "Remit" and Quash Motions, Plaintiffs aver that they have standing to contest

17   the WGII Subpoena because Plaintiffs have "a right of privilege with regard to the documents

18   sought because the subpoena issued by WGII is simply a subversive attempt to obtain information

19   developed by Plaintiffs [sic] expert Robert Bea outside the permissible scope of discovery."  Pl.

20   Remit Mot. at pp. 2-3; Pl. Quash Mot. at 3.  Plaintiffs' alleged "subversive attempt to obtain

21   expert information" argument, even if it was true (which clearly, it is not), is simply not a

22   "privilege" necessary to support standing for a motion to quash.  *See, e.g., Estate of Ungar v.

23   Palestinian Auth.*, 400 F. Supp. 2d 541, 554 (S.D.N.Y. 2005) (denying motion to quash for lack

24   of standing where "[i]n the absence of a claim of privilege, a party usually does not have standing

25   to object to a subpoena directed to a non-party witness" and moving party "has not raised any

26   such claims of evidentiary privilege"); *Nova Prod., Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238,

27   241 (S.D.N.Y. 2004) (denying motion by individual defendants to quash nonparty subpoena

28   where the defendants "claim that the information at issue [sought by the nonparty subpoena] is

1   'proprietary and confidential,' [but] they do not assert any privilege" with respect to the

2   information); *E.E.O.C. v. Danka Indus., Inc.*, 990 F. Supp. 1138, 1141 (E.D. Mo. 1997) (denying

3   plaintiffs' motions to quash and for a protective order in connection with third-party subpoenas

4   seeking plaintiffs' employment and educational records because "plaintiffs do not assert any

5   claim of privilege with respect to the subpoenaed documents and, as such, they have no standing

6   to request that the subpoenas be quashed") (citations omitted); *Diamond State Ins. Co. v. Rebel*

7   *Oil Co.*, 157 F.R.D. 691, 698-99 (D. Nev. 1994) (denying motions to quash because "general

8   conclusory allegations" are insufficient to support privilege claims).  As such, Plaintiffs'

9   desperate attempt to support standing to challenge the Subpoena, which, as recognized by

10  Plaintiffs normally does not extend to parties (Pl. Remit Mot. at 2; Pl. Quash Mot. at 2), should be

11  rejected.

12          Further, apparently offered both in support of their standing and as to the merits of the

13  Quash Motion, Plaintiffs allude to perceived burdens associated with the WGII Subpoena.  *See,*

14  *e.g.,* Pl. Remit Mot. at 3 (offering that ILIT "has now been disbanded"); Pl. Quash Mot. at 4

15  (offering that the "subpoena in question saddles the University of California at Berkeley with an

16  unreasonably burdensome task to produce information subject of [sic] the subpoena because the

17  ILIT Team no longer exists").[6]  Plaintiffs do not argue, however, that the burden is on them.  In

18  fact, Plaintiffs make clear that the burden they offer is apparently on the University, which

19  incidentally, has never objected to the Subpoena because of undue burden.  Plaintiffs do not have

20  standing to offer undue burden on the University as the reason to quash the WGII Subpoena.  *See*

21  *Moore et al.*, *supra*, § 45.50[3], at 45-79 (noting that "a party to the action does not have standing

22  to assert any rights of the nonparty as a basis for a motion to quash or modify a subpoena")

23  (citations omitted).  As such, they cannot offer any perceived undue burden on the University in

24  support of the merits of their Quash Motion.[7]  Moreover, while Plaintiffs make no effort to

25  _____

26          [6] Interestingly, Plaintiffs' (as well as UC-Berkeley's) argument that ILIT "no longer
    exists" is flatly contradicted by the November 19, 2007 of Prof. Robert Bea, one of Plaintiffs'
27  experts, that as of the date of his deposition, he continues his ILIT work.  *See* Kasley Dec., Exs.
    13 and 14.

28          [7] In any event, Plaintiffs' "undue burden on UC-Berkeley argument" is completely
    undermined by the fact that the University has already informed WGII that it is collecting the

12

1    actually explain their position or even identify which of "the 'specifications of documents to be

2    produced'" suffer from the alleged flaw that "WGII has given little consideration to the relevance

3    of its requests" and that "[t]he information sought by WGII is . . . irrelevant to the litigation at

4    hand" (Pl. Quash Mot. at p. 5), it does not matter because a party simply may not move under

5    Rule 45 to quash a subpoena directed to a third party on the ground that the material sought is

6    irrelevant.  *See Windsor v. Martindale*, 175 F.R.D. 665, 668 (D. Colo. 1997) (rejecting motion to

7    quash where defendant objected on relevance grounds, "objections that can only be raised by [the

8    recipients of the third-party subpoenas]"); *Smith v. Midland Brake, Inc.*, 162 F.R.D. 683, 685 (D.

9    Kan. 1995) (noting, while denying defendant's motion to quash where defendant argued that the

10   challenged subpoena sought irrelevant documents, that "Fed. R. Civ. P. 45(c)(3)(A) enumerates

11   four circumstances under which the court may enter an order quashing or modifying a subpoena"

12   and ruling that defendant "has failed to establish that any of the circumstances set forth in the

13   Rule are applicable").  Thus, Plaintiffs' undue burden and relevance arguments in support of the

14   "Remit" and Quash motions ring hollow, and as such, WGII respectfully requests that the Court

15   deny both motions.

16   **IV.    WGII's Cross-Motion to Compel Compliance With the Subpoena Should Be**

17   **Granted.**

18          As an initial matter, Rule 45 is clear that in order to simply not produce documents in

19   response to a subpoena (as UC-Berkeley has proceeded here), a third party must object in writing

20   within fourteen (14) days of service of the subpoena.  *See* Fed. R. Civ. P. 45(c)(2)(B).  WGII

21   served the Subpoena on UC-Berkeley on November 19, 2007.  *See* Kasley Dec., Ex. 1.  Thus, if

22   the University had objections to the Subpoena, it was required to provide them in writing no later

23   than December 3, 2007—fourteen (14) days after November 19, 2007.  *See* Kasley Dec., Ex. 13

24

25   _____

     (continued…)

26   very documents sought by WGII (except those from Prof. Bea) for production on February 8,
     2008 to another party.  *See* Kasley Dec., Ex. 19 (1/23/08 Ltr.) ("UC Berkeley personnel who were
27   on the ILIT (with the exception of Prof. Bea) will continue to collect documents responsive to the
     similar subpoena issued by Lafarge North America, Inc., which has agreed to a February 8, 2008,
28   response date").

1   (1/22/08 Ltr.).  UC-Berkeley failed to do so.  In fact, UC-Berkeley counsel did not even contact

2   WGII until December 6, 2007, after the deadline for written objections had passed, and only to

3   request an extension of the original December 18, 2007 return date until January 18, 2008.  *See*

4   Kasley Dec., Ex. 7.[8]  As such, UC-Berkeley has waived any objections it may now attempt to

5   belatedly assert.  *See, e.g. McCoy v. Southwest Airlines Co.*, 211 F.R.D. 381, 385 (C.D. Cal. 2002)

6   (holding that "[f]ailure to serve timely objections waives all grounds for objection, including

7   privilege"); Moore et al., *supra*, § 45.41[1][c], at 45-72 (noting that "[i]f no timely written

8   objection is served, the person subject to the subpoena generally waives any objection to

9   production or inspection as commanded by the subpoena") (citations omitted).  Therefore,

10  because UC-Berkeley has not objected to the Subpoena in writing as required, it should be

11  compelled to comply with the Subpoena.

12       Even if, for the sake of argument, UC-Berkeley somehow did not waive its objections by

13  failing to serve them in writing as required within fourteen (14) days of the Subpoena, any such

14  objections would be without merit.  For example, it is likely that UC-Berkeley will respond to this

15  cross-motion arguing that ILIT is not a "UC-Berkeley entity."  *See, e.g.,* Kasley Dec., Ex. 7

16  (12/6/07 E-mail); Ex. 10 (1/18/08 E-mail).  While it may be technically accurate that one cannot

17  find ILIT identified in a UC-Berkeley organizational chart as an "entity" of the University, as set

18  forth above, the University has repeatedly made clear its very close relationship with ILIT.

19  Specifically, the ILIT Report itself in its first few pages states that ILIT was "led" by UC-

20  Berkeley.  *See* Kasley Dec., Ex. 2.  Two UC-Berkeley professors, Raymond B. Seed and Robert

21  G. Bea, authored the ILIT Report and are prominently identified as such in the UC-Berkeley Civil

22  and Environmental Engineering Department website.  *See* Kasley Dec., Ex. 3.  The UC-Berkeley

23  Civil and Environmental Engineering Department website also reports that CITRIS, undeniably a

24  "UC-Berkeley entity," "sponsored" and funded ILIT.  *See* Kasley Dec., Exs. 3 and 6.  In this

25  regard, upon the release of a draft Final ILIT Report in May, 2006—a copy of which is available

26

_____

27       [8] Even if UC-Berkeley were to claim now it raised an objection that ILIT is not a
    "University entity" on December 6, 2007 and that this somehow satisfied Rule 45's written
    objection requirement, that objection was untimely, and even if it was not untimely, as discussed
28  below, it is belied by the facts as reported by the University to the public.

SFI-578013v2                                    14        WASHINGTON GROUP INTERNATIONAL, INC.'S
                                                          NOTICE AND MEMORANDUM IN OPPOSITION TO
                                                          MOTIONS AND CROSS-MOTION TO COMPEL

1    at the "ILIT DOWNLOAD CENTER," courtesy of the UC-Berkeley Civil and Environmental

2    Engineering Department website (*see* Kasley Dec., Ex. 5)—the University announced that the

3    Report was funded with $280,000, $50,000 of which came from "UC Berkeley's Center for

4    Technology Research in the Interest of Society (CITRIS)." *See* Kasley Dec., Ex. 21

5    (www.berkeley.edu/news/media/releases/2006/05/04_leveereport.shtml).  Moreover, Robert Bea,

6    a UC-Berkeley professor, has touted the critical role that the University, through CITRIS, would

7    play in connection with ILIT:  "We need to go to ground zero to gather data and preserve the

8    things that can get trashed or lost (in the recovery effort), . . . .  CITRIS can help to preserve and

9    analyze this data."  Kasley Dec., Ex. 4 (quoting Prof. Robert Bea at p. 2).  In this respect, of the

10    35 ILIT members, fifteen (15) are UC-Berkeley professors or students—nearly half the total

11    membership of ILIT.  *See* Kasley Dec., Exs. 2 and 3.  No other entity identified more than five (5)

12    ILIT representatives.  *See* Kasley Dec., Ex. 2.

13      These statements to the public are clear and unmistakable and should bind the University.

14    Nearly 20% of ILIT's funding came from UC-Berkeley.  Almost 50% of the ILIT team came

15    from UC-Berkeley.  Two UC-Berkeley professors co-authored the ILIT Report.  The relationship

16    between UC-Berkeley and ILIT was so evident that on August 31, 2005—just days after

17    Hurricane Katrina passed near New Orleans—the University issued a press release making Prof.

18    Robert Bea "available for media interviews related to the aftermath of Hurricane Katrina."  *See*

19    Kasley Dec., Ex. 22 (8/31/05 UC-Berkeley Press Release issued 9/1/05).  Its protestations now in

20    the face of the Subpoena to the contrary, the University cannot for years tout its close relationship

21    with ILIT and in good faith now object to the Subpoena on the grounds that ILIT is not a "UC-

22    Berkeley entity."  Any such objection now would be meritless and should be rejected by this

23    Court.

24      Because it has not properly objected in writing to the Subpoena, WGII does not know

25    whether UC-Berkeley will attempt to argue that the information sought by the Subpoena is

26    somehow not relevant.  Notwithstanding any such belated argument, WGII offers the following

27    overview of the clear relevance of the information sought from ILIT:

28      With respect to WGII, Plaintiffs have alleged that in an area along the Industrial Canal

1   (also known as the Inner Harbor Navigation Canal or "IHNC") in New Orleans called the "East

2   Bank Industrial Area," WGII, through environmental remediation work performed for the U.S.

3   Army Corps of Engineers between 2001 and 2005, "undermined the integrity of the levee, and/or

4   flood wall along the eastern shoreline of the IHNC/Industrial Canal, abutting the Lower Ninth

5   Ward of Orleans Parish," and because of WGII's acts and/or omissions "underseepage-induced

6   erosion and other damage to the levee and/or flood wall [resulted], ultimately causing and/or

7   contributing to its catastrophic failure."  *See* Kasley Dec., Ex. 23 (excerpts from MR-GO Master

8   Consolidated Class Action Complaint ¶¶ 40-45).

9           WGII has been largely unable to test Plaintiffs' allegations because in response to what

10  the Eastern District has labeled "common liability" discovery, Plaintiffs have referred WGII back

11  to the ILIT Report in response to no fewer than 70 separate discovery requests, without

12  identifying where in the 1,300-page Report Plaintiffs rely.  *See, e.g.* Kasley Dec., Ex. 24 (excerpts

13  from Plaintiffs' Response to MRGO Defendants' First Set of Joint Interrogatories, Requests for

14  Production of Documents and Requests for Admissions to Plaintiffs Regarding Common Liability

15  Issues at Response to Interrogatory Nos. 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 22, 23, 25, 26,

16  27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, and 43; and Response to Document

17  Request Nos. 1, 4, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 26, 27, 28, 29, 31, 32,

18  33, 34, 35, 38, 47, 48, 49, 53, 54, 55, 56, 57, 58, 60, 61, and 62).  Thus, WGII does not know

19  what in particular in the ILIT Report Plaintiffs allege supports their claims.

20          WGII does know that much attention has been paid to statements in the July 31, 2006

21  Final ILIT Report that "persistent reports of underseepage and ponding of waters along this IHNC

22  frontage at the west edge of the Lower Ninth Ward, and contractor's significant problems with

23  dewatering of excavations along this same frontage, all bespoke of high lateral permeability

24  within these strata."  Kasley Dec., Ex. 25 (excerpts of ILIT Final Report at p. 6-12).  Importantly,

25  the "IHNC frontage" mentioned in the ILIT Report refers to the southern of two levee / flood wall

26  breaches (one referred to as the "North Breach" and the other the "South Breach") within the East

27  Bank Industrial Area near where WGII performed its environmental remediation work for the U.S.

28  Army Corps of Engineers.  Even more importantly, the ILIT Report identifies a contractor named

1   McElwee Brothers, Inc. as a source of the aforementioned reports of "significant problems

2   dewatering excavations" along the "same frontage" where the Southern Breach occurred:

3             Demonstration that underseepage occurred at this site [the site of

4             the Southern Breach in the Industrial Canal] . . . can also be based

5             on the observed difficulties encountered by McElwee Construction

6             [sic] in dewatering an excavation near the breach site immediately

7             to the north (due to massive underseepage flow through the marsh

8             depositions that were not adequately cut off at that site either).

9   *Id*. at p. 6-15.  With respect to the North Breach, the ILIT Report again cites to McElwee Brothers,

10  Inc.'s experiences in that area:  "This site [of the North Breach] has a well-documented history of

11  underseepage problems; McElwee Construction [sic] had great difficulty dewatering an

12  excavation ***at this site*** during earlier construction, and residents of the neighborhood had also

13  previously reported problems with seepage at the inboard toe."  *Id*. at p. 6-18 (emphasis added).

14  There is no dispute that the ILIT Report relied upon information provided by McElwee Brothers,

15  Inc. in reaching its conclusions as to the cause, timing, and mode of failures of the levee and/or

16  floodwalls adjacent to the East Bank Industrial Area (the North and South Breaches).  Further,

17  Plaintiffs have clearly relied on the ILIT Report's conclusions in support of the allegations

18  against WGII.  As such, the information sought by WGII is clearly relevant and therefore

19  discoverable from ILIT.[9]

20         Moreover, the information sought is further relevant and critical to WGII's defense of

21  Plaintiffs' allegations because WGII has learned through third-party discovery from McElwee

22  Brothers, Inc. that, contrary to the ILIT Report's conclusions, "McElwee Bros. ***has not conducted***

23

24         [9] In particular, Specification Nos. 1 (eyewitnesses or other interviews concerning
    difficulty dewatering excavations), 2 (reports of underseepage), 3 (complaints of underseepage), 4
25  (as well as 10) (what theories of failure were examined), 5 (whether WGII was made aware of
    underseepage), 6 (whether anyone else was made aware of underseepage), 7 (ILIT requests for
26  information from McElwee), and 8 (information provided by McElwee to ILIT) of the WGII
    Subpoena all seek information concerning underseepage, communications with McElwee or
27  others about underseepage, and whether ILIT investigated theories other than underseepage—
    topics clearly relevant to Plaintiffs' claims against WGII and Plaintiffs' reliance on the ILIT
28  Report.

1    *or attempted to conduct dewatering procedures along the Industrial Canal's east bank between*

2    *Florida and Claiborne avenues*," the northern and southern boundaries, respectively, of the East

3    Bank Industrial Area.  *See* Kasley Dec., Ex. 26 (11/19/07 Responses to Subpoena Requiring the

4    Production of Documents at p. 3) (emphasis added).  Further, WGII has learned that along with

5    dewatering procedures, "McElwee Bros. has not conducted or attempted to conduct excavations

6    along the Industrial Canal's east bank between Florida and Claiborne avenues"—again, in

7    apparent contradiction of the conclusions contained in the ILIT Report. *Id.*  Obviously, these

8    revelations are very important to WGII and are clearly relevant to Plaintiffs' allegations

9    concerning WGII and as such, the discovery sought from ILIT is proper.[10]  Indeed, in response to

10   the third party discovery WGII propounded on McElwee Brothers, Inc., in addition to producing

11   some information, McElwee informed WGII "Dr. Bea is the best source for this information."

12   Kasley Dec., Ex. 26 (at p. 2).[11]  Given that Plaintiffs have clearly relied on the ILIT Report in

13   support of allegations against WGII, and as noted above, some of those very conclusions have

14   been cast into doubt by other discovery in this matter, the discovery sought by WGII from ILIT is

15   clearly relevant, and as such, ILIT should be compelled to comply with the Subpoena.[12]

16                                         **CONCLUSION**

17         Rather than dealing with the WGII Subpoena in a timely fashion, Plaintiffs waited until

18   *after* the last minute to file a thinly-supported Quash Motion and completely unsupportable

19   "Remit" Motion.  In fact, Plaintiffs did not even take the time to cite to the Court the relevant

20   ───────────────────

21   [10] Plaintiffs' argument in support of the Quash Motion that discovery sought from ILIT
     somehow violates McElwee Brothers, Inc.'s "privacy interests" is specious in light of the fact that
22   McElwee has responded to WGII's discovery concerning its communications with the ILIT team,
     and Prof. Robert Bea in particular, including the production of some e-mails between McElwee
     and Prof. Bea.

23        [11] Notably, and in further support of WGII's position that UC-Berkeley cannot now
24   disavow its clear relationship with ILIT, when Prof. Robert Bea contacted Melvin M.L. McElwee,
     Sr. in May, 2006 and again in June, 2006 about the release of the Final ILIT Report, he directed
25   Mr. McElwee to the ILIT DOWNLOAD CENTER at www.ce.berkeley.edu/~ new_orleans. *See*
     Kasley Dec., Ex. 27 (6/22/06 E-mail).

26        [12] In particular, Specification Nos. 4 (and 10) (what theories of failure were examined), as
27   well as 9 (instances of disagreement among the ILIT members) of the Subpoena seek information
     concerning whether ILIT investigated theories other than underseepage and whether any ILIT
     member questioned what ILIT was being told by sources like McElwee—topics clearly relevant
28   to Plaintiffs' claims against WGII and Plaintiffs' reliance on the ILIT Report.

SFI-578013v2                                 18

1    Federal Rule of Civil Procedure or applicable case law.  Yet, the Plaintiffs accomplished what

2    they wanted:  further delay of WGII's discovery of relevant, critical information.  This

3    gamesmanship hinders WGII's good faith efforts to comply with the Eastern District of

4    Louisiana's Case Management Order deadlines.  For these reasons, and for the reasons set forth

5    above, Plaintiffs' "Remit" and Quash Motions should be denied.

6         Further, for the reasons set forth above, UC-Berkeley should be ordered to comply with

7    the Subpoena directed to ILIT and produce all responsive documents to WGII in an expeditious

8    fashion.

9    Dated:  February 5, 2008                    Respectfully submitted,

10

11                                    _____/S/ Aaron L. Agenbroad_____
                                     Aaron L. Agenbroad
12                                    alagenbroad@jonesday.com
                                     Jones Day
13                                    555 California Street
                                     26th Floor
14                                    San Francisco, CA  9401-1500
                                     Telephone:  (415) 626-3939
15                                    Facsimile:  (415) 875-5700

16                                    Of Counsel

17                                    Adrian Wager-Zito
                                     Shannon M. Kasley
18                                    Jones Day
                                     51 Louisiana Avenue, N.W.
19                                    Washington, D.C. 20001-2113
                                     Telephone:  (202) 879-3939
20                                    Facsimile:  (202) 626-1700

21                                    William D. Treeby, 12901
                                     Carmelite M. Bertaut, 3054
22                                    Heather S. Lonian, 29956
                                              Of
23                                    Stone Pigman Walther Wittmann L.L.C.
                                     546 Carondelet Street
24                                    New Orleans, Louisiana  70130
                                     Telephone:  (504) 581-3200
25                                    Facsimile:   (504) 581-3361

26                                    Attorneys for Washington Group
                                     International, Inc., a division of URS
27                                    Corporation

28