1  Aaron L. Agenbroad (State Bar No. 242613)
   alagenbroad@jonesday.com
2  JONES DAY
   555 California Street, 26th Floor
3  San Francisco, CA 94104
   Telephone:    (415) 626-3939
4  Facsimile:    (415) 875-5700

5  Attorneys for WASHINGTON GROUP
   INTERNATIONAL, INC., A DIVISION OF URS
6  CORPORATION

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

| 11 | **IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION** | **Case No. MISC. NO. 08-CV-80007MISC (PJH)** |
|----|----|----|
| 12 | | |
| 13 | **PERTAINS TO MR-GO** | **DECLARATION OF SHANNON M. KASLEY IN SUPPORT OF WASHINGTON GROUP INTERNATIONAL, INC.'S MEMORANDUM IN OPPOSITION TO MOTIONS OF MR-GO PLAINTIFFS TO QUASH, TO "REMIT," AND IN SUPPORT OF CROSS-MOTION TO COMPEL COMPLIANCE WITH THE SUBPOENA** |
| 14 | | |
| 15 | **(PENDING IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AS CIVIL ACTION NO. 05-4182 "K" (2) BEFORE HON. STANWOOD R. DUVAL, JR.,** | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | Date:      March 12, 2008 |
|    | | Time:      9:00 a.m. |
| 20 | | Courtroom: 3, 17th Floor |
|    | | Judge:     Hon. Phyllis J. Hamilton |
| 21 | | |

22        I, SHANNON M. KASLEY, declare:

23        1.      I am Of Counsel with the law firm of Jones Day, located at 51 Louisiana Avenue,

24  N.W., Washington, D.C. 20001, (202) 879-3710 (telephone), (202) 626-1700 (facsimile).  I am a

25  member in good standing of the bars of New York, New Jersey, and the District of Columbia, and

26  the United States District Court, Eastern District of Louisiana has granted me leave to appear in

27  this matter as a foreign attorney in the above-captioned matter.  I submit this Declaration in

28  support of WGII's Opposition to the motions of the MR-GO Plaintiffs to quash WGII's

1    November 19, 2007 Subpoena for the Production of Documents to the Independent Levee

2    Investigation Team ("ILIT"), led by the University of California at Berkeley ("UC-Berkeley")

3    and funded in part by the University of California at Berkeley Center for Technology Research in

4    the Interest of Society ("CITRIS") ("Subpoena" or "WGII Subpoena") and to "remit" the motion

5    to quash to the United States District Court for the Eastern District of Louisiana.  I also submit

6    this Declaration in support of WGII's Cross-Motion to Compel UC-Berkeley to Comply with the

7    Subpoena.  I have personal knowledge of the matters stated in this declaration.  Jones Day

8    represents Defendant Washington Group International, Inc. ("WGII") in the above-captioned

9    matter.  If called upon to do so, I could and would testify to all matters set forth herein.

10          2.       Attached as Exhibit 1 is a true and correct copy of WGII's November 19, 2007

11   Subpoena for the Production of Documents to the Independent Levee Investigation Team, led by

12   the University of California at Berkeley and funded in part by the University of California at

13   Berkeley Center for Technology Research in the Interest of Society

14          3.       Attached as Exhibit 2 is a true and correct copy of excerpts from ILIT July 31,

15   2006 Final Report.

16          4.       Attached as Exhibit 3 is a true and correct copy of a printout of the website page

17   www.ce.berkeley.edu/news/view.php?item=47.

18          5.       Attached as Exhibit 4 is a true and correct copy of a printout of the website page

19   www.berkeley.edu/news/media/ releases/2005/09/12_katrina.shtml.

20          6.       Attached as Exhibit 5 is a true and correct copy of a printout of the website page

21   "ILIT DOWNLOAD CENTER" via the UC-Bekeley Civil and Environmental Engineering

22   Department website at www.ce.berkeley.edu/~new_orleans/.

23          7.       Attached as Exhibit 6 is a true and correct copy of a printout of the website page

24   www.universityofcalifornia.edu/news/article/7524.

25          8.       Attached as Exhibit 7 is a true and correct copy of a 12/6/07 C. Patti E-mail to S.

26   Kasley.

27          9.       Attached as Exhibit 8 is a true and correct copy of a 1/15/08 C. Patti E-mail to S.

28   Kasley.

DECLARATION OF
SHANNON M. KASLEY

1    10.    Attached as Exhibit 9 is a true and correct copy of a 1/18/08 S. Kasley Ltr. to C.

2    Patti.

3    11.    Attached as Exhibit 10 is a true and correct copy of a 1/18/08 C. Patti E-mail to S.

4    Kasley.

5    12.    Attached as Exhibit 11 is a true and correct copy of a 1/18/08 E-mail exchange

6    between S. Joanen and W. Treeby and attached draft motion to quash.

7    13.    Attached as Exhibit 12 is a true and correct copy of a 1/22/08 W. Treeby E-mail to

8    S. Joanen.

9    14.    Attached as Exhibit 13 is a true and correct copy of a 1/22/08 S. Kasley Ltr. to C.

10   Patti.

11   15.    Attached as Exhibit 14 is a true and correct copy of excerpts of 11/19/07 Bea Tr. at

12   125:22-126:8 (testifying that he had billed a total of 750 hours to Plaintiffs in this  litigation since

13   being hired as an expert in March, 2007); 126:23-127:2 (testifying that the hours he had spent "on

14   the ILIT report" were not hours he was billing to Plaintiffs); 127:6-15 (testifying that he keeps

15   track separately of his hours as an expert and his ILIT hours, which at the time of his deposition

16   totaled "[a]pproximately 5,530"); and 128:6-13 (testifying that his 5,000-plus hours of ILIT time

17   are pro bono).

18   16.    Attached as Exhibit 15 is a true and correct copy of a 1/22/08 S. Joanen E-mail to

19   W. Treeby.

20   17.    Attached as Exhibit 16 is a true and correct copy of a 1/23/08 J. Bruno E-mail to

21   W. Treeby.

22   18.    Attached as Exhibit 17 is a true and correct copy of a 1/22/08 C. Patti E-mail to S.

23   Kasley.

24   19.    Attached as Exhibit 18 is a true and correct copy of a 1/23/08 S. Kasley Ltr. to C.

25   Patti.

26   20.    Attached as Exhibit 19 is a true and correct copy of a 1/23/08 C. Patti Ltr. to S.

27   Kasley.

28

DECLARATION OF
SHANNON M. KASLEY

21.    Attached as Exhibit 20 is a true and correct copy of a 1/24/08 S. Joanen E-mail and attachments to W. Treeby.

22.    Attached as Exhibit 21 is a true and correct copy of a printout of the website page www.berkeley.edu/news/media/releases/2006/05/04_leveereport.shtml.

23.    Attached as Exhibit 22 is a true and correct copy of a 8/31/05 UC Berkeley Press Release issued 9/1/05.

24.    Attached as Exhibit 23 is a true and correct copy of excerpts from MR-GO Master Consolidated Class Action Complaint at ¶¶ 40-45.

25.    Attached as Exhibit 24 is a true and correct copy of excerpts from Plaintiffs' Response to MRGO Defendants' First Set of Joint Interrogatories, Requests for Production of Documents and Requests for Admissions to Plaintiffs Regarding Common Liability Issues at Response to Interrogatory Nos. 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 22, 23, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, and 43; and Response to Document Request Nos. 1, 4, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 26, 27, 28, 29, 31, 32, 33, 34, 35, 38, 47, 48, 49, 53, 54, 55, 56, 57, 58, 60, 61, and 62.

26.    Attached as Exhibit 25 is a true and correct copy of excerpts of ILIT July 31, 2006 Final Report.

27.    Attached as Exhibit 26 is a true and correct copy of Responses to Subpoena Requiring the Production of Documents Dated November 19, 2007.

28.    Attached as Exhibit 27 is a true and correct copy of a June 22, 2006 R. Bea E-mail to M.L. McElwee.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.  Executed this 5th day of February, 2008 at Washington, District of Columbia.

_____/S/ Shannon M. Kasley_____
Shannon M. Kasley

SFI-578032v1

DECLARATION OF
SHANNON M. KASLEY

1           I hereby attest that I have on file all holograph signatures for any signatures indicated by a

2    "conformed" signature (/S/) within this efiled document.

3

4    Dated:  February 5, 2008                                    /S/ Aaron L. Agenbroad

5                                                                         Aaron L. Agenbroad

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF
SHANNON M. KASLEY

**EXHIBIT 1**

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

Northern                           DISTRICT OF                              California

In Re: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION
V.

**SUBPOENA IN A CIVIL CASE**

Pertains to: MRGO

Case Number:[1]   05-4182 "K" (2)

TO: Independent Levee Investigation Team
University of California at Berkeley
Center for Technology Research in the Interest of Society
281 Hearst Memorial Mining Building, UC Berkeley
Berkeley, CA  94720-1764

(pending in the United States
District Court for the Eastern
District of Louisiana before the
Hon. Stanwood R. Duval, Jr.)

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE          Jones Day<br>555 California Street, 26th Floor, San Francisco, CA 94104-1500 | DATE AND TIME<br>12/19/2007 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>11/19/2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Aaron L. Agenbroad, Jones Day, 555 California Street, 26th Floor, San Francisco, CA 94104-1500, (415-626-3939)
Counsel for Washington Group International, Inc.

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

B 255 (11/91) (cont.)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | 11-19-07 AT 11:40AM | INDEPENDENT LEVEE INVESTIGATION TEAM UNIVERSITY OF CALIFORNIA AT BERKELEY CENTER FOR TECHNOLOGY RESEARCH IN THE INTEREST OF SOCIETY 281 HEARST MEMORIAL MINING BUILDING, UC BERKELEY BERKELEY, CA 94720-1764 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| FORREST RULISON MONROE, STUDENT ASSISTANT AUTHORIZED TO ACCEPT LEGAL DOCUMENTS | PERSONAL SERVICE |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| ALLAN MENDIETA | PROCESS SERVER |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on     NOVEMBER 19, 2007
                DATE

SIGNATURE OF SERVER

REF: 3005611
NATIONWIDE LEGAL, INC,
ALLAN MENDIETA
REG. NUMBER: 1018
SAN FRANCISCO COUNTY

1255 POST STREET, SUITE #500
ADDRESS OF SERVER

SAN FRANCISCO, CALIFORNIA 94109

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(C) PROTECTION OF PERSON SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take responsible steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and and reasonable attorney's fees

(2) (A) A person commanded to produce and permit inspection and copying designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect or copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of the party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow for reasonable time for compliance:

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearances or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When the information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO. 05-4182 "K" (2)

PERTAINS TO: MRGO

JUDGE DUVAL
MAG. WILKINSON

## NOTICE OF SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS

Pursuant to the Court's Case Management and Scheduling Order No. 4, entered March 1,

2007 (Docket No. 3299), and as subsequently amended ("CMO No. 4"), PLEASE TAKE

NOTICE that pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant

Washington Group International, Inc. ("WGII") has caused a subpoena *duces tecum* ("subpoena")

to be issued by the United States District Court for the Northern District of California upon the

Independent Levee Investigation Team ("ILIT"), led by the University of California at Berkeley

and funded in part by the University of California at Berkeley Center for Technology Research

in the Interest of Society ("CITRIS").  The Subpoena has been directed to CITRIS, located at

281 Hearst Memorial Mining Building #1764, University of California, Berkeley, Berkeley,

California  94720-1764.

The subpoena requires the production of documents as described and designated in the

attached Schedule A, at 10:00 a.m., December 19, 2007, at the offices of Jones Day, 555

California Street, 26th Floor, San Francisco, California 94104-1500.

The notice, service, and enforcement of this subpoena is without prejudice to the pending

motion of WGII to dismiss, or any other similar motion to be filed by WGII, and shall not be deemed a waiver by WGII of any right.

Dated:  November 19, 2007                        Respectfully submitted,


                                                 /s/ William D. Treeby
                                                 William D. Treeby, 12901
                                                 Carmelite M. Bertaut, 3054
                                                 Heather S. Lonian, 29956
                                                         Of
                                                 Stone Pigman Walther Wittmann L.L.C.
                                                 546 Carondelet Street
                                                 New Orleans, Louisiana  70130
                                                 Telephone:  (504) 581-3200
                                                 Facsimile:  (504) 581-3361

                                                 Attorneys for Washington Group
                                                 International, Inc.

                                                 Of counsel
                                                 Adrian Wager-Zito
                                                 Jones Day
                                                 51 Louisiana Avenue, N.W.
                                                 Washington, D.C. 20001-2113
                                                 Telephone:  (202) 879-4645
                                                 Facsimile:  (202) 626-1700

<u>SCHEDULE A</u>

This subpoena is to be answered in accordance with the provisions of Federal Rule of

Civil Procedure 45(d)(1) and in accordance with the following definitions and instructions:

**A.    Definitions**

The terms set forth below are defined as follows unless otherwise stated:

1.    "Document(s)," "data," "report(s)," "information," and "material(s)" shall be used

in the broadest sense contemplated by Federal Rule of Civil Procedure 34, and shall include any

writing of any kind, including, without limitation, any written, printed, taped, electronically or

digitally encoded, graphic or other information, including, without limitation, originals, identical

copies, translations and drafts thereof and all copies bearing notations and marks not found on

the original.  "Document(s)," "data," "report(s)," "information," and "material(s)" includes,

without limitation, affidavits; agreements; analyses; appointment books; articles from

publications; workpapers of any kind; books; calendars; charts; checks (canceled or uncancelled);

check stubs; communications; computer disks, print outs, tapes; confirmations; contracts;

correspondence; credit card receipts; desk calendars; deskpads; diaries; diskettes; drafts;

electronic mail; estimates; evaluations; facsimiles; files; filings; forms; graphs; invoices; journals;

ledgers; letters; lists; maps; meeting minutes; memoranda; notations; notes; opinions; orders;

pamphlets; papers; pictures; press releases; publications; receipts; recordings of conferences,

conversations, or meetings; reports; statements; statistical records; studies; summaries;

tabulations; telegrams; telephone records; telex messages; transcripts; understandings; videotapes;

vouchers; and sheets or things similar to any of the foregoing however denominated.

"Document(s)," "data," "report(s)," "information," and "material(s)" further means any

document now or at any time in the possession, custody or control of the entity to whom these

1

Requests are directed (together with any predecessors, successors, affiliates, subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys). Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof.

2.    "Concerning," "regarding," "relating to," and "demonstrating" means referring to, describing, discussing, evidencing, or constituting.

3.    "ILIT" means the Independent Levee Investigation Team, led by the University of California at Berkeley and funded in part by the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"); any of ILIT's members, employees, affiliates, representatives, advisors, agents, attorneys or associates; or any other person acting on behalf of the ILIT in any capacity.

4.    "You," or "Your" means the ILIT and/or the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"), its predecessors, parents, subsidiaries, affiliates, and any of its present or former directors, officers, agents, employees, designees, assignees, representatives or other persons acting on its behalf.

5.    "Person" or "individual" means any natural person or any business, legal, or government entity or association.

6.    "Meeting" means the contemporaneous presence of any natural persons, whether or not such presence occurred by chance or was prearranged and whether or not the meeting was formal or informal or occurred in connection with some other activity, and whether or not the meeting took place via telephonic, telegraphic video or in-person, or otherwise.

7.    "Including" means including without limitation.

2

8.      "Identify," when used in reference to a person, means to state his, her, or its full name, present or last known address, and telephone number.

9.      Unless otherwise set forth specifically in a request, the relevant time period applicable to this subpoena is January 1, 1965 through and including the date of your document production.

10.     "Hurricane Katrina" means the hurricane that made landfall along the Mississippi Gulf Coast to the east of the New Orleans, Louisiana area on or about the morning of August 29, 2005.

11.     "WGII" means Washington Group International, Inc.

12.     "Canal" shall include the waterway itself, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

13.     "MRGO" means the Mississippi River Gulf Outlet Navigation Canal, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

14.     "GIWW" means the Gulf Intracoastal Waterway, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

15.     "Industrial Canal" means the Inner Harbor Navigation Canal, also referred to locally as the Industrial Canal, that connects Lake Pontchartrain, the Mississippi River, and the segment of the GIWW between New Orleans East and St. Bernard Parish.

16.     "Breach(es)" means the failure, during and/or immediately after Hurricane Katrina, other than from overtopping, of a levee, berm, spoil bank, levee wall, and/or flood wall resulting in the release of floodwater.

17.     "Adjacent to" means next to, along, near, or on/or near the boundary of property or a specific area.

3

18.     "East Bank Industrial Area" ("EBIA") means the 32-acre parcel of land in New Orleans bordered by Florida and Claiborne Avenues to the north and south along the eastern edge of the Industrial Canal and bounded on the east by the levee and/or floodwall.

**B.      Instructions**

1.      The documents sought in these Requests include all documents in your possession, custody or control.  Unless otherwise indicates, these Requests seek all documents generated or received by you during the Relevant Period.

2.      You shall produce all documents in the manner in which they are maintained in the usual course of your business and/or you shall organize and label the documents to correspond with the categories in these Requests.  A Request for a document shall be deemed to include a request for any and all file folders in which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

3.      Each document withheld from production based upon privilege or any similar claim shall be identified by: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document, including, without limitation, the author of the document, the relationship of the author and any recipient to each other.  The nature of each claim of privilege shall be set forth in sufficient detail to enable a determination to be made concerning the reasons for the privilege claim.

4.      Documents attached to each other should not be separated.

5.    Documents not otherwise responsive to these Requests shall be produced if such documents mention, discuss, refer to, or explain the documents that are called for by these Requests.

6.    If any document within the scope of these Requests has been destroyed, that document shall be identified, including, without limitation, identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction shall be produced.

7.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants or investigators, or by your attorney or their agents, employees, representatives or investigations.

8.    If you object to any part of any request, you shall state fully the nature of the objection. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

9.    Each Request shall be construed independently and not with reference to any other document Request for the purpose of limitation.

10.    "All" and "each" shall be construed as "all and each."

11.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside the scope.

12.    The use of the singular form of any word includes the plural and vice versa.  The

past tense shall include the present tense and vice versa.

13.    The documents shall be produced in full, without abbreviation or expurgation.

## SPECIFICATIONS OF DOCUMENTS TO BE PRODUCED

1) documents, including statements of eyewitnesses or other interviews provided to ILIT, reflecting instances in which residents of the Lower Ninth Ward in New Orleans, Louisiana or others encountered difficulty dewatering excavations in or near the EBIA

2) documents reflecting reports of underseepage and/or ponding of water along the Industrial Canal at the west edge of the Lower Ninth Ward in New Orleans

3) documents, including statements or other interviews provided to ILIT, reflecting complaints or other expressions of concern by residents of the Lower Ninth Ward and St. Bernard Parish concerning underseepage and/or ponding of water along the Industrial Canal, including who made those complaints, when those complaints were made, and to whom those complaints were made

4) documents supporting the conclusion you made in Chapter 11, page 11-5 of your July 31, 2006 Final Report that the "main breaches that were the principal source of flooding for both the St. Bernard/Lower Ninth Ward protected area and the New Orleans East protected area were the levee frontages facing 'Lake' Borgne (which is actually a bay, as it is connected directly to the Gulf of Mexico)"

5) documents reflecting that WGII was made aware or warned of underseepage of water along the Industrial Canal, particularly in the EBIA

6) documents reflecting that any other person (including, but not limited to any natural person or any business, legal, or government entity or association) was made aware or warned of underseepage of water along the Industrial Canal, particularly in the EBIA

7) documents requests or other requests for information from ILIT to McElwee Brothers, Inc. or any other individual in connection with your investigation of Hurricane Katrina and its effects in the Industrial Canal and your preparation of your July 31, 2006 Final Report, or any interim drafts thereof

8) documents provided to ILIT by McElwee Brothers, Inc. or any other individual in connection with your investigation of Hurricane Katrina and its effects in the Industrial Canal and your preparation of your July 31, 2006 Final Report, or any interim drafts thereof

9) documents reflecting instances of disagreement among any members of the ILIT regarding conclusions in your July 31, 2006 Final Report, or any interim drafts thereof

10)  documents reflecting theories examined or investigated by ILIT surrounding the breaches of the levees and flood walls along the EBIA in the Industrial Canal at the west edge of the Lower Ninth Ward in New Orleans

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Notice of Subpoena Requiring the

Production of Documents and Schedule A has been served upon all counsel of record through the

Court's CM/ECF electronic filing system or by placing same in the United States mail, postage

prepaid and properly addressed, this 19th day of November, 2007.

_/s/ Heather S. Lonian_____
Heather S. Lonian

**EXHIBIT 2**

# Investigation of the Performance of the New Orleans Flood Protection Systems

## in Hurricane Katrina on August 29, 2005

### Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**







## THE INVESTIGATION TEAM

The University of California at Berkeley led Independent Levee Investigation Team (ILIT) grew through the course of this investigation, and eventually numbered 35 very dedicated and accomplished individuals.

The team included a large number of leading experts across a diverse range of fields. Team members came from six states, and they came from universities, private engineering firms, and state and federal agencies.

As a group, the investigation team had very impressive prior experience with forensic studies of major disasters and catastrophes. For example, the team members had previously investigated 12 major earthquakes and 8 major hurricanes (both domestic and foreign), 14 dam failures, more than a dozen levee failures, numerous landslides, one tsunami, the pivotal Kettleman Hills waste landfill failure, the Challenger and Columbia space shuttle disasters, the Exxon Valdez tanker disaster, and a number of major offshore pipeline and oil platform failures. They are well experienced with the carnage and disarray of disasters, and with the unforgettable smell of death. They are also well experienced at the delicate and deliberate art and science of piecing their way through the devastation, carefully and professionally, and figuring out what had happened, and why; the art and science of engineering forensics.

The calibre of these assembled experts is such that we could never possibly have afforded to hire them. Instead, excepting a handful of graduate research students who worked for very low wages, these world class experts all volunteered, and they worked pro bono (for free.) They did this for the intellectual challenge, for the camaraderie of a very special group of accomplished colleagues, for the chance to make a positive difference, because it was important, and most importantly because it was the right and necessary thing to do.

The pages that follow list the names and affiliations of the members of the Independent Levee Investigation Team. I have had the opportunity to work on a number of investigations of major catastrophes and disasters, but I have never worked with a finer group. They are all heroes in my book.

Dr. Raymond B. Seed
Head, ILIT

## The Independent Levee Investigation Team

**Remon I. Abdelmalak, Ph.D.**, Graduate Researcher, Zachry Department of Civil Engineering, Texas A&M University, TX

**Adda G. Athanasopoulos, P.E., Ph.D.** Student, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Robert G. Bea, Ph.D., P.E., G.E., S.E.**, Professor, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Gordon P. Boutwell, Jr., Ph.D., P.E.**, President, Soil Testing Engineers, Inc., Baton Rouge & New Orleans, LA

**Jonathan D. Bray, Ph.D., P.E.**, Professor, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Jean-Louis Briaud, Ph.D., P.E.**, Professor and Holder of the Buchanan Chair, Zachry Department of Civil Engineering, Texas A&M University, TX

**Carmen Cheung**, Graduate Researcher, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Diego Cobos-Roa, P.E.**, Graduate Researcher, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Julien Cohen-Waeber**, Graduate Researcher, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Brian D. Collins, Ph.D., P.E.**, Research Civil Engineer, United States Geological Survey, Menlo Park, CA

**Luke Ehrensing, P.E.**, President, Thigpen Construction, New Orleans, LA.

**Dan A. Farber, J.D.**, Sho Sato Professor of Law, University of California, Berkeley, CA

**W. Michael Hanneman, Ph.D.**, Chancellor's Professor, Department of Agricultural & Resource Economics and Goldman School of Public Policy, University of California, Berkeley, CA

**Leslie F. Harder. Jr., Ph.D. P.E.**, Acting Deputy Director for Public Safety, California Department of Water Resources, Sacramento, CA

**Kofi Inkabi**, Graduate Researcher, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

**Anne M. Kammerer, Ph.D., P.E.**, Senior Risk Consultant, Arup, San Francisco, CA

**Deniz Karadeniz, Ph.D.**, Candidate, Department of Geological Sciences and Engineering, University of Missouri-Rolla, MO

**Robert E. Kayen, Ph.D., P.E.**, Research Scientist, United States Geological Survey, Menlo Park, CA

**Robb E. S. Moss, Ph.D., P.E.**, Assistant Professor of Civil Engineering, California Polytechnic Institute and State University, San Luis Obispo, CA

**Jennifer Nicks**, Graduate Researcher, Zachry Department of Civil Engineering, Texas A&M University, TX

Seshu Nimala, Graduate Researcher, Civil, Construction, and Environmental Engineering, Oregon State University, OR

Juan M. Pestana, Ph.D., P.E., Associate Professor, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

Jim Porter, C.E.T., Soil Testing Engineers, Inc., Baton Rouge & New Orleans, LA

Keunyong Rhee, Graduate Researcher, Zachry Department of Civil Engineering, Texas A&M University, TX

Michael F. Riemer, Ph.D., Associate Adjunct Professor, Civil and Environmental Engineering, University of California, Berkeley, CA

Karlene Roberts, Ph.D., Haas School of Business, University of California, Berkeley, CA

J. David Rogers, Ph.D., P.E., R.G., Hasselmann Chair in Geological Engineering, University of Missouri-Rolla, MO

Raymond B. Seed, Ph.D., Professor, Department of Civil and Environmental Engineering, University of California, Berkeley, CA

Rune Storesund, P.E., Consulting Engineer, Storesund Consulting, Albany, CA

Anand V Govindsamy, Graduate Researcher, Zachry Department of Civil Engineering, Texas A&M University. TX

Xavier Vera-Grunauer, P.E., CVA Consulting group, Guayaquil, Ecuador

Joseph Wartman, Ph.D., P.E., Assistant Professor, Civil, Architectural and Environmental Engineering, Drexel University, Philadelphia, PA

Conor M. Watkins, Graduate Researcher, Department of Geological Sciences and Engineering, University of Missouri-Rolla, MO

Ed Wenk, Jr., D. Eng., Emeritus Professor of Engineering, Public Administration and Social Management of Technology, University of Washington at Seattle, WA

Solomon C. Yim, Ph.D., P.E., Professor, Civil, Construction, and Environmental Engineering, Oregon State University, OR

# ACKNOWLEDGEMENTS

This report would not have been possible without the generous help of many individuals and organizations.

This project was supported, in part, by the National Science Foundation (NSF) under Grants No. CMS-0413327 and CMS-0611632, and additional support was provided by the Center for Information Technology Research in the service of Society (CITRIS) at the University of California at Berkeley. This support is gratefully acknowledged.

The authors also wish to express their gratitude to the U.S. Army Corps of Engineers (USACE) for their considerable assistance with numerous elements of this work. Their field investigation team from the Engineer Research Development Center (ERDC) in Vicksburg hosted and assisted our own field investigation team in the critical early days of late September and early October. The USACE has also posted massive amounts of background documents on their website, and this has been an invaluable resource. The USACE, and the Interagency Performance Evaluation Team (IPET) have graciously shared much of their field and laboratory data, and we have done the same. This positive sharing and collaboration helps everyone by providing the best possible basis for study and analysis of this event.

We are also deeply grateful to the honorable men and women of the USACE who have taken extra measures to help to provide additional documents, data and insight. Many of these prefer not to be named, but their dedication to service of the greater public good in this difficult situation has been admirable.

We are deeply grateful to the members of the State of Louisiana's independent investigation team, Team Louisiana, for their tremendous efforts and dogged persistence under very difficult circumstances, and for their generous mutual sharing of data and insights throughout this investigation. This team consists of Dr. Ivor Van Heerden, Dr. Paul Kemp and Dr. Hassan Mashriqui (all from the Louisiana State University Hurricane Research Center), Billy Prochaska and Dr. Lou Cappozzoli (both local geotechnical consultants), and Art Theis (retired head of the Louisiana Department of Public Works.) The people of Louisiana, and the nation, owe these gentlemen a great debt as their persistent efforts have, time and again, produced critical data and insights that would not otherwise have been available.

We are also grateful to the members of the field investigation team of the American Society of Civil Engineers, who jointly formed a combined team with ours in the urgent initial post-event field studies when it was of vital importance to gather all possible data and observations while (fully necessary) emergency repair operations were already damaging and burying critical evidence. This was a very strong field forensics team, and their collaboration both in the field and in the subsequent preparation of an initial Preliminary Report which was issued in early November of 2005, was of great value.

Finally we are deeply grateful to the many others who will remain anonymous, but who have assisted by providing information, data, background history and other information that might otherwise not have been available.

A great many people gave generously of themselves, their time, and their expertise to assist these studies. It was important, and we are profoundly grateful.

**EXHIBIT 3**



search [        ] (go)



# CIVIL AND ENVIRONMENTAL ENGINEERING
## University of California, Berkeley

Berkeley
Engineering

**HOME**

CEE > News

## NEWS & EVENTS
08.24.06

### Professor Raymond Seed Publishes Final Report on Failure of New Orleans Levee System



Investigation of the Performance of the
New Orleans Flood Protection Systems in
Hurricane Katrina on August 29, 2005

Volume I: Main Text and Executive Summary

Report No. UCB/CCRM - 06/01
July 22, 2006

DRAFT FINAL REPORT
Version 1.2, Rev. 1, 2006

View Final Report

Over the past nine months, a national team of 38 engineers and investigators led by Professor Raymond Seed, and sponsored by the National Science Foundation and UC Berkeley's Center for Technology Research in the Interest of Society (CITRIS), conducted an independent investigation of the failure of New Orleans' levees and flood protection system during Hurricane Katrina; the largest and most costly failure of an engineered system in history. This study represented an unprecedented effort, as the large and distinguished team of leading national experts all worked as volunteers, on a pro bono basis, in order to devote the available funding to support of students, and to cover travel, field investigation and laboratory testing expenses.

The team made a thorough study of the New Orleans regional levee system, including urgent post-hurricane forensic ground investigations, field borings and laboratory testing, and extensive computer modeling and analyses.

In its final report published on July 31, the team concluded that the several dozen levee failures in this catastrophic event occurred for a number of reasons, including the choice of materials used in the levee construction, the challenging geology and unstable soils upon which they were built, efforts to achieve economic savings at the expense of reduced margins of safety, and engineering lapses associated with failure to anticipate critical failure modes and mechanisms specific to some of the failure sites. Their research indicated that a majority of the levees failed primarily as a result of human error, and not because Hurricane Katrina was an exceptionally large hurricane.

Professor Robert Bea, co-author of the report, added that the levees were deficient as a result of organizational problems within the U.S. Army Corps of Engineers, which oversees the design and construction of the levee system, and organizational problems endemic to the cumbersome overall system within which Congress, the Corps, and local government and oversight agencies must coordinate their efforts to design and construct these types of complex regional systems. The report notes that the Corps' oversight of the levee system was massively hampered due to layoffs of many of its geotechnical engineers who might have otherwise more effectively overseen its design, construction and maintenance.

The UC Berkeley-led team recommends changes from the White House and Congress right on down to the local levee district level, and these include creation of a risk management

council reporting directly to the President, a risk assessment office in Congress, and parallel offices at the state level. Their recommendation is not to replace the Corps of Engineers, but rather to re-establish necessary strength and support levels, and to refocus a larger fraction of its efforts on engineering rather than its current focus primarily on project management.



Video Simulation of Levee Breach



Professors Seed and Bea (center)
Inspecting New Orleans Levees

The report states that the principal overall lesson to be learned is that short-term savings achieved by streamlining the process of preparation for storms and other natural disasters resulted in massively larger losses when the hurricane eventually arrived; losses far out of scale with the smaller short-term savings initially achieved. This has ramifications extending well beyond the New Orleans region, and is a national issue of some urgency.

Other faculty and students from the UC Berkeley Department of Civil and Environmental Engineering who participated in this study included Prof's. Jon Bray, Juan Pestana and Michael Riemer, and a very hard working group of graduate students including Rune Storesund, Adda Athanasopoulos, Diego Cobos-Roa, Xavier Vera-Grunauer, Carmen Cheung, Kofi Inkabi and Julien Cohen-Waeber.

© Copyright 2007 — UC Regents | webmaster

**EXHIBIT 4**

9.12.2005 - Hurricane Katrina relief roundup

UC Berkeley



# UCBerkeleyNews

**NewsCenter**

▶ Today's news & events

Browse by Subject or Date | Select one | News Search | | Go

Web Feature

▶ Subscribe to news

▶ For the news media

▶ Calendar of events

**Top stories:**



Coming attractions on campus: Global warming, rebellion and redemption

Young student's ADHD memoir sees disorder as 'a gift'



Students' political, religious and social convictions, by the numbers



**More news:** Diseased pines in Albany | Environmental footprint

## Katrina-related aid efforts at UC Berkeley

By Noel Gallagher, Media Relations | 12 September 2005

**BERKELEY** – In the wake of Hurricane Katrina, University of California, Berkeley, officials have set up a relief fund to help displaced students studying on campus and authorized paid leave for staff members volunteering to help, while faculty are organizing their efforts to help rebuild New Orleans.

"I am proud of the many efforts of the UC Berkeley family and its friends to help the victims of Hurricane Katrina," Chancellor Robert J. Birgeneau said. "The campus community is fulfilling the great tradition of public service at Berkeley."

The Katrina Emergency Fund, set up on Friday, collected $12,000 over the weekend. The fund, at: https://colt.berkeley.edu/urelgift/katrina_fund. html, benefits the approximately 100 displaced students attending UC Berkeley classes as visiting students this fall. Many arrived at UC Berkeley with little more than a change of clothes.

UC Berkeley is hosting up to 50 undergraduate students, 18 law school students and about 70 graduate students for as long as it takes their home institutions to recover. Most of the undergraduate and law school students arrived on campus last week for special orientation sessions and to begin classes.

But many of them left behind everything while being evacuated in the hurricane, or, in some cases, after being stranded in the floodwaters and rescued by boat. UC Berkeley staff members have led the effort to help them get into classes, find housing and make other arrangements. Fellow students have offered to help with housing and tutoring, and faculty members have arranged to let the students into already crowded classrooms.

These students' short-term emergency needs of housing and books at UC Berkeley have been met, but there is still a significant need for financial donations to help them get settled.

By collecting money through the new emergency fund, the campus can work one-on-one with the displaced students, assess their specific needs

and help them accordingly. The money can be used for everything from food, bed linens and kitchenware to emergency travel and phone bill costs incurred if the students return to their home campus to collect their possessions or to see their families over the holidays.

In addition to the Katrina Emergency Fund, a committee at Boalt Hall that includes students, faculty and staff is working on the creation of a fund to meet any needs in the coming months of the visiting law school students.

The campus is asking individuals who want to donate items such as clothes and bikes to contact a charity helping the hurricane victims. UC Berkeley is continuing to work with corporations and foundations interested in donating either money or specific in-kind donations to benefit these students.

Businesses and foundations that have already contributed money or goods include Longs Drugs, Levi Strauss & Co., the Thomas J. Long Foundation, the Bernard Osher Foundation, and other Bay Area companies and philanthropic organizations.

The campus community began dipping into its pockets early on, collecting $25,000 for the Red Cross at the Sept. 3 home opener football game. Students have been dropping dollar-by-crumpled-dollar donations into big blue rubber tubs on Sproul Plaza at lunchtime. This week, several UC Berkeley student organizations that have banded together as Cal Katrina Relief plan a series of fundraising efforts to benefit the Red Cross.

**Researchers organizing**

In addition to fundraising efforts, the campus is putting to work its scholars' expertise and commitment to public service. Many UC Berkeley faculty members whose research is directly related to Katrina are moving quickly to help the victims and emergency relief agencies and to provide insight and perspective on the disaster.

Last Thursday, UC Berkeley's Center for Information Technology Research in the Interest of Society (CITRIS) held a town hall meeting at UC Berkeley to mobilize campus researchers in the New Orleans rebuilding effort. Civil engineering professor Bob Bea, former chief of offshore civil engineering for Shell Oil, summarized the situation along the Gulf Coast and proposed that campus experts "put feet on the ground" in New Orleans to assess the situation and learn lessons for the future.

"We need to go to ground zero to gather data and preserve the things that can get trashed or lost (in the recovery effort)," Bea said. "CITRIS can help to preserve and analyze this data."

While Bea will focus on offshore issues, other researchers are analyzing other aspects of the tragedy. They include:

- **Ray Seed**, a geotechnical engineer who is spearheading an effort to assess the levee and flood walls. Seed wants to apply what he learns to California's levees in the San Joaquin delta, which are vulnerable

to earthquakes. If they go, he says, most of Southern California will lose its water supply for months or even years.

- **Karlene Roberts**, a professor of organizational behavior in the Haas School of Business and an authority on the management of organizations and systems in which error can be catastrophic. She is heading an effort to identify organizational breakdowns in the Katrina catastrophe. They may involve groups including the family, neighborhood, emergency services, and state, local and federal government, she says.

- Civil engineering professor **Jack Moehle**, director of the Pacific Earthquake Engineering Research center, who is emphasizing the need to steer the new federal interest in disaster preparedness to California's earthquake-prone areas, not just to the hurricane areas of the Southeast. He and architecture professor **Mary Comerio**, an internationally recognized authority on post-disaster reconstruction issues, are working on a project to look at disaster preparedness and recovery in the area and its implications for New Orleans as well as the San Francisco Bay Area.

Among the other UC Berkeley departments lending aid and expertise is the School of Social Welfare, which has mental health experts and other staff and faculty who regularly do field work and are called on by the Red Cross to assist in disasters.

A more complete list of campus experts who conduct research relevant to the Katrina disaster can be found at: www.berkeley.edu/news/extras/ hurricane/experts.html.

**Paid leave approved**

To encourage campus support of humanitarian efforts to assist those affected by Hurricane Katrina, Chancellor Birgeneau has approved the granting of paid administrative leave for staff who wish to volunteer through official relief agencies such as the American Red Cross and FEMA.

"As rescue and recovery efforts become more focused, many of us may heed the call to contribute to the humanitarian efforts. Donating money or supplies and volunteering are two important ways we can take action to help the people of New Orleans and the Gulf Region," read a memo sent from Steve Lustig, acting vice chancellor of business & administrative service.

Details on the leave policy and other efforts to assist hurricane victims can be found at: https://mossberg.berkeley.edu/CALmessages/ display_message.asp?d=9/8/2005&s=103.

**Getting settled**

In order to acclimate to campus life and deal with the stress of being displaced by Katrina, the visiting students are being offered a number of

9.12.2005 - Hurricane Katrina relief roundup

resources on campus.

The Cal Student Orientation (CalSO) office provided a special orientation session for the displaced undergraduate students and is currently matching counselors with individual students through a buddy system in which pairs will work together throughout the semester on any issues that arise.

The California Alumni Association is setting up a program so that alumni can serve as virtual mentors, and University Health Services will be starting a mentoring program within a few weeks to provide support throughout the semester.

University Health Services has also set up a Web site related to Katrina that includes material on coping with traumatic stress, how to help colleagues affected by the disaster and about an ongoing weekly support group for those impacted by Katrina. The site is http://www.uhs.berkeley.edu/home/news/supportforkatrina.shtml.

UC Berkeley | NewsCenter | A-Z List of Web Sites | People Finder
Comments? E-mail newscenter@pa.urel.berkeley.edu
Copyright UC Regents

**EXHIBIT 5**

ILIT DOWNLOAD CENTER (sponsored in part by the National Science Foundation)

# I L I T     D O W N L O A D     C E N T E R

## Independent Levee Investigation Team Final Report



# *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*

# **July 31, 2006**

---

## VOLUME I: MAIN TEXT AND EXECUTIVE SUMMARY (download entire document)

**Cover, Table of Contents, and Executive Summary**

# PART I – INTRODUCTION:
**Chapter 1: Introduction and Overview**


# PART II – TECHNICAL STUDIES:
**Chapter 2: Overview of Hurricane Katrina and its Aftermath**
**Chapter 3: Geology of the New Orleans Region**
**Chapter 4: History of the New Orleans Flood Protection System**
**Chapter 5: The Lower Mississippi Region and Plaquemines Parish**
**Chapter 6: The St. Bernard Parish and Lower Ninth Ward Protected Area**
**Chapter 7: The New Orleans East Protected Area**
**Chapter 8: The Orleans East Bank (Downtown) and Canal District Protected Area**
**Chapter 9: Overtopping-Induced Erosion Studies**
**Chapter 10: Earthen Levee Evaluation**
**Chapter 11: Summary of Engineering Lessons**


# PART III – ORGANIZATIONAL AND INSTITUTIONAL ISSUES:
**Chapter 12: Organized for Failure**
**Chapter 13: Organized for Success**
**Chapter 14: Engineering for Success**


# PART IV – SUMMARY AND FINDINGS
**Chapter 15: Findings and Recommendations**

---

# VOLUME II: APPENDICES (download entire document)
**Cover and Table of Contents**


# APPENDIX A: TERRESTRIAL LIDAR IMAGERY OF NEW ORLEANS LEVEES AFFECTED BY HURRICANE KATRINA


# APPENDIX B: BORING LOGS

**APPENDIX C: CPT LOGS**

**APPENDIX D: STE LABORATORY TESTING**

**APPENDIX E: U.C. BERKELEY LABORATORY TESTING AND
ILIT IN-SITU FIELD VANE SHEAR TESTING**

**APPENDIX F: LOOKING BACK**

**APPENDIX G: LOOKING FORWARD**

**APPENDIX H: HOW SAFE IS SAFE?** Coping with Mother Nature, Human
Nature and Technology's Unintended Consequences

**APPENDIX I: EROSION TEST RESULTS ON
NEW ORLEANS LEVEE SAMPLES**

---

# PRIOR ILIT PUBLICATIONS



**Draft Final Report (May 2006)**

**23**

**EXHIBIT 6**



## UC Newsroom Home RSS Feed Archives About Publications UC en Español Video Features

## Engineers studying levee failures in New Orleans

Date: 2005-10-03 Contact: Sarah Yang Phone: (510) 643-7741 Email: scyang@berkeley.edu

Civil engineers from the University of California, Berkeley, have arrived in New Orleans as part of an independent team of researchers investigating levee failures in the wake of Hurricane Katrina. The research team is funded by the National Science Foundation (NSF) and led by Ray Seed, UC Berkeley professor of civil engineering and principal investigator of the NSF grant. The team will collaborate closely with groups from the U.S. Army Corps of Engineers and the American Society of Civil Engineers (ASCE), sharing data and resources, but each team's findings will be developed independently. "Many public statements have been made in recent weeks about the causes of the levee breaches," said Seed. "The goal of our efforts is to get to the truth of what actually happened so that we can learn from these failures and identify where we need to improve our defenses." The first major site investigation for the NSF-funded team began in New Orleans on Sunday, Oct. 2, and additional team members will rotate in as project conditions dictate. The three investigative teams (from the NSF, ASCE and Army Corps) will work together on site as long as necessary to collect and analyze data. Other UC Berkeley researchers involved in this levee investigation are Robert Bea, professor of civil engineering; Jonathan Bray, professor of civil engineering; Juan Pestana, associate professor of civil engineering; and Rune Storesund, a graduate student in civil engineering. They are being joined by a dozen national experts in levees and post-disaster forensic investigation. These other leading experts include faculty and researchers from other universities, experts from state and federal agencies, and independent consultants. Supplementary funding to help support travel for some investigators is being provided by the UC Berkeley-based Center for Information Technology Research in the Interest of Society (CITRIS), the California Department of Water Resources and the Sacramento District Army Corps of Engineers. The researchers studying the levee failures expect to identify and prioritize the steps that need to be taken to help restore the critical societal infrastructure that was damaged by Katrina and to extend lessons learned to other regions of the United States. Other UC Berkeley efforts to study aspects of Hurricane Katrina's aftermath are underway, including a project led by Karlene Roberts, professor of organizational behavior, to analyze societal dynamics and such critical response organizations as the Federal Emergency Management Agency (FEMA). Bea, the civil engineering professor, is leading a separate initiative to study the performance of coastal and offshore facilities, including refineries, oil platforms and pipelines. When ready, the findings of their investigation will be made publicly available.

© 2007 Regents of the University of California
· 1111 Franklin St., Oakland, CA 94607-5200

Site best viewed in IE 5, Netscape 6 or higher. Update browser

**EXHIBIT 7**



| | | | |
|---|---|---|---|
| "Christopher Patti" <Christopher.Patti@ucop.edu > | To | <smkasley@jonesday.com> | |
| | cc | | |
| | bcc | | |
| 12/06/2007 04:26 PM | Subject | Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society | |

History:          🖅 This message has been replied to.

Shannon,

This will confirm our conversation today in which you agreed to extend the return date on the subpoena until 1/19/07.  As I indicated, the Independent Levee Investigation Team is not a University of California at Berkeley entity and the Center for Technology Research in the Interest of Society at UC Berkeley, although it provided some funding for the ILIT work, is believed not to be in possession of substantial responsive documents.  We will, however, canvass UC Berkeley personnel who were members of the ILIT team to locate responsive documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

**EXHIBIT 8**



| | |
|---|---|
| **"Christopher Patti"** <Christopher.Patti@ucop.edu> | To "Shannon M Kasley" <smkasley@JonesDay.com> |
| | cc |
| | bcc |
| 01/15/2008 06:04 PM | Subject RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society |

| History: | 📧 This message has been replied to and forwarded. |
|---|---|

Shannon,

Because of the semester break, many of the individuals who have to search for documents are just now returning to campus. We, therefore, request another extension for response to the subpoena until February 8, 2008.

I would also like to discuss logistics for review/copying of documents. I would suggest that you arrange for a document service to handle imaging of documents and copying of electronic files, with us receiving an electronic copy.

Finally, I understand that Prof. Robert Bea is an expert for plaintiffs in the litigation and that plaintiffs' counsel will be addressing his production of documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Thursday, December 06, 2007 2:31 PM
To: Christopher Patti
Subject: Re: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society

Thanks Chris.

As we discussed, we understand that ILIT is not a University entity, although it did receive funding from and, according to the UC-Berkeley website, was sponsored by CITRIS, which is a University entity. As I mentioned during our call, we issued the subpoena as we did in an effort to avoid the necessity of having to subpoena multiple individuals, many of whom, as you recognized, are University employees. We can still do so, but our hope is that we will not have to and to that end, I appreciate your efforts to locate UC Berkeley personnel who are/were ILIT members and to collect responsive documents from them. I also expect that you will remind any University employees of the need to preserve such documents now that a subpoena has been issued.

Again, I appreciate your efforts and if you need a further extension,

please do not hesitate to contact me to discuss.

Take care.

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)


|  | "Christopher | |
|---|---|---|
|  | Patti" | |
| To | <Christopher.Patt | |
|  | i@ucop.edu> | <smkasley@jonesday.com> |
| cc | | |
| Subject | 12/06/2007 04:26 | |
|  | PM | Katrina Litigation--Subpoena to |
|  | | "ILIT"/UC Berkeley/Center for |
|  | | Technology Research in the |
| Interest | | of Society |


Shannon,

This will confirm our conversation today in which you agreed to extend the
return date on the subpoena until 1/19/07.  As I indicated, the
Independent
Levee Investigation Team is not a University of California at Berkeley

entity and the Center for Technology Research in the Interest of Society
at
UC Berkeley, although it provided some funding for the ILIT work, is
believed not to be in possession of substantial responsive documents.
We
will, however, canvass UC Berkeley personnel who were members of the
ILIT
team to locate responsive documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other
privilege.
If you received this e-mail in error, please delete it from your system
without copying it and notify sender by reply e-mail, so that our
records
can be corrected.
==========

**EXHIBIT 9**



**Shannon M Kasley/JonesDay**
Extension 4-3710
01/18/2008 02:10 PM

To    "Christopher Patti" <Christopher.Patti@ucop.edu>
cc    Adrian Wager-Zito/JonesDay/JonesDay,
      wtreeby@stonepigman.com
bcc
Subject    RE: Katrina Litigation--Subpoena to "ILIT"/UC
           Berkeley/Center for Technology Research in the Interest of
           Society

Chris,

Please see the attached letter in response to your e-mail below.

 - 1_18_08_Kasley_to_Patti.pdf

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)
"Christopher Patti" <Christopher.Patti@ucop.edu>

**"Christopher Patti"**
**<Christopher.Patti@ucop.edu**
**>**

01/15/2008 06:04 PM

To    "Shannon M Kasley" <smkasley@JonesDay.com>
cc
Subject    RE: Katrina Litigation--Subpoena to "ILIT"/UC
           Berkeley/Center for Technology Research in the Interest of
           Society

```
Shannon,

Because of the semester break, many of the individuals who have to
search for documents are just now returning to campus.  We, therefore,
request another extension for response to the subpoena until February 8,
2008.

I would also like to discuss logistics for review/copying of documents.
I would suggest that you arrange for a document service to handle
imaging of documents and copying of electronic files, with us receiving
an electronic copy.

Finally, I understand that Prof. Robert Bea is an expert for plaintiffs
in the litigation and that plaintiffs' counsel will be addressing his
production of documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757
```

# JONES DAY

51 LOUISIANA AVENUE, N.W.

WASHINGTON, D.C. 20001-2113

TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

WRITER'S DIRECT NUMBER:
202.879.3710
smkasley@jonesday.com

January 18, 2008

**VIA E-MAIL**

Christopher M. Patti
University Counsel
University of California at Berkeley
1111 Franklin St., 8th Fl.
Oakland, CA 94607

      Re:    In Re Katrina Canal Breaches Consol. Litig.

Dear Chris:

     I write in response to your e-mail dated January 15, 2008 concerning the status of your response to Washington Group International, Inc.'s November 19, 2007 third-party subpoena ("Subpoena") to the Independent Levee Investigation Team ("ILIT") in the above-referenced case. Thank you for the update.

     As an initial matter, with respect to logistics, we have been in contact with our San Francisco office in an effort determine the appropriate vendor to handle the tasks mentioned in your e-mail, and to do so, we will need to know a little bit more information, including what volume you expect in both hard copy and electronic format, and in connection with the copying of "electronic files" in particular, we will need to know more specifically what you are referring to—e-mails, PowerPoint presentations, Word, Excel, and other similar documents, or something else. Also, we will need to know whether you will have collected all of the electronic files and have them in a central location or whether the vendor will have to go from custodian to custodian to collect same from each individual. I presume from our prior conversations that you will have collected both hard copy and electronic information responsive to the Subpoena so that the vendor need only come to you to collect it, but I want to confirm that understanding. Please let me know when you have a better idea with respect to the issues I raise.

     With respect to your request for another four-week extension (from Friday, January 18, 2008 to Friday, February 8, 2008), we appreciate some of the difficulty in collecting documents responsive to the Subpoena, and generally, we have no objection to your request. However, in return, and in light of deadlines WGII currently faces in these cases, we would like a representation from you that you intend to comply fully with the Subpoena by the proposed February 8, 2008 deadline, and that the extension has not been requested so that a motion to

JONES DAY

Christopher M. Patti
January 18, 2008
Page 2

quash or similar motion can be drafted. This representation would include the production of all documents from Prof. Bea that are responsive to the Subpoena. In this regard, it appears that you have discussed the Subpoena with Plaintiffs' counsel, and we would appreciate if you would identify with whom you spoke, given that no one has raised this issue with us to date. Plaintiffs have not filed any motion with respect to the Subpoena, and therefore, as you are aware, your obligation to respond continues. Importantly, we are not seeking discovery from Prof. Bea as an expert retained by Plaintiffs, we are requesting discovery from University of California-Berkeley employees, including Prof. Bea and others, who were a part of the ILIT long before Prof. Bea may have been retained in connection with this litigation. If the attorneys who retained Prof. Bea want to argue that all of the materials he has in his files subject to the Subpoena were not part of the ILIT effort, but instead, were part of his retention as an expert for them, and they communicate this position with us immediately, we will consider those claims. If we are going to have a discovery dispute, however, about the production of certain documents then we need to have that sooner rather than later. Otherwise, we believe what we have requested from the ILIT should be produced.

In light of the foregoing, if you are willing to make the representation we request, then we are willing to concede to a further four-week extension. If not, and you fail to comply by the already extended deadline, you risk motion practice in the Northern District.

Please advise how you wish to proceed.

Sincerely,

Shannon M. Kasley

cc:    William D. Treeby, Esq.
       Adrian Wager-Zito, Esq.

**EXHIBIT 10**



"Christopher Patti"
<Christopher.Patti@ucop.edu>

01/18/2008 03:03 PM

To  "Shannon M Kasley" <smkasley@JonesDay.com>

cc  "Adrian Wager-Zito" <adrianwagerzito@JonesDay.com>,
<wtreeby@stonepigman.com>

bcc

Subject  RE: Katrina Litigation--Subpoena to "ILIT"/UC
Berkeley/Center for Technology Research in the Interest of
Society

Shannon,

Thank you for your letter. I am concerned that, contrary to your prior
statements that WGI would be amenable to additional extensions, you now
appear to be conditioning that assurance on the University's waiver of
objections to the subpoena and its agreement to produce documents from
Prof. Bea.

The concern is particularly acute since, as noted in my 12/06/07 e-mail
to you and in our early December telephone conversation, the entity you
subpoenaed, ILIT, is not a University of California entity, apparently
no longer exists, and the subpoena is therefore defective.
Notwithstanding that infirmity, I voluntarily agreed to canvass UC
Berkeley personnel involved with ILIT (now with the exception of Prof.
Bea, who, I have learned, is a retained expert) and to collect documents
so that you would not have to subpoena those individuals directly. With
the exception of Prof. Bea, I am still willing to do so if the date for
that production can be extended to February 8, as requested.

It is my understanding from plaintiffs' counsel, Scott Johannson, that
plaintiffs intend to file a motion to quash as to production from Prof.
Bea.

Regarding logistics, assuming we are able to work out an agreeable
production date, I intend to collect documents and electronic materials
at a central location for your vendor to copy. Until the collection
efforts have proceeded further, I will not be able to predict either the
quantity of documents or the type of electronic files that will be
produced.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA 94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Friday, January 18, 2008 11:11 AM
To: Christopher Patti
Cc: Adrian Wager-Zito; wtreeby@stonepigman.com
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society
Importance: High

Chris,

Please see the attached letter in response to your e-mail below.

**EXHIBIT 11**



"Treeby, William D."
<wtreeby@stonepigman.com>

01/18/2008 05:25 PM

To "Shannon M Kasley" <smkasley@JonesDay.com>, <dsclayman@jonesday.com>, "Wager-Zito, Adrian" <adrianwagerzito@jonesday.com>
cc "Bertaut, Carmelite" <CBertaut@stonepigman.com>, "Lonian, Heather S." <hlonian@stonepigman.com>
bcc
Subject FW: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society

History:          ☞ This message has been replied to.

See what Scott sent me.
          WTreeby

William D. Treeby (A Professional Corporation)
Stone Pigman Walther Wittmann LLC
546 Carondelet Street
New Orleans, LA 70130
Direct Dial (504) 593-0807
Direct Fax (504) 596-0807
e-mail <wtreeby@stonepigman.com>

_____

This communication is from a law firm and may be privileged and
confidential. If you are not the intended recipient, please notify the
sender by reply e-mail and destroy all copies of this communication.
The sender's name and other information in this e-mail are for
information purposes only and are not electronic signatures.

-----Original Message-----
From: Scott Joanen [mailto:scott@jbrunolaw.com]
Sent: Friday, January 18, 2008 4:00 PM
To: Treeby, William D.
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society

Bill,

Here is part of what I'm filing

Scott Joanen
The Law Office of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, LA, 70113
Telephone: (504) 525-1335
Toll Free: 1-800-966-1335
Facsimile: (504) 561-6775
Email: scott@jbrunolaw.com

The information contained in this electronic message is attorney
privileged and confidential information intended only for the use of the
owner of the email address listed as the recipient of this message.  If
you are not the intended recipient, or the employee or agent responsible
for delivering this message to the intended recipient, you are hereby
notified that any disclosure, dissemination, distribution, or copying of
this communication is strictly prohibited.  If you have recieved this
transmission in error, please immediately notify us by telephone at
(504) 525-1335.

-----Original Message-----
From: Treeby, William D. [mailto:wtreeby@stonepigman.com]
Sent: Friday, January 18, 2008 3:15 PM
To: Scott Joanen
Cc: Shannon M Kasley
Subject: FW: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society

Scott,
            See below an e-mail from someone using your name, hopefully not
in vain, regarding our third party subpoena to ILIT.  If you are going
to file some motion to quash a subpoena issued in the Northern District
of California (or here) I think it behooves you to call us to discuss it
before taking that step.  We are not trying to get production of
communications between you and Dr. Bea since you retained him in March
of 2007 (according to his testimony).  However, we are entitled
certainly to get all the ILIT documents and supporting material and
communications he may have had with anyone about the matters we have
subpoenaed prior to that time.
            Please let us know your thoughts.
            WTreeby


William D. Treeby (A Professional Corporation) Stone Pigman Walther
Wittmann LLC
546 Carondelet Street
New Orleans, LA 70130
Direct Dial (504) 593-0807
Direct Fax (504) 596-0807
e-mail <wtreeby@stonepigman.com>
_____

This communication is from a law firm and may be privileged and
confidential. If you are not the intended recipient, please notify the
sender by reply e-mail and destroy all copies of this communication.
The sender's name and other information in this e-mail are for
information purposes only and are not electronic signatures.


-----Original Message-----
From: Christopher Patti [mailto:Christopher.Patti@ucop.edu]
Sent: Friday, January 18, 2008 2:03 PM
To: Shannon M Kasley
Cc: Wager-Zito, Adrian; Treeby, William D.
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society

Shannon,

Thank you for your letter.  I am concerned that, contrary to your prior
statements that WGI would be amenable to additional extensions, you now
appear to be conditioning that assurance on the University's waiver of
objections to the subpoena and its agreement to produce documents from
Prof. Bea.

The concern is particularly acute since, as noted in my 12/06/07 e-mail
to you and in our early December telephone conversation, the entity you
subpoenaed, ILIT, is not a University of California entity, apparently
no longer exists, and the subpoena is therefore defective.
Notwithstanding that infirmity, I voluntarily agreed to canvass UC
Berkeley personnel involved with ILIT (now with the exception of Prof.

Bea, who, I have learned, is a retained expert) and to collect documents
so that you would not have to subpoena those individuals directly.  With
the exception of Prof. Bea, I am still willing to do so if the date for
that production can be extended to February 8, as requested.

It is my understanding from plaintiffs' counsel, Scott Johannson, that
plaintiffs intend to file a motion to quash as to production from Prof.
Bea.

Regarding logistics, assuming we are able to work out an agreeable
production date, I intend to collect documents and electronic materials
at a central location for your vendor to copy.  Until the collection
efforts have proceeded further, I will not be able to predict either the
quantity of documents or the type of electronic files that will be
produced.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Friday, January 18, 2008 11:11 AM
To: Christopher Patti
Cc: Adrian Wager-Zito; wtreeby@stonepigman.com
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society
Importance: High

Chris,

Please see the attached letter in response to your e-mail below.

(See attached file: 1_18_08_Kasley_to_Patti.pdf)

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)

|  | "Christopher | | |
|---|---|---|---|
|  | Patti" | | |
|  | <Christopher.Patt | | |
| To | | | |
|  | i@ucop.edu> | "Shannon M Kasley" | |
|  | | <smkasley@JonesDay.com> | |
| cc | | | |
|  | 01/15/2008 06:04 | | |

                    PM
Subject                                 RE: Katrina Litigation--Subpoena

to                                      "ILIT"/UC Berkeley/Center for

                                        Technology Research in the

Interest                                of Society

Shannon,

Because of the semester break, many of the individuals who have to
search for documents are just now returning to campus.  We, therefore,
request another extension for response to the subpoena until February 8,
2008.

I would also like to discuss logistics for review/copying of documents.
I would suggest that you arrange for a document service to handle
imaging of documents and copying of electronic files, with us receiving
an electronic copy.

Finally, I understand that Prof. Robert Bea is an expert for plaintiffs
in the litigation and that plaintiffs' counsel will be addressing his
production of documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Thursday, December 06, 2007 2:31 PM
To: Christopher Patti
Subject: Re: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society

Thanks Chris.

As we discussed, we understand that ILIT is not a University entity,
although it did receive funding from and, according to the UC-Berkeley

website, was sponsored by CITRIS, which is a University entity.  As I
mentioned during our call, we issued the subpoena as we did in an effort
to avoid the necessity of having to subpoena multiple individuals, many
of whom, as you recognized, are University employees.  We can still do
so, but our hope is that we will not have to and to that end, I
appreciate your efforts to locate UC Berkeley personnel who are/were
ILIT members and to collect responsive documents from them.  I also
expect that you will remind any University employees of the need to
preserve such documents now that a subpoena has been issued.

Again, I appreciate your efforts and if you need a further extension,
please do not hesitate to contact me to discuss.

Take care.

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)


|  |  |  |
|---|---|---|
| To | "Christopher Patti" <Christopher.Patti@ucop.edu> | <smkasley@jonesday.com> |
| cc |  |  |
| Subject | 12/06/2007 04:26 PM | Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the |
| Interest |  | of Society |

Shannon,

This will confirm our conversation today in which you agreed to extend
the return date on the subpoena until 1/19/07.  As I indicated, the
Independent Levee Investigation Team is not a University of California
at Berkeley entity and the Center for Technology Research in the
Interest of Society at UC Berkeley, although it provided some funding
for the ILIT work, is believed not to be in possession of substantial
responsive documents.
We
will, however, canvass UC Berkeley personnel who were members of the
ILIT team to locate responsive documents.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757


==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other
privilege.
If you received this e-mail in error, please delete it from your system
without copying it and notify sender by reply e-mail, so that our
records can be corrected.
==========



==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other
privilege.
If you received this e-mail in error, please delete it from your system
without copying it and notify sender by reply e-mail, so that our
records can be corrected.
==========

Mx.quash.SDT.pdf    Memo.Mx.to.quash.SDT.pdf

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES                    CIVIL ACTION
          CONSOLIDATED LITIGATION
                                                 NO. 05-4182

                                                 SECTION "K" (2)

PERTAINS TO: MRGO

_____

MEMORANDUM IN SUPPORT OF MOTION TO QUASH
and CONTEMPORANEOUS MOTION TO STAY PRODUCTION

**NOW INTO COURT**, through undersigned counsel, comes the MRGO PSLC, which

moves to quash the subpoena duces tecum issued by Washington Group International, Inc.

("WGII"), and to contemporaneously stay records production pending a ruling on the Motion to

Quash, for the following reasons:

I.

FACTS

On November 19, 2007, Washington Group International, Inc. ("WGII") issued a

Subpoena to the Independent Levee Investigation Team ("ILIT"), University of California at

Berkeley, Center for Technology Research in the Interest of Society (CITRIS), accompanied by

a Notice of Subpoena Requiring the Production of Documents that specified the documents to be

produced. (See Exhibit 1).

The subpoena required production on December 19, 2007 at 10:00 a.m. Subsequent communications between counsel for University of California at Berkeley and counsel for WGII resulted in an agreement that the deadline for production be extended to January 19, 2008. An additional agreement allowed for a further extension until February 8, 2008; however, this additional agreement has since been rescinded and now posed as a offer conditioned on the concession that no Motions to Quash be filed.

A described by Ray Seed, the former the head of ILIT, the ILIT team was a loosely organized group of volunteers eventually numbering 35 individuals, working pro bono, with no formal arrangements for record keeping. The team included a large number of leading experts across a diverse range of fields. One such member was Robert Bea, a retained expert of the MRGO PSLC. The ILIT team members came from six states, and they came from universities, private engineering firms, and state and federal agencies. This project was supported, in part, by the National Science Foundation (NSF) under Grants No. CMS-0413327 and CMS-0611632, and additional support was provided by the CITRIS. (See Exhibit 2). **This group has now been disbanded upon the completion of their NSF sponsored studies.**

The subpoena seeks a plethora of information from an entity that no longer exists, and is simply a subversive attempt to obtain information developed by the MRGO PSLC expert Robert Bea outside the permissible scope of discovery as set forth in this Court's Case Management and Scheduling Order No. 4 (CMO No. 4). It is for this reason that a contemporaneously stay records production pending a ruling on the Motion to Quash be granted on an expedited basis.

## II.

## WGII'S SUBPOENA DEFIES CMO NO. 4 BY ISSUING A PRODUCTION SUBPOENA

## TO A NON-PARTY AFTER THE COURT IMPOSED DEADLINE

CMO No. 4, § IV (B)(3) sets forth as follows:

> "[n]o later than **August 31, 2007**, any party may serve subpoenas
> on non-parties for the production of documents without testimony
> pursuant to Fed.R.Civ.P. 45, but shall notice testimonial
> depositions of non-parties in accordance with the other provisions
> of this order.  A copy of the subpoena issued shall be filed into the
> record contemporaneously with service of the subpoena.
> Thereafter, <u>no</u> Rule 45 subpoena duces tecum may be issued to a
> non-party without prior order of the Court issued after motion,
> noticed for hearing before Magistrate Wilkinson, establishing good
> cause.

The subpoena issued to the ILIT team is plainly deficient in that it was served on

November 19, 2007, two and one half (2 ½) months after the deadline.  As such, WGII was

obligated to seek leave of the Court through a noticed motion, which it neglected to do.  As

WGII did not comply with the dictates of CMO No. 4, the Court must quash WGII's subpoena.

## III.

## THE COURT IS ENTITLED TO QUASH THE SUBPOENA AT ISSUE

Federal Rules of Civil Procedure, Rule 45 (c)(3)(B) holds in pertinent part:

**(3) Quashing or Modifying a Subpoena.**

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a
subpoena that:

> ( i) fails to allow a reasonable time to comply;

> (ii) requires a person who is neither a party nor a party's officer to travel
> more than 100 miles from where that person resides, is employed, or
> regularly transacts business in person--except that, subject to Rule
> 45(c)(3)(B)(iii), the person may be commanded to attend a trial by
> traveling from any such place within the state where the trial is held;

3

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**( i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

A motion to quash or modify a subpoena duces tecum may be made by a party when the party seeking to challenge the subpoena has a personal right or privilege with respect to the subject matter requested in the subpoena. Transcor, Inc. v. Furney Charters, Inc., 212 F.R.D. 588 (D.Kan.,2003).; Norris Manufacturing Co. v. R. E. Darling Co., 29 F.R.D. 1 (D.Md.1961); Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York, 519 F.Supp. 668 (D.C.Del., 1981).

CMO No. 4, enacted by the Court on March 1, 2007, established the permissible scope of expert discovery for both the Class Certification (CMO No. 4, § (III,)(D)) and Common Liability Issues (CMO No. 4, § (IV)(E). These parameters were consistent with Federal Rule of Civil Procedure, Rule 26 (b)(4) and Federal Rules of Evidence, 702, *et. seq.* WGII's issuance of a subpoena duces tecum to a group to which Plaintiffs' expert Robert Bea was a contributor is simply a subversive effort to avoid the limitations of the Court's Order.

CMO No. 4, § (IV)(E)(3) establishes that Plaintiff's deadline to produce expert reports is May 30, 2008. Again, the Court must quash WGII's subpoena.

4

IV.

## WGII'S SUBPOENA SHOULD BE QUASHED BECAUSE IT SEEKS IRRELEVANT INFORMATION AND CREATES AN UNDUE BURDEN FOR A THIRD PARTY

As the Court is aware, the extent of discovery and use of protective orders by a judge is within discretion of judge. Chemical & Indus. Corp. v. Druffel, 301 F.2d 126 (C.A.6 (Ohio) 1962). The application of discovery orders is within discretion of the trial court and may be reversed only on clear showing of abuse of discretion. Galella v. Onassis, 487 F.2d 986 (C.A.2 (N.Y.) 1973); General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204 (C.A.Mo.1973), certiorari denied, 94 S.Ct. 926, 414 U.S. 1162, 39 L.Ed.2d 116.

Where relevancy is not apparent, it is the burden of the party seeking discovery to show the relevancy of the discovery request. Steil v. Humana Kansas City, Inc., 197 F.R.D. 442 (D.Kan.,2000), citing Employers Commercial Union Ins. Co. of America v. Browning-Ferris Industries of Kansas City, Inc., 1993 WL 210012 (D.Kan. Apr.5, 1993). WGII's blanket request for all of the information collected by the ILIT team can have no rational relation to the subject litigation.

Fed.R.Civ.P. 45 does not include relevance as an enumerated reason for quashing a subpoena. However, it is well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b) and Rule 34. Thus, this court must examine whether a request contained in a subpoena duces tecum is overly broad or seeking irrelevant information under the same standards set forth in Rule 26(b) and as applied to Rule 34 requests for production. Digital Equipment Corp. v. Micro Technology, Inc., 142 F.R.D. 488, D.Colo.,1992

The subpoena in question saddles the University of California at Berkeley with an unreasonably burdensome task to produce the information subject of the subpoena because the ILIT Team no longer exists. WGII seeks confidential information of certain individuals that

5

WGII is otherwise not entitled to discover as it is proprietary information for those individuals who compromised the ILIT team. For these reasons alone, the Court should quash the subpoena duces tecum at issue.

But more importantly, a review of the "specifications of documents to be produced" in response to WGII's subpoena reveals that WGII has given little consideration to the relevance of its requests and simply demands that the entire universe of documents generated by the ILIT team be produced. Clearly, WGII has given no consideration to the privacy concerns of the citizens of the Lower Ninth Ward as set forth in specification numbers 1 and 3; or McElwee Brothers, Inc. as set forth in specification numbers 7 and 8. The citizens whose privacy interests are substantially impacted are entitled to careful consideration of their interests before any such information is disclosed

## III.

## CONCLUSION

As indicated above, the MRGO PSLC has standing to move to quash the subpoena issued by WGII to the Independent Levee Investigation Team ("ILIT"), University of California at Berkeley, Center for Technology Research in the Interest of Society (CITRIS). The information sought by WGII is confidential, and irrelevant to the litigation at hand. The Plaintiffs are confident that once the Court sees that WGII can enunciate no legitimate, relevant reason for the productions of the documents requested, the Court will grant the Motion to Quash. As such, this Court must grant the Motion to Quash.

6

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL

s/ Joseph M. Bruno
JOSEPH M. BRUNO
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
LA Bar Roll Number: 3604
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775

MR-GO PLAINTIFFS SUB-GROUP LITIGATION
COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY

MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: (337) 233-2796

For

MR-GO PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE

Jonathan Andry (Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles,
CA)
James Parkerson Roy (Domengeaux, Wright, et al.,
Lafayette, LA)

7

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above referenced pleading upon all known counsel for all parties via the Court's CM/ECF system, or by placing same in the United States mail, properly addressed and with first class postage prepaid, or by facsimile, e-mail, or other electronic transmission this 18th day of January, 2008.

____/s/ Joseph M. Bruno_____
Joseph M. Bruno

**EXHIBIT 12**



| | |
|---|---|
| "Treeby, William D." <wtreeby@stonepigman.com> | **To** "Scott Joanen" <scott@jbrunolaw.com>, "Joe Bruno" <jbruno@jbrunolaw.com> |
| | **cc** "Shannon M Kasley" <smkasley@JonesDay.com>, "Wager-Zito, Adrian" <adrianwagerzito@jonesday.com> |
| 01/22/2008 05:47 PM | **bcc** |
| | **Subject** Subpoena for ILIT |

Scott,

   As I explained to you earlier today, we have made it clear to your office and to those who received the subpoena in the Northern District of California that we were not trying to secure any documents or work product of Dr. Bea (in connection with our ILIT subpoena) that was created since Dr. Bea was retained by the plaintiffs in the Katrina litigation, which he has testified (I believe) was in March of 2007.  Any representation to the effect that WGII was attempting to "end run" expert discovery deadlines in the Katrina litigation by our subpoena to ILIT was wrong and misguided, and apparently ignored our earlier communications to this effect.

   You indicated that something has been filed in the Northern District of California called a "Motion to Remit".  We have not been served with any such documents and any supporting materials.  Since it is obviously intended to have the effect of delaying or thwarting subpoenas for documents in the Katrina litigation, please immediately serve me with those filings, since you know we represent WGII who was the party that served that subpoena.

   WTreeby


William D. Treeby (A Professional Corporation)
Stone Pigman Walther Wittmann LLC
546 Carondelet Street
New Orleans, LA 70130
Direct Dial (504) 593-0807
Direct Fax (504) 596-0807
e-mail <wtreeby@stonepigman.com>

---

**This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication.  The sender's name and other information in this e-mail are for information purposes only and are not electronic signatures.**

**EXHIBIT 13**



**Shannon M Kasley/JonesDay**
Extension 4-3710
01/22/2008 06:09 PM

To "Christopher Patti" <Christopher.Patti@ucop.edu>
cc "Adrian Wager-Zito" <adrianwagerzito@JonesDay.com>, wtreeby@stonepigman.com
bcc

Subject RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society

Chris,

Please see the attached letter in response to your 1/18/08 e-mail.

 - 1_22_08_Kasley_to_Patti.pdf

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
202.879.3710
202.626.1700 (fax)
"Christopher Patti" <Christopher.Patti@ucop.edu>



**"Christopher Patti"**
**<Christopher.Patti@ucop.ed**
**u>**

01/18/2008 03:03 PM

To "Shannon M Kasley" <smkasley@JonesDay.com>
cc "Adrian Wager-Zito" <adrianwagerzito@JonesDay.com>, <wtreeby@stonepigman.com>
Subject RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society

```
Shannon,

Thank you for your letter.  I am concerned that, contrary to your prior
statements that WGI would be amenable to additional extensions, you now
appear to be conditioning that assurance on the University's waiver of
objections to the subpoena and its agreement to produce documents from
Prof. Bea.

The concern is particularly acute since, as noted in my 12/06/07 e-mail
to you and in our early December telephone conversation, the entity you
subpoenaed, ILIT, is not a University of California entity, apparently
no longer exists, and the subpoena is therefore defective.
Notwithstanding that infirmity, I voluntarily agreed to canvass UC
Berkeley personnel involved with ILIT (now with the exception of Prof.
Bea, who, I have learned, is a retained expert) and to collect documents
so that you would not have to subpoena those individuals directly.  With
the exception of Prof. Bea, I am still willing to do so if the date for
that production can be extended to February 8, as requested.

It is my understanding from plaintiffs' counsel, Scott Johannson, that
plaintiffs intend to file a motion to quash as to production from Prof.
Bea.
```

Regarding logistics, assuming we are able to work out an agreeable
production date, I intend to collect documents and electronic materials
at a central location for your vendor to copy.  Until the collection
efforts have proceeded further, I will not be able to predict either the
quantity of documents or the type of electronic files that will be
produced.

Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Friday, January 18, 2008 11:11 AM
To: Christopher Patti
Cc: Adrian Wager-Zito; wtreeby@stonepigman.com
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society
Importance: High

Chris,

Please see the attached letter in response to your e-mail below.

(See attached file: 1_18_08_Kasley_to_Patti.pdf)

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)


|  | "Christopher Patti" <Christopher.Patti@ucop.edu> | To | "Shannon M Kasley" <smkasley@JonesDay.com> |
|---|---|---|---|
|  | 01/15/2008 06:04 PM | cc |  |
|  |  | Subject | RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the |

# JONES DAY

51 LOUISIANA AVENUE, N.W.

WASHINGTON, D.C. 20001-2113

TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

WRITER'S DIRECT NUMBER:
202.879.3710
smkasley@jonesday.com

January 22, 2008

**VIA E-MAIL**

Christopher M. Patti
University Counsel
University of California at Berkeley
1111 Franklin St., 8th Fl.
Oakland, CA  94607

Re:     In Re Katrina Canal Breaches Consol. Litig.

Dear Chris:

Although I have not been served or seen a copy, moments ago I learned of a possible filing in the Northern District of California with respect to Washington Group International, Inc.'s November 19, 2007 third-party subpoena ("Subpoena") to the Independent Levee Investigation Team ("ILIT") in the above-referenced case. In any event, I write to address a number of points you raise in your January 18, 2008 e-mail (in response to my letter to you of the same date) concerning the status of your response to the Subpoena.

Initially, nothing in my letter is contrary to anything I said in our prior conversation. When we spoke for the first and only time on December 6, 2007, I explained to you that WGII was amendable to discussing additional extensions, but I did not say that WGII would simply rubber-stamp your requests. I made this clear in a December 6, 2007 e-mail exchange with you wherein I stated "if you need a further extension, please do not hesitate to contact me to discuss." We did not speak again after that e-mail exchange. Therefore, your e-mail to the contrary, no where did I say that WGII would be "amendable to additional extensions" without explanation. Further, it is now clear that your January 15, 2008 request for an additional four-week extension to February 8, 2008 was not made in good faith, as WGII had been operating, but instead, was made to enable plaintiffs' counsel time to finalize a motion to quash, a draft copy of which (containing multiple factual inaccuracies and frivolous arguments) we received on Friday evening, only after we inquired about statements you had made about plaintiffs' counsel's intentions. Therefore, it was not unreasonable, with the benefit of hindsight, for me to request on January 18, 2008 that you represent that your need for additional time was in good faith, and not for some other purpose.

ATLANTA • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK
MILAN • MUMBAI• • MUNICH • NEW DELHI• • NEW YORK • PARIS • PITTSBURGH • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON
•ASSOCIATE FIRM

JONES DAY

Christopher M. Patti
January 22, 2008
Page 2

        Secondly, nothing in my letter demands that the University waive any objections it might have had to the Subpoena. However, I was surprised to see your reference to objections as the time for the University to object has long since passed. See Fed. R. Civ. Proc. 45(c)(2)(B). In fact, we did not even speak until December 6, 2007, three days *after* the University's deadline for written objections had passed. Thus, talk of objections at this point accomplishes little.

        Further, even if you had not waived the right to object, you cannot claim the Subpoena is "defective." It was served on November 19, 2007 by a person duly authorized to serve process in the State of California on Forrest Rulison Monroe, a "Student Assistant Authorized to Accept Legal Documents." While you have stated your opinion that ILIT is not a "University entity," this is belied by the facts. As you are aware, and cannot deny, as reported prominently throughout various University websites, the University funded ILIT, at least in part, through a University entity, CITRIS, and it was undeniably staffed by University employees, as evidenced by who accepted service of the Subpoena. As I explained, the alternative to our service of the University was the service of numerous individual professors and others on your campus, which you agreed was not a desirable solution. Moreover, your statement that ILIT "no longer exists" is very troubling and actually runs directly counter to the testimony of Prof. Bea as recently as November 11, 2007 that he continues his efforts on behalf of ILIT. I remind you that as of November 19, 2007, the date of service of the Subpoena, you were bound to assure preservation of responsive materials, and we hope that the University has abided by its obligations in that regard.

        Finally, with respect to Prof. Bea, for your information, Prof. Bea recently testified that he has spent more than 5,000 pro bono hours in connection with his ILIT work, that such work is on-going, and that he was not retained by Plaintiffs as an expert in this litigation until March, 2007. Thus, the vast majority of these 5,000 pro bono hours were spent prior to Prof. Bea's retention by Plaintiffs. We already know from productions by other third parties that throughout 2006 Prof. Bea maintained regular contact from his e-mail address at bea@ce.berkeley.edu with New Orleans residents concerning his ILIT work, and such communications were made long before Prof. Bea was retained as an expert in this litigation. Therefore, these communications as well as other documents in Prof. Bea's possession from his 5,000-plus pro bono hours are discoverable pursuant to the Subpoena, and should be produced.

        All of this being said, the January 18, 2008 deadline for your production has passed. You are now in default. Any motion to quash or other such motion filed now would be untimely.

JONES DAY

Christopher M. Patti
January 22, 2008
Page 3

Therefore, please advise whether you intend to comply with the Subpoena, and if so, when we should expect to receive responsive documents.

Sincerely,

Shannon M. Kasley

cc:     William D. Treeby, Esq.
        Adrian Wager-Zito, Esq.

**EXHIBIT 14**

BEA, ROBERT GLENN

11/19/2007

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION
                          NO. 05-4182
                and Consolidated Cases
                         "K" (2)
                      JUDGE DUVAL

                    MAG. WILKINSON
-----------------------------------------------

ROBINSON                       CIVIL ACTION

                          NO. 06-2286
VERSUS

THE UNITED STATES

                VIDEOTAPED DEPOSITION OF

                  ROBERT GLENN BEA,

60 Shuy Drive, Moraga, California 94556

given in the offices of Lambert & Nelson, 701

Magazine Street, New Orleans, Louisiana 70130

on Monday November 19, 2007.

56426bb5-e730-4b31-8a5e-52b73a281bb4

BEA, ROBERT GLENN

Page 2

1  APPEARANCES:
2    O'DONNELL & ASSOCIATES
       (BY: PIERCE O'DONNELL, ESQ.)
3      Suite 1000
       550 Hope Street
4    Los Angeles, California 90071-2627
         ATTORNEYS FOR ROBINSON PLAINTIFFS
5
6
     UNITED STATES DEPARTMENT OF JUSTICE
7    TORTS BRANCH, CIVIL DIVISION
       (BY: ROBIN D. SMITH, ESQ.)
8        DAN BAEZA, ESQ.
         Room 8095N
9      1331 Pennsylvania Avenue NW
       Washington, D.C. 20530
10        ATTORNEYS FOR UNITED STATES
11
     LAW OFFICES OF JOSEPH M. BRUNO
12     (BY: JOSEPH M. BRUNO, ESQ.)
         FLORIAN BUCHLER, ESQ.)
13     855 Baronne Street
       New Orleans, Louisiana 70113
14        PLAINTIFF LIAISON COUNSEL
15   ------------------------------------
16   ALSO PRESENT IN ATTENDANCE:
17     LAMBERT & NELSON
       (BY: LINDA NELSON, ESQ.)
18        ALEXIS BEVIS, ESQ.)
       701 Magazine Street
19     New Orleans, Louisiana 70130
          ATTORNEYS FOR THE PLAINTIFFS
20
21
     GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
22   WARSHAUER
       (BY: GERALD E. MEUNIER, ESQ.)
23     1100 Poydras Street
       Suite 2800
24     New Orleans, Louisiana 70163
          ATTORNEYS FOR PLAINTIFFS
25

Page 3

1  ALSO PRESENT IN ATTENDANCE (CONTINUED)
2
     LAW OFFICE OF DANIEL E. BECNEL
3      (BY: DANIEL E. BECNEL, JR., ESQ.)
       425 West Airline Highway
4      Suite B
       LaPlace, Louisiana 70068
5         ATTORNEYS FOR PLAINTIFFS
6
     F. GERALD MAPLES, PA
7      (BY: TODD CAMPBELL, ESQ.)
       902 Julia Street
8      New Orleans, Louisiana 70113
          ATTORNEYS FOR PLAINTIFFS
9
10   DUPLASS, ZWAIN, BOURGEOIS, MORTON,
11   PFISTER & WEINSTOCK
       (BY: GARY ZWAIN, ESQ.)
       Suite 2900
12     3838 North Causeway Boulevard
       Metairie, Louisiana 70002
13        ATTORNEYS FOR THE BOARD OF
          COMMISSIONERS FOR THE LAKE BORGNE
14        BASIN LEVEE DISTRICT
15
     STONE PIGMAN WALTHER WITTMANN
16     (BY: WILLIAM D. TREEBY, ESQ.)
       546 Carondelet Street
17     New Orleans, Louisiana 70130-3588
          ATTORNEYS FOR WASHINGTON GROUP
18        INTERNATIONAL, INC.
19
     BURGLASS & TANKERSLEY
20     (BY: MONICA WALDRON, ESQ.)
       5213 Airline Drive
21     Metairie, Louisiana 70001
          ATTORNEYS FOR JEFFERSON PARISH
22
23
24
25

Page 4

1  ALSO PRESENT IN ATTENDANCE (CONTINUED)
2
     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
3    MAXWELL & MCDANIEL
       (BY: DARCY DECKER, ESQ.)
4      Suite 800
       3445 North Causeway Blvd.
5      Metairie, Louisiana 70002
          ATTORNEYS FOR ORLEANS LEVEE DISTRICT
6
7
     GOODWIN PROCTER LLP
8      (BY: MARK S. RAFFMAN, ESQ.)
       901 New York Avenue NW
9      Washington, D.C. 20001
          ATTORNEYS FOR LAFARGE NORTH AMERICA
10
11
12   ALSO PRESENT:
       Richard J. Varuso
13
14
     VIDEOTAPED BY: Greg Cassin, Depo-Vue
15
16
     REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
17       Certified Court Reporter,
         State of Louisiana
18
19
20
21
22
23
24
25

Page 5

1      S T I P U L A T I O N
2
3      It is stipulated and agreed by and between
4  counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken under the
7  Federal Rules of Civil Procedure, for all
8  purposes, in accordance with law;
9      That the formalities of reading and
10 signing are not waived;
11     That the formalities of certification and
12 filing are specifically waived;
13     That all objections, save those as to the
14 form of the question and the responsiveness of
15 the answer, are hereby reserved until such
16 time as this deposition, or any part thereof,
17 may be used or sought to be used in evidence.
18
19     * * * *
20
21     ROGER D. JOHNS, RDR, CRR Certified Court
22 Reporter, for the State of Louisiana,
23 officiated in administering the oath to the
24 witness.
25

BEA, ROBERT GLENN

11/19/2007

Page 122

1    Q.  What is the basis of that assertion,
2  sir?
3    A.  The multiple field studies that I
4  participated in on Reach 2 of the Mississippi
5  River Gulf Outlet EBSBs.
6    Q.  Okay.  So is that essentially a
7  conclusion based upon what you observed in the
8  wake of Hurricane Katrina at those locations
9  that you visited?
10   A.  That and information that became
11  subsequent to those visits.
12   Q.  Okay.  And what information?
13   A.  For example, soil borings.
14   Q.  Which soil borings would you be
15  referring to, if you know?
16   A.  I don't recall the numbers, but
17  there is something of the order of 30 soil
18  borings along Reach 2 of -- along Reach 2.
19   Q.  Would these be soil borings taken
20  from the center line of the earthen levees or
21  earthen embankments?
22   A.  In some cases, yes.
23   Q.  Well, you referred to 30.  I thought
24  you had 30 specifically in mind.  Are these --
25  Some soil borings as I understand it were

Page 123

1  taken along the --
2    A.  Alignment.
3    Q.  -- alignment of the MRGO itself.
4    A.  Correct.
5    Q.  The waterway.
6    A.  Correct.
7    Q.  And I am just trying to find out if
8  the soil borings that informed your opinion
9  about what was built there were soil borings
10  that were taken from the navigation channel.
11   A.  (Witness shakes head negatively.)
12   Q.  No?
13   A.  No.
14   Q.  From the levee alignment itself?
15   A.  Correct.
16   Q.  And these would be USACE documents?
17   A.  USACE?
18   Q.  When I say "these", I mean the 30
19  soil borings that you're referring to, these
20  were soil borings that were performed at the
21  behest of the Corps of Engineers?
22   A.  That plus the additional ones we
23  performed there.
24   Q.  Subsequent to Hurricane Katrina?
25   A.  Correct.

Page 124

1    MR. SMITH:
2      Well, Pierce, it looks like you
3  get your wish.  It looks like we're about out of
4  time on the videotape.  So let's take
5  a break now.
6    MR. O'DONNELL:
7      Okay.  Great.
8    VIDEO OPERATOR:
9      Off the record.  This concludes
10  tape two.
11   (Recess.)
12   VIDEO OPERATOR:
13     We're back on the record.  It's
14  11:33.  This is the start of tape 3.
15 EXAMINATION BY MR. SMITH:
16   Q.  Dr. Bea, I wanted to ask you just a
17  question that I didn't ask you earlier and
18  it's a little bit unrelated, but just to go
19  back and clean it up.  You are being paid on,
20  compensated on an hourly basis by the
21  Plaintiffs in this matter and you're producing
22  a written report every two weeks.  Do you get
23  paid on a regular basis?
24   A.  Yes.
25   Q.  And how frequently do you get paid?

Page 125

1    A.  Monthly from the University of
2  California at Berkeley.  Monthly from the
3  Consolidated Katrina Litigation Levees and
4  MRGO groups.
5    Q.  Are you being compensated separately
6  by the Robinson Plaintiffs or is --
7    A.  Correct.
8    Q.  I mean, when I say separately, I
9  mean is that in addition and separate to the
10  compensation you're receiving monthly from the
11  consolidated Katrina --
12   A.  It's part of.
13   Q.  Okay.  So --
14   A.  So there's two groups.  The levee
15  group and the GO group.
16   Q.  So you're billing some of your hours
17  to the MRGO group?
18   A.  Correct.
19   Q.  Some of your hours to the levee
20  group?
21   A.  Correct.
22   Q.  And how many -- Do you know how many
23  hours you have billed both of those two groups
24  together?
25   A.  Yes.  We can separate it and then

BEA, ROBERT GLENN

11/19/2007

| Page 126 |
|---|
| 1   you can total it.  Approximately 400 hours to |
| 2   the MRGO group; approximately 350 hours to the |
| 3   levee group. |
| 4      Q.  So 750 hours.  That would have been |
| 5   since -- |
| 6      A.  March, 2007. |
| 7      Q.  March of this year. |
| 8      A.  Correct. |
| 9      Q.  And that's a little more than seven |
| 10  months ago? |
| 11     A.  Correct. |
| 12     Q.  So about 100 -- approximately 100 |
| 13  hours a month? |
| 14     A.  Correct. |
| 15     Q.  The work that you're performing as |
| 16  part of the ILIT Team, I take it -- you have |
| 17  mentioned that it's for the benefit of the |
| 18  Plaintiffs in this litigation who have |
| 19  retained you, because you're using the results |
| 20  of those studies that you're pursuing in |
| 21  producing this report, for instance. |
| 22     A.  Correct. |
| 23     Q.  So are the hours that you're |
| 24  spending as extending and elaborating on the |
| 25  ILIT report, are you billing those to the |

| Page 127 |
|---|
| 1   Plaintiffs in this litigation? |
| 2      A.  No. |
| 3      Q.  Are you being compensated for that |
| 4   by the University? |
| 5      A.  No. |
| 6      Q.  Are you keeping track of those hours |
| 7   separate and apart from the hours that you're |
| 8   working for the Plaintiffs in this |
| 9   litigation? |
| 10     A.  Yes. |
| 11     Q.  Do you know how many hours you have |
| 12  spent on the ILIT -- |
| 13     A.  Related efforts? |
| 14     Q.  Related efforts? |
| 15     A.  Approximately 5,530. |
| 16     Q.  Now, that sounds like an update from |
| 17  the number that you listed in your report.  I |
| 18  think you said 5,000 in your report. |
| 19     A.  Uh-huh (affirmatively). |
| 20     Q.  You might have said more than.  So |
| 21  you just approximated it there. |
| 22     A.  Well, I've actually been spending |
| 23  more pro bono hours. |
| 24     Q.  I'm sorry, say that again, sir? |
| 25     A.  I have actually been spending much |

| Page 128 |
|---|
| 1   more pro bono hours since this report was |
| 2   written. |
| 3      Q.  More than you did before the report |
| 4   was written?  I mean, when you say more, I am |
| 5   not sure what the comparison is to. |
| 6      A.  Well, you're referring to the 5,000 |
| 7   hours here? |
| 8      Q.  Correct. |
| 9      A.  Well, since that time I have |
| 10  continued the pro bono work here. |
| 11     Q.  I see.  And that pro bono work is |
| 12  what you identify with the ILIT studies? |
| 13     A.  Correct. |
| 14     Q.  We were talking about the -- which I |
| 15  take it to be your criticism of the flood |
| 16  protection structures that were built by the |
| 17  Corps of Engineers along Reach 2 of the MRGO |
| 18  and along the New Orleans East Back Levee -- |
| 19     A.  Correct. |
| 20     Q.  -- before the break.  And your |
| 21  dissatisfaction, I suppose, with the work that |
| 22  was performed there led you to coin a phrase, |
| 23  "EBSB", -- |
| 24     A.  Correct. |
| 25     Q.  -- to describe those structures in |

| Page 129 |
|---|
| 1   those two locations. |
| 2      A.  That is correct. |
| 3      Q.  And I asked you specifically about |
| 4   what you describe in your report as a decision |
| 5   to build -- not to build levees, -- |
| 6      A.  Correct. |
| 7      Q.  -- but to build piles of dirt.  Is |
| 8   the decision not to build levees reflected in |
| 9   Design Memorandum Number 3, which is the |
| 10  design memorandum, 1966, November, for the |
| 11  Chalmette area -- |
| 12     A.  Correct. |
| 13     Q.  -- levees?  Okay.  I would like to |
| 14  turn your attention to that document at this |
| 15  time. |
| 16        MR. BAEZA: |
| 17           Just bring it over? |
| 18        THE WITNESS: |
| 19           Sure.  Whatever works. |
| 20        MR. O'DONNELL: |
| 21           Do you have another copy? |
| 22        MR. BAEZA: |
| 23           A couple of copies. |
| 24        MR. O'DONNELL: |
| 25           I just need one. |

33 (Pages 126 to 129)

56426bb5-e730-4b31-8a5e-52b73a281bb4

**EXHIBIT 15**



**"Scott Joanen"**
<scott@jbrunolaw.com>

01/22/2008 06:23 PM

To    "Treeby, William D." <wtreeby@stonepigman.com>, "Joe Bruno" <jbruno@jbrunolaw.com>
cc    "Shannon M Kasley" <smkasley@JonesDay.com>, "Wager-Zito, Adrian" <adrianwagerzito@jonesday.com>
bcc

Subject    RE: Subpoena for ILIT

Bill,

I disagree with your assessment of this entire matter. A subpoena was issued to the ILIT team by your Jones Day counterparts seeking extensive documentation, and the subpoena did not specify any limitations concerning the production. I do not have any knowledge of any communications between your Jones Day San Francisco office counterpart's communications with any Cal, Berkeley entities other than that which was forwarded to me last Friday, January 18, 2008 as an email string. However, it is my understanding of the gist of communication, given to me by Chris Patti, was that Jones Day would not give him any breathing room to produce documents unless he agreed to waive any rights to quash or seek a protective order.

Given the hostile environment created by Jones Day, the MRGO PSLC felt the need to protect the interests of the litigation; especially since the production requests drafted by Jones Day does not utilize ANY language designed to minimize the improper request for the MRGO PSLC's expert materials. In our conversation Friday, you indicated that any attempts to resolve this issue would need to be taken up with the District Court for the Northern District of California. At no time did you or your Jones Day counterparts indicate a realistic effort to amicably resolve this issue. As a result, the MRGO PSLC has now undertaken substantial efforts to address this matter with the District Court for the Northern District of California.

Because this will be an original filing, it must be filed at the clerk's counter; said filing cannot be done via the PACER system. I expect that my motions will be filed before close of business today. I have left instruction that a conformed copy be sent to me in electronic format at the earliest opportunity in order that I may provide a courtesy copy to the interested parties. As this will entail a two hour time difference, I cannot promise that I will get that copy to you today. However, you can be assured that I will not leave you out of my courtesy copy production, and I will forward a copy of this document to your attention as soon as I get it.

In the meantime, please advise if you will be willing to accept formal service of my Motions and eliminate the need of incurring any additional expenses.

Scott Joanen
The Law Office of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, LA, 70113
Telephone: (504) 525-1335
Toll Free: 1-800-966-1335
Facsimile: (504) 561-6775
Email: scott@jbrunolaw.com

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have recieved this transmission in error, please immediately notify us by telephone at (504) 525-1335.

**EXHIBIT 16**



| | | To | "Scott Joanen" <scott@jbrunolaw.com>, "Treeby, William D." |
| --- | --- | --- | --- |
| "Joe Bruno" <jbruno@jbrunolaw.com> | | | <wtreeby@stonepigman.com> |
| | | cc | "Shannon M Kasley" <smkasley@JonesDay.com>, |
| 01/23/2008 06:12 PM | | | "Wager-Zito, Adrian" <adrianwagerzito@jonesday.com>, |
| | | | "Joni Scioneaux" <joni@jbrunolaw.com> |
| | | bcc | |
| | | Subject | RE: Subpoena for ILIT |

History:    ⤷ This message has been forwarded.

Bill, we have filed appropriate motions to address this issues raised by the subpoena. Please call off the dogs until we can have the Court weigh in.

*Joseph M. Bruno*

**Joseph M. Bruno**
The Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile (504) 561-6775
Email: jbruno@jbrunolaw.com
Website: www.jbrunolaw.com

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as a recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone at (504) 525-1335.

**From:** Scott Joanen
**Sent:** Tuesday, January 22, 2008 5:23 PM
**To:** 'Treeby, William D.'; Joe Bruno
**Cc:** Shannon M Kasley; Wager-Zito, Adrian
**Subject:** RE: Subpoena for ILIT

Bill,

I disagree with your assessment of this entire matter. A subpoena was issued to the ILIT team by your Jones Day counterparts seeking extensive documentation, and the subpoena did not specify any limitations concerning the production. I do not have any knowledge of any communications between your Jones Day San Francisco office counterpart's communications with any Cal, Berkeley entities other than that which was forwarded to me last Friday, January 18, 2008 as an email string. However, it is my

understanding of the gist of communication, given to me by Chris Patti, was that Jones Day would not give him any breathing room to produce documents unless he agreed to waive any rights to quash or seek a protective order.

Given the hostile environment created by Jones Day, the MRGO PSLC felt the need to protect the interests of the litigation; especially since the production requests drafted by Jones Day does not utilize ANY language designed to minimize the improper request for the MRGO PSLC's expert materials. In our conversation Friday, you indicated that any attempts to resolve this issue would need to be taken up with the District Court for the Northern District of California. At no time did you or your Jones Day counterparts indicate a realistic effort to amicably resolve this issue. As a result, the MRGO PSLC has now undertaken substantial efforts to address this matter with the District Court for the Northern District of California.

Because this will be an original filing, it must be filed at the clerk's counter; said filing cannot be done via the PACER system. I expect that my motions will be filed before close of business today. I have left instruction that a conformed copy be sent to me in electronic format at the earliest opportunity in order that I may provide a courtesy copy to the interested parties. As this will entail a two hour time difference, I cannot promise that I will get that copy to you today. However, you can be assured that I will not leave you out of my courtesy copy production, and I will forward a copy of this document to your attention as soon as I get it.

In the meantime, please advise if you will be willing to accept formal service of my Motions and eliminate the need of incurring any additional expenses.

Scott Joanen
The Law Office of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, LA, 70113
Telephone: (504) 525-1335
Toll Free: 1-800-966-1335
Facsimile: (504) 561-6775
Email: scott@jbrunolaw.com

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have recieved this transmission in error, please immediately notify us by telephone at (504) 525-1335.

**From:** Treeby, William D. [mailto:wtreeby@stonepigman.com]
**Sent:** Tuesday, January 22, 2008 4:48 PM
**To:** Scott Joanen; Joe Bruno
**Cc:** Shannon M Kasley; Wager-Zito, Adrian
**Subject:** Subpoena for ILIT
**Importance:** High

Scott,

As I explained to you earlier today, we have made it clear to your office and to those who received the subpoena in the Northern District of California that we were not trying to secure any documents or work product of Dr. Bea (in connection with our ILIT subpoena) that was created since Dr. Bea was retained by the plaintiffs in the Katrina litigation, which he has testified (I believe) was in March

of 2007.  Any representation to the effect that WGII was attempting to "end run" expert discovery deadlines in the Katrina litigation by our subpoena to ILIT was wrong and misguided, and apparently ignored our earlier communications to this effect.

You indicated that something has been filed in the Northern District of California called a "Motion to Remit".  We have not been served with any such documents and any supporting materials.  Since it is obviously intended to have the effect of delaying or thwarting subpoenas for documents in the Katrina litigation, please immediately serve me with those filings, since you know we represent WGII who was the party that served that subpoena.

WTreeby

William D. Treeby (A Professional Corporation)
Stone Pigman Walther Wittmann LLC
546 Carondelet Street
New Orleans, LA 70130
Direct Dial (504) 593-0807
Direct Fax (504) 596-0807
e-mail <wtreeby@stonepigman.com>

---

**This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication.  The sender's name and other information in this e-mail are for information purposes only and are not electronic signatures.**

**EXHIBIT 17**



"Christopher Patti"
<Christopher.Patti@ucop.edu>

01/22/2008 07:45 PM

To    "Shannon M Kasley" <smkasley@JonesDay.com>

cc    "Adrian Wager-Zito" <adrianwagerzito@JonesDay.com>,
      <wtreeby@stonepigman.com>

bcc

Subject    RE: Katrina Litigation--Subpoena to "ILIT"/UC
           Berkeley/Center for Technology Research in the Interest of
           Society

History:        ⤷ This message has been forwarded.

Shannon,

I've now reviewed your January 22, 2008 letter, which apparently did
cross with my earlier e-mail. While there are a number of statements in
the letter with which I take issue, at this point I will address only
the following:

First, I take exception to your accusation of bad faith. At the time I
requested an extension of the January 19, 2008, deadline, although
plaintiffs' counsel had informed me (in December) that they might file a
motion to quash, I was unaware whether they actually intended to do so
or what the timing of any such motion might be. My request was purely
for the purpose of providing adequate time for the collection of
documents from individuals, something which I had voluntarily offered to
do as a convenience to all parties.

Second, as indicated in my e-mail of earlier today, whatever its
funding, ILIT is not and never was a UC entity. Rather, I understand
that it was an ad hoc team of researchers from various institutions that
was partially funded by CITRIS. There is no "ILIT" at the University of
California from which documents could be produced. CITRIS has no
responsive documents. Therefore, the subpoena has been fully complied
with.

Finally, given our inability to reach agreement on terms for the
voluntary collection of documents from individual UC Berkeley personnel,
I will inform those individuals that they may discontinue their
collection efforts.

Regards,


Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Tuesday, January 22, 2008 3:11 PM
To: Christopher Patti
Cc: Adrian Wager-Zito; Christopher Patti; wtreeby@stonepigman.com
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society
Importance: High

**EXHIBIT 18**

| Adrian Wager-Zito/JonesDay | To | "Christopher Patti" <Christopher.Patti@ucop.edu> |
|---|---|---|
| Extension 43891 | cc | "Shannon M Kasley" <smkasley@JonesDay.com>, wtreeby@stonepigman.com |
| 01/23/2008 12:07 PM | bcc | |
| | Subject | RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society |

Chris - On behalf of Shannon Kasley, attached please find a response to your e-mail.

Adrian Wager-Zito
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
adrianwagerzito@jonesday.com
Tel:  202/879-3891
Fax: 202/626-1700

| "Christopher Patti" <Christopher.Patti@ucop.edu> | To | "Shannon M Kasley" <smkasley@JonesDay.com> |
|---|---|---|
| | cc | "Adrian Wager-Zito" <adrianwagerzito@JonesDay.com>, <wtreeby@stonepigman.com> |
| 01/22/2008 07:45 PM | Subject | RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center for Technology Research in the Interest of Society |

```
Shannon,

I've now reviewed your January 22, 2008 letter, which apparently did
cross with my earlier e-mail.  While there are a number of statements in
the letter with which I take issue, at this point I will address only
the following:

First, I take exception to your accusation of bad faith.  At the time I
requested an extension of the January 19, 2008, deadline, although
plaintiffs' counsel had informed me (in December) that they might file a
motion to quash, I was unaware whether they actually intended to do so
or what the timing of any such motion might be.  My request was purely
for the purpose of providing adequate time for the collection of
documents from individuals, something which I had voluntarily offered to
do as a convenience to all parties.

Second, as indicated in my e-mail of earlier today, whatever its
```

funding, ILIT is not and never was a UC entity.  Rather, I understand
that it was an ad hoc team of researchers from various institutions that
was partially funded by CITRIS.  There is no "ILIT" at the University of
California from which documents could be produced.  CITRIS has no
responsive documents.  Therefore, the subpoena has been fully complied
with.

Finally, given our inability to reach agreement on terms for the
voluntary collection of documents from individual UC Berkeley personnel,
I will inform those individuals that they may discontinue their
collection efforts.

Regards,


Christopher M. Patti
University Counsel
1111 Franklin St., 8th Fl.
Oakland, CA  94607
Tel: (510) 987-9800
Fax: (510) 987-9757

-----Original Message-----
From: Shannon M Kasley [mailto:smkasley@JonesDay.com]
Sent: Tuesday, January 22, 2008 3:11 PM
To: Christopher Patti
Cc: Adrian Wager-Zito; Christopher Patti; wtreeby@stonepigman.com
Subject: RE: Katrina Litigation--Subpoena to "ILIT"/UC Berkeley/Center
for Technology Research in the Interest of Society
Importance: High

Chris,

I just sent you a letter in response to your 1/18/08 e-mail, which
probably
crossed with this e-mail.

I look forward to your response.

Shannon M. Kasley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202.879.3710
202.626.1700 (fax)



          "Christopher

          Patti"

          <Christopher.Patt
To
          i@ucop.edu>              "Christopher Patti"

                                   <Christopher.Patti@ucop.edu>,

                                   "Shannon M Kasley"

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

202.879.3710
smkasley@jonesday.com

January 23, 2008

**VIA E-MAIL**

Christopher M. Patti
University Counsel
University of California at Berkeley
1111 Franklin St., 8th Fl.
Oakland, CA  94607

Re:     In Re Katrina Canal Breaches Consol. Litig.

Dear Chris:

I write to respond to your e-mail that I received at 7:45 p.m. (EST) last night.

Your argument that you "voluntarily offered" to collect documents "as a convenience to all parties" from members of the Independent Levee Investigation Team ("ILIT") employed or attending graduate school at the University of California-Berkeley rings hollow.  As you were aware, Washington Group International, Inc.'s November 19, 2007 third-party subpoena ("Subpoena") to ILIT in the above-referenced case clearly defined ILIT in a way that included UC-Berkeley professors like Prof. Bea and others, as well as graduate students:

> 3.     "ILIT" means the Independent Levee Investigation Team, led by the University of California at Berkeley and funded in part by the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"); any of ILIT's members, employees, affiliates, representatives, advisors, agents, attorneys or associates; or any other person acting on behalf of the ILIT in any capacity.

> 4.     "You," or "Your" means the ILIT and/or the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"), its predecessors, parents, subsidiaries, affiliates, and any of its present or former directors, officers, agents, employees, designees, assignees, representatives or other persons acting on its behalf.

JONES DAY

Christopher M. Patti
January 23, 2008
Page 2

Subpoena at Schedule A, pg. 2. Therefore, you were duty bound under the Federal Rules of
Civil Procedure to determine whether responsive documents were in the possession of UC-
Berkeley professors and graduate students who were "members, . . ., representatives, advisors,
. . . or any other person acting on behalf of ILIT" and/or "representatives or other persons acting
on . . . behalf" of "ILIT and/or the University of California at Berkeley's Center for Technology
Research in the Interest of Society ('CITRIS')" and to collect those documents for production.
Any argument to the contrary is specious. Furthermore, you had a duty since November 19,
2007 to preserve responsive documents from these individuals even if ILIT no longer exists (a
point directly refuted by the sworn testimony of a Berkeley professor on November 11, 2007)
and you have a continuing duty to collect and produce documents.

        You continue to return to the argument that "ILIT is not and never was a UC entity."
WGII understands your position and disagrees and believes that the facts belie your position.
For example, a review of the UC-Berkeley Department of Civil and Environmental Engineering
website yesterday, January 22, 2008, and again this morning, revealed numerous pages
referencing ILIT and describing ILIT as "UC-Berkeley led" and "sponsored" by CITRIS. At
least five UC-Berkeley professors are identified as members of the ILIT team, along with no
fewer than seven UC-Berkeley graduate students. ILIT is further described as being "led by
Professor Raymond Seed." Profs. Seed and Bea are identified in the UC-Berkeley Department
of Civil and Environmental Engineering website as "co-author[s]" of the ILIT Report and a copy
of the Report is available via a link identified as the "ILIT Download Center." The web address
for the "ILIT Download Center" is www.ce.berkeley.edu/~new_orleans/. Finally, as recently as
May 15, 2007, the University bestowed upon Prof. Bea its "Chancellor's Award for Public
Service 2006/07" for his ILIT work. While these are only a sampling of the numerous times the
UC-Berkeley Department of Civil and Environmental Engineering website references ILIT,
WGII believes, despite your protestations now in the face of the Subpoena, that the University
has made its connection with and lead role in ILIT very clear to the public.

        WGII have attempted to resolve this matter in good faith. It agreed to eight weeks for the
University to respond, even after the deadline for written objections had passed and WGII
arguably could have demanded a response by the original December 19, 2007 deadline. As we
have repeatedly explained, WGII is not seeking any documents from Prof. Bea after his retention
by Plaintiffs as an expert in this litigation in March, 2007 and we remain willing to enter into a
stipulation to that effect. WGII has been very accommodating with the University. Although we
still have not seen the filing in the Northern District of California, we understand from a
communication from Plaintiffs' counsel last night that it paints WGII in a very different light, but
we are ready and will be able to defend easily our actions to date with respect to the Subpoena.
Given that motion practice has apparently now been initiated and it does not appear that we can
come to some sort of a resolution short of continued motion practice, WGII will seek the
appropriate relief with respect to the University. I understand your threat that you will inform
Prof. Bea and other UC-Berkeley personnel "that they may discontinue collection efforts" and
we see that as an unfortunate development, directly in contravention to the Federal Rules of Civil

JONES DAY

Christopher M. Patti
January 23, 2008
Page 3

Procedure, and we reserve all of WGII's rights with respect to possible spoliation of evidence as a result of your instruction.

Sincerely,

*Shannon M. Kasley*
*by eeo*

Shannon M. Kasley

cc:    William D. Treeby, Esq.
       Adrian Wager-Zito, Esq.

**EXHIBIT 19**



"Lee Jackson"
<Lee.Jackson@ucop.edu>

01/23/2008 04:31 PM

To  <smkasley@JonesDay.com>

cc

bcc

Subject  In re Katrina Canal Breaches Litigation

History:          ⤷ This message has been forwarded.

The attached is being forwarded to you from the Office of the General
Counsel, University of California.

Christopher M. Patti, University Counsel
(by way of Lee Jackson)
University of California, Office of the General Counsel
Telephone:  (510) 987-9800
Fax:  (510) 987-9757



ln001.PDF

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
OFFICE OF THE GENERAL COUNSEL



1111 Franklin Street, 8th Floor • Oakland, California 94607-5200 • (510) 987-9800 • FAX (510) 987-9757

Charles F. Robinson
VICE PRESIDENT AND GENERAL COUNSEL

Writer's direct line:  (510) 987-9739
E-mail:  christopher.patti@ucop.edu

January 23, 2008

**VIA E-MAIL:  SMKASLEY@JONESDAY.COM**

Shannon M. Kasley
51 Louisiana Ave., N.W.
Washington, D.C.  20001-2113

Re:     In Re Katrina Canal Breaches Litigation

Dear Shannon:

I have your January 23, 2008, letter.  It would not be especially productive for me to respond in detail to all the statements it contains with which I disagree.  Essentially, it appears that WGI is now seeking to argue that its subpoena directed to the Independent Levee Investigation Team ("ILIT") at the UC Berkeley Center for Technology Research in the Interests of Society ("CITRIS") requires a response from certain individuals who were neither named in nor served with the subpoena and who are not, by the way, associated with CITRIS.  You seem to be making this assertion based on your claim that ILIT is a University of California entity, despite the acknowledgment in your December 6, 2007, electronic mail message to me that "we understand that ILIT is not a University entity."  If, as threatened in your January 23 letter, WGI wishes to "seek the appropriate relief with respect to the University" under these circumstances, I suppose it is free to do so.

I do want make clear that you have grossly misunderstood my statement that I would instruct individuals that they could cease efforts to collect documents of the type called for in the ILIT subpoena.  You seem to have interpreted that statement to mean that I intended to instruct individuals that they no longer needed to retain documents or that they may dispose of them.  I

Shannon M. Kasley
January 23, 2008
Page 2


am not sure how you came to that understanding, but it is incorrect.  In any event, please be
aware that UC Berkeley personnel who were on the ILIT (with the exception of Prof. Bea) will
continue to collect documents responsive to the similar subpoena issued by Lafarge North
America, Inc., which has agreed to a February 8, 2008, response date.

Sincerely,

Christopher M. Patti
University Counsel


CMP/lj

**EXHIBIT 20**



"Treeby, William D."
<wtreeby@stonepigman.com
>

01/24/2008 09:25 AM

To   "Shannon M Kasley" <smkasley@JonesDay.com>,
     "Wager-Zito, Adrian" <adrianwagerzito@jonesday.com>,
     <dsclayman@jonesday.com>

cc

bcc

Subject   FW: Subpoena for ILIT

| History: | ✉ This message has been replied to and forwarded. |
|---|---|

Shannon and Adrian,

   Here is Scott's response to my request. This should tell the CA counsel where to look for the ILIT matter.

   WTreeby


William D. Treeby (A Professional Corporation)
Stone Pigman Walther Wittmann LLC
546 Carondelet Street
New Orleans, LA 70130
Direct Dial (504) 593-0807
Direct Fax (504) 596-0807
e-mail <wtreeby@stonepigman.com>
**This communication is from a law firm and may be privileged and confidential. If you are not the intended recipient, please notify the sender by reply e-mail and destroy all copies of this communication. The sender's name and other information in this e-mail are for information purposes only and are not electronic signatures.**



**From:** Scott Joanen [mailto:scott@jbrunolaw.com]
**Sent:** Thursday, January 24, 2008 4:46 AM
**To:** Treeby, William D.; Joe Bruno
**Subject:** RE: Subpoena for ILIT

Bill,

Attached are pdf's of the endorsed caption pages. Hard copies are headed your way via first class mail service from the West Coast.


**From:** Treeby, William D. [mailto:wtreeby@stonepigman.com]
**Sent:** Wednesday, January 23, 2008 9:47 PM
**To:** Joe Bruno
**Cc:** Scott Joanen
**Subject:** RE: Subpoena for ILIT


**Joe,**

**Please have Scott send us a conformed copy of the pleadings that were filed in California. He sent copies, but without any designation of the Case No., Division of Court, etc.**
**WTreeby**


William D. Treeby
546 Carondelet St.
New Orleans, LA 70130
Office: (504) 593-0807
Cell:    (504) 388-0291
e-mail: <wtreeby@stonepigman.com>


**From:** Joe Bruno [mailto:jbruno@jbrunolaw.com]
**Sent:** Wednesday, January 23, 2008 5:13 PM
**To:** Scott Joanen; Treeby, William D.
**Cc:** Shannon M Kasley; Wager-Zito, Adrian; Joni Scioneaux
**Subject:** RE: Subpoena for ILIT
Bill, we have filed appropriate motions to address this issues raised by the subpoena. Please call off the dogs until we can have the Court weigh in.


**Joseph M. Bruno**
The Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile (504) 561-6775
Email: jbruno@jbrunolaw.com
Website: www.jbrunolaw.com


The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as a recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone at (504) 525-1335.


**From:** Scott Joanen

1   JOEWEPH W. COTCHETT (# 36324)
    PHILLIP L. GREGORY (# 95217)
2   JOSEPH C. WILSON (# 249027)
    **COTCHETT, PITRE & McCARTHY**
3   San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
4   Burlingame, CA 94010
    Telephone: (650) 697-6000
5   Facsimile: (650) 692-0577
    E-mail: jcotchett@cpmlegal.com
6           pgregory@cpmlegal.com
            jwilson@cpmlegal.com
7

8

9                   **UNITED STATES DISTRICT COURT**

10                  **EASTERN DISTRICT OF LOUISIANA**

11

12  IN RE: KATRINA CANAL BREACHES          Case No. 05-4182 "K" (2)
        CONSOLIDATED LITIGATION
13                                         **MEMORANDUM IN SUPPORT OF
                                           MOTION TO QUASH and**
14                                         **CONTEMPORANEOUS MOTION TO
                                           STAY PRODUCTION**
15
16  _____       **(PENDING IN UNITED STATES
                                           DISTRICT COURT FOR THE EASTERN**
    PERTAINS TO MRGO                       **DISTRICT OF LOUISIANA BEFORE
17                                         THE HON. STANWOOD R. DUVAL, JR.)**

18                                         **TO BE FILED AS MISCELLANEOUS
                                           CASE.**
19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**MEMORANDUM IN SUPPORT OF MOTION TO QUASH and CONTEMPORANEOUS
MOTION TO STAY PRODUCTION**, Case No. Case No. 05-4182 "K" (2)

●                    ●

1    JOEWEPH W. COTCHETT (# 36324)
     PHILLIP L. GREGORY  (# 95217)
2    JOSEPH C. WILSON  (# 249027)
     **COTCHETT, PITRE & McCARTHY**
3    San Francisco Airport Office Center
     840 Malcolm Road, Suite 200
4    Burlingame, CA  94010
     Telephone:  (650) 697-6000
5    Facsimile:  (650) 692-0577
     E-mail: jcotchett@cpmlegal.com
6         pgregory@cpmlegal.com
          jwilson@cpmlegal.com
7

8

9                 **UNITED STATES DISTRICT COURT**

10               **EASTERN DISTRICT OF LOUISIANA**

11

12   IN RE:  KATRINA  CANAL  BREACHES          Case No. 05-4182 "K" (2)
            CONSOLIDATED   LITIGATION
13                                             **MOTION TO REMIT**
                                                                        **PJH**
14

15                                             **(PENDING IN UNITED STATES
                                               DISTRICT COURT FOR THE EASTERN
16   PERTAINS TO MRGO                          DISTRICT OF LOUISIANA BEFORE
                                               THE HON. STANWOOD R. DUVAL, JR.)**
17
                                               **TO BE FILED AS MISCELLANEOUS
18                                             CASE.**

19

20

21

22

23

24

25

26

27

⊕    28
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**MOTION TO REMIT**, Case No. Case No. 05-4182 "K" (2)

1 | JOEWEPH W. COTCHETT (# 36324)
PHILLIP L. GREGORY  (# 95217)
2 | JOSEPH C. WILSON  (# 249027)
**COTCHETT, PITRE & McCARTHY**
3 | San Francisco Airport Office Center
840 Malcolm Road, Suite 200
4 | Burlingame, CA  94010
Telephone:  (650) 697-6000
5 | Facsimile:  (650) 692-0577
E-mail: jcotchett@cpmlegal.com
6 |        pgregory@cpmlegal.com
        jwilson@cpmlegal.com
7 |

8 |

9 |                **UNITED STATES DISTRICT COURT**

10 |                **EASTERN DISTRICT OF LOUISIANA**

11 |

12 | IN RE:  KATRINA CANAL  BREACHES | Case No. 05-4182 "K" (2)
       CONSOLIDATED   LITIGATION
13 |                                | **MOTION TO QUASH and**
                                    | **CONTEMPORANEOUS MOTION TO**
14 |                                | **STAY PRODUCTION**
15 |                                | **(PENDING IN UNITED STATES**
                                    | **DISTRICT COURT FOR THE EASTERN**
16 | PERTAINS TO MRGO               | **DISTRICT OF LOUISIANA BEFORE**
                                    | **THE HON. STANWOOD R. DUVAL, JR.)**
17 |
18 |                                | **TO BE FILED AS MISCELLANEOUS**
                                    | **CASE.**
19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**MOTION TO QUASH and CONTEMPORANEOUS MOTION TO STAY PRODUCTION,**
Case No. Case No. 05-4182 "K" (2)



1  JOEWEPH W. COTCHETT (# 36324)
   PHILLIP L. GREGORY (# 95217)
2  JOSEPH C. WILSON (# 249027)
   **COTCHETT, PITRE & McCARTHY**
3  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
4  Burlingame, CA  94010
   Telephone:  (650) 697-6000
5  Facsimile:  (650) 692-0577
   E-mail: jcotchett@cpmlegal.com
6          pgregory@cpmlegal.com
           jwilson@cpmlegal.com
7

8

9            **UNITED STATES DISTRICT COURT**

10          **EASTERN DISTRICT OF LOUISIANA**

11

12  IN RE:  KATRINA CANAL  BREACHES          Case No. 05-4182 "K" (2)
            CONSOLIDATED   LITIGATION
13                                           **[Proposed] ORDER GRANTING PJH
                                             MOTION TO REMIT**
14

15

16                                           **(PENDING IN UNITED STATES
                                             DISTRICT COURT FOR THE EASTERN**
17  PERTAINS TO MRGO                         **DISTRICT OF LOUISIANA BEFORE
                                             THE HON. STANWOOD R. DUVAL, JR.)**
18
                                             **TO BE FILED AS MISCELLANEOUS
19                                           CASE.**

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**[Proposed] ORDER GRANTING MOTION TO REMIT,**
Case No. Case No. 05-4182 "K" (2)

1  JOEWEPH W. COTCHETT (# 36324)
   PHILLIP L. GREGORY  (# 95217)
2  JOSEPH C. WILSON  (# 249027)
   **COTCHETT, PITRE & McCARTHY**
3  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
4  Burlingame, CA  94010
   Telephone:  (650) 697-6000
5  Facsimile:  (650) 692-0577
   E-mail: jcotchett@cpmlegal.com
6        pgregory@cpmlegal.com
         jwilson@cpmlegal.com
7

ORIGINAL
FILED

JAN 2 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9              **UNITED STATES DISTRICT COURT**

10             **EASTERN DISTRICT OF LOUISIANA**

11

12  IN RE:  KATRINA  CANAL  BREACHES        Case No. 05-4182 "K" (2)
            CONSOLIDATED   LITIGATION
13                                          **MEMORANDUM IN SUPPORT**  PJH
                                            **MOTION TO REMIT**
14

15
                                            **(PENDING IN UNITED STATES**
16  _____     **DISTRICT COURT FOR THE EASTERN**
                                            **DISTRICT OF LOUISIANA BEFORE**
    PERTAINS TO MRGO                        **THE HON. STANWOOD R. DUVAL, JR.)**
17

18                                          **TO BE FILED AS MISCELLANEOUS**
                                            **CASE.**
19  _____

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

**MEMORANDUM IN SUPPORT OF MOTION TO REMIT,**
Case No. Case No. 05-4182 "K" (2)

**EXHIBIT 21**

05.24.2006 - UC Berkeley-led levee investigation team releases final report at public meeting in New Orleans

UC Berkeley
>



NewsCenter

► Today's news & events
► Subscribe to news
► For the news media
► Calendar of events

**Top stories:**
Young student's ADHD memoir sees disorder as 'a gift'



Students' political, religious and social convictions, by the numbers



Campus to remove diseased Monterey pines from Gill Tract in Albany

**More news:** Chancellor's perspective on affordability | Environmental footprint

## UC Berkeley-led levee investigation team releases final report at public meeting in New Orleans

By Robert Sanders, Media Relations | 24 May 2006

**BERKELEY** – A team of engineers conducting an independent investigation of the failure of New Orleans' levees during Hurricane Katrina issued a draft of its final report this week, concluding that the levees failed because of design and construction errors resulting from insufficient money and lack of appropriate oversight by federal, state and local agencies, in particular the U.S. Army Corps of Engineers.



Water pushes wall and embankment out

**Levee breach video**
This animation shows how the 17th Street Canal levee failed during Hurricane Katrina. Pushed by a storm surge, the rising water in the canal shoved the flood wall outward, cutting the levee in half. The water pressure was now sufficient to push the levee and floodwall horizontally, sliding along a weak layer of jelly-like clay. The inflowing water rapidly widened the breach. Credit: Trent Schindler/National Science Foundation
🎬 Watch video (3.2Mb Quicktime)

The team, led by Raymond Seed, a University of California, Berkeley, professor of civil and environmental engineering, recommends in its May 22 report a broad reorganization of the Corps, which oversees most of the nation's dams, waterways and levees, and a restructuring of federal, state and local oversight of levees to prevent a similar disaster in the future.

The 700+-page report was funded with $230,000 from the National Science Foundation, another $50,000 from UC Berkeley's Center for Technology Research in the Interest of Society (CITRIS), and the donated time of 36

professional engineers and scientists from around the nation. The team studied every stretch of the levee system, either on the ground or from the air, conducted soil tests and ran computer simulations.

Its results differ from those of many previous reports, in particular that of the Corps' own Interagency Performance Evaluation Taskforce (IPET). According to Seed, the Corps always has maintained that the levees breached because they were overtopped by an unexpectedly high storm surge.

"These levees were not overtopped, they failed, primarily as a result of human error," Seed said. " The hurricane wasn't much bigger than the levees were designed for."

"One of our major findings is that the levee system protecting New Orleans was defective as a result of dysfunctional organizations," emphasized report coauthor Bob Bea, UC Berkeley professor of civil and environmental engineering. "The Corps needs to be modernized, and federal and state oversight of flood control restructured, because they can't build a safe levee with current processes."

Among the report's findings are that:

1. The 17th Street Canal levee was doomed to fail because of three weaknesses in the soil on which it was built, two of which should have been foreseen. As flood waters rose in the canal, they tipped the floodwall and flowed into the gap at its base, cutting the levee in two. Under the weight of the water, the outer half of the levee then slid horizontally along a weak layer of flocculated clay with a jelly-like consistency, perhaps laid down by a previous hurricane. Seed referred to this as a "peanut butter and jelly" failure.

Sticks mixed with the jelly-like clay probably concealed it during test borings done before the levee was built. But a close look at the borings should have revealed two other weakness: a layer of marshy material or peat, which would have failed had the jelly not failed first; and a deep layer of soft clay that also would have given way.

"The levee was going to fail anytime the water got up to eight or nine feet on the flood wall," Seed said. He noted that the IPET study found that the tipped floodwall failure could not have been foreseen, even though a full-scale test by the Corps in 1978 of a flood wall identical to that at the 17th Street canal concluded that such a failure was likely.

2. The flooding of New Orleans' Ninth Ward was a "failure in three acts," according to Seed. The levee along the Mississippi River Gulf Outlet was composed of highly erodable material, including shell sand, that was overtopped and washed away by 16- to 19-foot storm surges from Katrina. The surges continued across seven miles of treeless bayou to inundate the ward from the east.

Later, hurricane-pushed water surged up the Industrial Canal, overtopping the levees and flood walls in two spots. Failure, however, was not the result

05.24.2006 - UC Berkeley-led levee investigation team releases final report at public meeting in New Orleans

of overtopping, but rather, was due to seepage through the levee, which eventually led to blowouts that rapidly eroded the levee and undermined the flood wall. Flood waters poured in to meet the flooding coming from the east.

### Tree Damage



The southern breach of the London Avenue Canal was most likely caused by one or more trees growing on the levee. Tree roots provide an entry point for rising water, as illustrated in this drawing. *(Illustration by Zina Deretsky/ National Science Foundation)*

This material "should never have been used in a levee," Seed said. "A lot of that material is still in the levee, and if it didn't fail during Katrina, it will fail next time."

3. The London Avenue South failure was not a result of overtopping, as claimed by the IPET report, but rather seepage through the levee that weakened it and led to a breach. The seepage probably was aided by one or more trees on the levee that should have been removed, the team concluded. A second breach resulted from unstable soils beneath the levee.

In its executive summary, the report says "a large number of engineering errors and poor judgements" contributed to the design failures of the London Avenue and 17th Street canals. "In addition, a number of these same problems appear to be somewhat pervasive," it says, "and call into question the integrity and reliability of other sections of the flood protection system that did not fail during this event."

The report also highlights the organizational problems that led to failure of the levees. The Corps did not adequately oversee the entire levee system, the report notes, and laid off many of its geotechnical engineers who could have effectively overseen its construction and maintenance. Instead, it says, levees were planned and built without adequate oversight.

"They took the engineering out of the Corps of Engineers," Bea said. "Much of this was a result of mandates by the White House, Congress and the state to be better, faster and cheaper, but you can't have all three at once without lowering the quality and reliability of the flood defense system."

According to the report, because the Corps allowed local levee districts to build and maintain portions of the levee system without proper oversight, these flood walls and levees were built to different standards that left weak links where the pieces met. "Many failures developed at interfaces or 'joints' in the New Orleans Flood Defense System," the report notes.

For example, the Corps had long fought to install floodgates to protect the three canals that cut through New Orleans, but it couldn't sway the local Levee Board or Water and Sewerage Board to agree. As a result, the long expanse of levees lining the canals had to be strengthened to withstand a hurricane.

"As a result of the decision not to install the floodgates, the three canals represented potentially vulnerable "daggers" pointed at the heart of the main metropolitan New Orleans protected basin," the report states. Without floodgates, the report says, the London Avenue canal suffered two breaches and the 17th Street Canal one breach as a result of Katrina, letting in 80 percent of the floodwaters that inundated downtown New Orleans.

The UC Berkeley-led team recommends changes from the White House to the local levee district that include a risk management council reporting directly to the President, a risk assessment office in Congress, and parallel offices at the state level. Seed said the team's main recommendation is not to replace the Corps, but to refocus it on engineering,

"The corps has lost its technical capability, and we want to build it back up," Seed said.

**Links:**

Draft final report of the UC Berkeley-led independent levee investigation team

UC Berkeley | NewsCenter | A-Z List of Web Sites | People Finder
Comments? E-mail newscenter@berkeley.edu
Copyright UC Regents

**EXHIBIT 22**

## UC Berkeley Press Release

### Hurricane Katrina experts available for interviews

By Media Relations | 01 September 2005

**BERKELEY** – 8/31/05 - File #17033
Contact: Media Relations
(510) 643-3714

MEMO TO REPORTERS: Hurricane Katrina Aftermath Experts

The following University of California, Berkeley, experts are available for media interviews related to the aftermath of Hurricane Katrina.

LEVEES AND OTHER ENGINEERING CHALLENGES

Robert Bea
UC Berkeley professor of civil engineering
Campus Office: (510) 642-0967 (Monday, Wednesday, Friday)
Home Office: (925) 631-1587 (Tuesday, Thursday)
E-mail: bea@ce.berkeley.edu
Media Relations contact: Sarah Yang, (510) 643-7741, scyang@berkeley.edu
Broadcast contact: Julie Huang, (510) 642-6051, juliehuang@berkeley.edu

Expertise: Bea has expertise in the construction and maintenance of offshore oil platforms and pipelines, and has first-hand knowledge of the levee system in New Orleans, where he lived a total of eight years with his family while working as chief of offshore civil engineering for Shell Oil. He survived Hurricane Betsy, which hit the region in 1965, but lost his home to flooding. Many of the same problems the city is now experiencing with Hurricane Katrina -- failures of the levee and pump systems -- actually occurred during Hurricane Betsy.

Exacerbating the flooding dangers for New Orleans is the fact that the city sits below sea level and the soil in the region is soft and easily saturated, Bea points out. In addition, channels were constructed to make it easier for large cargo ships to reach New Orleans. The problem, says Bea, is that those channels also make it easier for sea water to rush towards the city.

Regarding the supply of oil from the Gulf of Mexico, Bea notes that last year's Hurricane Ivan brought down 10 percent of the oil supply facilities (platforms, pipelines, etc.) in the area. Hurricane Katrina, in contrast, has put 95 percent of the oil supply facilities out of service. "Oil prices jumped $3 a barrel overnight in response to Ivan. I would expect a significantly higher jump in oil prices with Katrina," said Bea.

PUBLIC HEALTH THREATS

Arthur Reingold, MD
Professor and head of epidemiology
Office: (510) 642-0327
Cell: (510) 610-0553
E-mail: reingold@berkeley.edu
Media Relations contact: Sarah Yang, (510) 643-7741, scyang@berkeley.edu
Broadcast contact: Julie Huang, (510) 642-6051, juliehuang@berkeley.edu

Expertise: Reingold can address both the acute and longer term health threats related to the aftermath of Hurricane Katrina. He heads the California Emerging Infections Program, a joint program with state and local health departments, and is the principal investigator for the CDC grant funding the Center for Infectious Disease Preparedness based at UC Berkeley.

He says the immediate threat to public health comes from the lack of access to appropriate hospital

care. The highest priority should be in enabling health care workers to handle acute injuries, from heart attacks to broken bones to snake bites, he says.

Another priority is to provide clean water to reduce the risk of waterborne infectious diseases, such as viral gastroenteritis, hepatitis A and other illnesses related to the drinking of contaminated water. He notes that people who find themselves frequently standing in or walking through contaminated water -- such as rescue or relief workers -- could also be at risk for illnesses. There have been cases in the United States of leptospirosis, an infection caused by bacteria that can burrow through the skin.

Reingold says it will be difficult to predict the impact of mosquito-borne diseases such as West Nile virus. He notes that many species of mosquitoes are very particular about their breeding sites and may not find the floodwaters ideal. He also says that while dead bodies are extremely upsetting emotionally, they are not a significant health risk.

GAS PRICES

Severin Borenstein*
Professor of business administration and public policy, director of the UC Energy Institute, research associate for the National Bureau of Economic Research
Office: (510) 642-3689
E-mail: borenste@haas.berkeley.edu
Media Relations contact: Kathleen Maclay, (510) 643-5651, kmaclay@berkeley.edu
Broadcast contact: Julie Huang, (510) 642-6051, juliehuang@berkeley.edu
*Available week of Aug. 29-Sept. 2 for print only

Expertise: Gasoline and oil market pricing and competition; U.S. and international airline industry and competition; electricity deregulation, market formation and competition

Dan Kammen
Professor of energy and resources and of public policy, director of the Renewable and Appropriate Energy Laboratory (RAEL)
Cell: (510) 459-9691
E-mail: kammen@socrates.berkeley.edu
Media relations contact: Robert Sanders, (510) 643-6998, rsanders@berkeley.edu

Expertise: Kammen has testified before U.S. House and Senate committees on energy and environmental issues. He has advised the New Apollo Energy Project, an initiative emphasizing energy independence and weaning the country from a reliance on imported fossil fuels by 2010.

POST-DISASTER RECONSTRUCTION, GOVERNMENT ROLE IN DISASTER RECOVERY

Mary Comerio
Professor of architecture
Office: (510) 642-2406 or call Media Relations at (510) 643-5651
E-mail: mcomerio@berkeley.edu
Media Relations contact: Kathleen Maclay, (510) 643-5651, kmaclay@berkeley.edu

Expertise: Comerio is an internationally recognized authority on post-disaster reconstruction issues, and says that people believe the Federal Emergency Management Agency will take care of them, and that perception will only change probably after a major disaster in which people can't get the help they expect. She recommends tax credits for modifying buildings and infrastructure to improve resistance to hazards, a reconception of the government's role in disaster recovery, and government intervention to revitalize the private disaster insurance market.

Comerio has spent much of the last 20 years on reconnaissance missions to the scenes of tragedies such as Hurricane Andrew, and the Loma Prieta, Kobe and Mexico City earthquakes. She advised in a 1998 book, "Disaster Hits Home: New Policy for Urban Housing Recovery," that unless new policies are adopted, natural disasters such as hurricanes and earthquakes will continue to leave economic and housing ruin in their wake.

**EXHIBIT 23**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES        CIVIL ACTION
CONSOLIDATED LITIGATION

                                       NO. 05-4182

                                  SECTION "K" (2)

FILED IN:     05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324,
                 05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152,
                 06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066,
                 06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159,
                 06-5161, 06-5260, 06-5162, 06-5771, 06-5937, 07-0206,
                 07-0621, 07-1073, 07-1271, 07-1285

PERTAINS TO: MRGO

---

## MR-GO MASTER CONSOLIDATED CLASS ACTION COMPLAINT

NOW COMES THE MR-GO PLAINTIFFS SUBGROUP LITIGATION COMMITTEE ("MR-GO PSLC"), PURSUANT TO CMO NO. 4, FOR THE PURPOSE OF FILING THIS SUPERSEDING *MR-GO MASTER CONSOLIDATED CLASS ACTION COMPLAINT.*

**VIII. COUNT THREE:**

**THE IHNC/INDUSTRIAL NAVIGATION CANAL:**

**AGAINST WASHINGTON GROUP, THE CORPS and ORLEANS**

**(Affects Only the Lower Ninth Ward/St. Bernard Sub-Class)**

39.    Named Plaintiffs re-allege all previous allegations contained herein, and in addition to the allegations regarding the MR-GO set forth above, Plaintiffs aver, upon information and belief, that the breaches and failure of the hurricane protection levees and flood walls of the IHNC/Industrial Canal were caused by the negligence and fault of the Defendants Corps, Washington Group, and Orleans all as set forth herein.

40.    Defendant Washington Group contracted with the Corps in connection with the IHNC/Industrial Canal Lock Replacement Project, which was authorized by the River and Harbor Act of 1956, the Water Resources Development Acts of 1986 and 1996, and which was intended to enlarge and deepen the lock. Defendant Washington Group was hired to level and clear abandoned industrial sites along the IHNC/Industrial Canal between the flood wall and the canal itself for the purpose of clearing acreage to make way for the digging of a new canal, which would be used temporarily for the same purpose as the existing IHNC/Industrial Canal while the new system of larger locks was constructed.

41.    The initial phases of work included demolition and site preparation of what was referred to as the East Bank Industrial Area—a 32-acre site located between Florida Avenue and Claiborne Avenue and extending from the canal to the floodwall. Defendant Washington Group's tasks included, but were not limited to, the removal of wharfage, salvage, debris, and other materials from the IHNC/Industrial Canal and/or its banks.

23

42.    More specifically, Defendant Washington Group's scope of work included, but were not limited to: demolition of abandoned industrial structures on the east side of the canal; removal of underground structures described in Defendant's own recommendation reports as "extensive excavation and subsurface activity"; abatement of vegetation, including numerous oak trees; removal of canal side obstructions; removal of the Jordan Street wharf, which included the removal of a concrete deck and support pilings to a depth of 36 feet below mean water level; removal of all electrical, sewer, gas, water, and telephone facilities on the site, including Boland sewer lift station; "bank removal" that included the vibratory extraction of bulkheads along the canal water's edge; removal of more than fifty structures and more than forty concrete slabs; grid trenching of the entire East Bank Industrial Area; removal of ten sunken or partially sunken barges; removal of barges that served as building foundations; removal of an estimated 3,000 pilings at the site, both on land and in the canal, by use of a vibratory extractor (to a depth of 30 feet for land-based pilings and 40-50 feet for canal/water-based pilings); grading and hydro-mulching the site; and other such work to be demonstrated through the course of discovery and trial.

43.    In performing the work, Defendant Washington Group, based on information and belief, undermined the integrity of the levee, and/or flood wall along the eastern shoreline of the IHNC/Industrial Canal, abutting the Lower Ninth Ward of Orleans Parish.

44.    Defendant Washington Group's acts and/or omissions resulted in underseepage-induced erosion and other damage to the levee and/or flood wall, ultimately causing and/or contributing to its catastrophic failure.

45.    Defendant Washington Group was negligent and/or at fault in the following non-exclusive respects:  (1) it knew or should have known that its work was causing damage to the levee and/or flood wall structures and did nothing to correct the problem; (2) it failed to follow proper procedures in performing its work; (3) it failed to comply with appropriate regulations and standards in performing its work; (4) it failed to notice the damage caused by its work and failed to call that damage to the attention of the appropriate authorities; (5) and any other acts of fault or negligence to be proven upon the trial of the cause.

46.    The negligence and/or fault of the Corps, caused or contributed to cause the failure of the levee and/or flood wall and/or spoil bank on the sides of the IHNC/Industrial Canal.

47.    The negligence of the Corps consisted of the following non-exclusive particulars:  (1) allowing the work to proceed; (2) failing to caution the Washington Group about the potential damage to the levee and/or flood wall system by its work; (3) failing to monitor and/or properly inspect the work of the Washington Group; (4) failing to adequately evaluate the potential damage to the levee and/or flood wall structure by the work of Washington Group; (5) failing to correct the damage caused by the actions of the Washington Group; (6) failing to discharge its duty to maintain the integrity of the levee and/or flood wall system of the IHNC/Industrial Canal; (7) and other acts of negligence or fault to be shown at trial of the cause.

48.    The negligence and/or fault of Defendant Orleans caused or contributed to the cause of the failure of the levee and/or flood wall and/or I-Walls and/or spoilbanks on the sides of the IHNC/Industrial Canal.

**EXHIBIT 24**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br><br>NO.: 05-4182<br><br>SECTION "K"(2) |

FILED IN:    05-4181, 05-4182, 05-5237, 05-6073, 05-6314, 05-6324,
             05-6327, 05-6359, 06-0225, 06-0886, 06-1885, 06-2152,
             06-2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066,
             06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06-5159,
             06-5161, 06-5260, 06-5162, 06-5771, 06-5937, 07-0206,
             07-0621, 07-1073, 07-1271, 07-1285

PERTAINS TO: MR-GO

---

**PLAINTIFFS' RESPONSE TO MRGO DEFENDANTS' FIRST SET OF JOINT
INTERROGATORIES, REQUESTS
FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR
ADMISSIONS TO PLAINTIFFS REGARDING COMMON LIABILITY ISSUES**
Pursuant to Federal Rules of Civil Procedure 33, 34 and 36, and Case Management Order

("CMO") No. 4, Section IV(B)(1)(d), as amended by Order issued March 29, 2007,  Plaintiffs

submit these Responses to Defendants' First Set of Joint Interrogatories, Requests for Production

of Documents and Requests for Admissions to Plaintiffs Regarding Common Liability Issues.

**GENERAL OBJECTIONS**

Plaintiffs' General Objections, as set forth below, apply to each of Defendants' discovery

request as if each such objection was set forth in the response.  In providing the following

responses, Plaintiffs do not in any manner waive or intend to waive any objections or defenses

and are preserving:

.        All objections as to the competency, relevancy, materiality and admissibility of

         any document or information provided; and

1

**RESPONSE TO INTERROGATORY NO. 8:**

See Plaintiffs' List of Exhibits filed on or about March 30, 2007 as required by the Court in CMO # 4, as amended. Plaintiffs will also submit supplemental and final exhibit lists as required by CMO # 4, as amended, and which are prospectively incorporated herein.

**INTERROGATORY NO. 9:**

Specify in detailed narrative form the factual basis for allegations made by you in the Complaint against the Lake Borgne Levee District ("LBLD"), relating specifically to the LBLD's alleged responsibilities for the authorization, design, construction, operation or maintenance of any part of the Hurricane Protection System you contend to have caused damage to plaintiffs, and identify any and all documents, evidence, or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiffs object to the extent this Interrogatory seeks to have Plaintiffs' counsel disclose mental impressions and work product, all of which is privileged and protected from disclosure. Plaintiffs further object on the grounds that this request seeks the disclosure of expert opinions and reliance materials, all of which is not yet due under the deadlines established by the CMO # 4, as amended.

Plaintiffs further object as this request is overly broad, unduly burdensome and/or oppressive and requests information that is irrelevant to the subject matter of this action and/or is not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiffs have not completed their investigation of the facts relating to this action, have not interviewed all potential witnesses, have not completed discovery and have not completed their preparation for the trial or any evidentiary hearing in this matter. Accordingly, the response provided is given without prejudice to Plaintiffs' rights to produce, at any time, subsequently

6

discovered evidence relating to presently known material facts and to produce all evidence, whenever discovered, relating to subsequently discovered material facts.

Subject to these objections, Plaintiffs respond as follows: Plaintiffs refer Defendants to the factual allegations of the Levee Superceding Master Consolidated Class Action Complaint, the IPET Report, Team Louisiana Report, the Independent Levee Investigation Team report, and all discovery provided by any party to this Litigation, all of which is publicly available and incorporated herein by reference. See also those documents listed on Exhibit "A" annexed hereto and incorporated herein by reference.

Discovery is ongoing and Plaintiffs will supplement their response as required.

**INTERROGATORY NO. 10:**

Specify in detailed narrative form the factual basis for allegations made by you against each and every MRGO Defendant, individually, that its actions or inactions played any part or role in causing any failure, breach or overtopping of any portion of the Hurricane Protection System you contend caused damage to plaintiffs, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 10:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 11:**

Identify any and all state, federal or local statutes or regulations you contend may apply to any MRGO Defendant, individually, with respect to the authorization, design, construction, operation, maintenance, inspection and/or oversight of any levees, floodwalls, spoil banks or other portion of the Hurricane Protection System you contend caused damage to plaintiffs.

**RESPONSE TO INTERROGATORY NO.11:**

    See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 12:**

    Identify any and all state, federal or local statutes or regulations you contend may apply to any MRGO Defendant, individually, with respect to construction, demolition, remediation, and/or any other work performed in the area surrounding any levees, floodwalls, spoil banks or other portion of the Hurricane Protection System, which you contend caused damage to plaintiffs.

**RESPONSE TO INTERROGATORY NO. 12:**

    See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 13:**

    Identify any state, federal or local statutes or regulations you contend any MRGO Defendant, individually, may have "violated," as that term is used by you in the Complaint, with respect to allegations made by you against it in the Complaint.

**RESPONSE TO INTERROGATORY NO. 13:**

    See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 14:**

    Specify in detailed narrative form the factual basis for allegations made by you against any MRGO Defendant, individually, for "violations" of any statutes or regulations as referenced in the Complaint, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 14:**

    See Plaintiffs' response to Interrogatory No. 9, *supra.*

8

**INTERROGATORY NO. 15:**

Identify any architectural, engineering, construction or other type of protocol, guideline, practice, convention or other applicable code or provision included in the standard of care you contend any MRGO Defendant, individually, may have "violated" with respect to any portion of the Hurricane Protection System.

**RESPONSE TO INTERROGATORY NO. 15:**

See Plaintiffs' response to Interrogatory No. 9 *supra.*

**INTERROGATORY NO. 16:**

Specify in detailed narrative form the factual basis for allegations made by you against each and every MRGO Defendant, individually, for alleged "violations" of any protocols, guidelines, practices, conventions, or other applicable code or provision as referenced in Interrogatory No. 15, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 16:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 17:**

Specify in detailed narrative form the factual basis for allegations made by you against each and every MRGO Defendant, individually, that it may have "caused and/or contributed to the inadequacy or breaching of the Flood Protection System that protects the Greater New Orleans area" as referenced specifically in Paragraph 15(b) of the Complaint, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 17:**

      See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 18:**

      Define "dredging activities," as that term is specifically used by you in **Paragraph** 15(e) of

the Complaint, and identify any and all documents, evidence, or other similar materials in your

possession or under your control relating to any MRGO Defendants' involvement, if any, in these

activities.

**RESPONSE TO INTERROGATORY NO. 18:**

      Dredging is intended to encompass the customary meaning of the term as used in common

parlance and as defined in any authoritatively recognized dictionary. The term is also intended to

have such meaning as is defined in state or federal (including maritime) law, statutes, regulation or

the like.

**INTERROGATORY NO. 19:**

      Specify in detailed narrative form the factual basis for your allegations of "nuisance" against

any MRGO Defendant, individually, as alleged in the Complaint, and identify any and all documents,

evidence or other similar materials in your possession or under your control to support such factual

basis.

**RESPONSE TO INTERROGATORY NO. 19:**

      See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 20:**

      Specify in detailed narrative form the factual basis for allegations made by you that any

MRGO Defendant, as set forth in Paragraphs 39 through 50 of the Complaint, undermined, damaged,

caused, contributed to, or otherwise played a part in the failure, overtopping breaching of the IHNC

levee and/or floodwalls, spoil banks, and identify any and all documents, evidence or other similar

materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 20:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 21:**

Define "underseepage-induced erosion," as that term is specifically used by you in Paragraph

44 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 21:**

"Underseepage-induced erosion" is intended to encompass the customary meaning of the

words as used in common parlance and as defined in any authoritatively recognized dictionary.

**INTERROGATORY NO. 22:**

Specify in detailed narrative form the factual basis for your allegation in Paragraph 43 of the

Complaint that Washington Group International, Inc.'s ("WGII") work along the eastern shoreline

of the IHNC/Industrial Canal, undermined the integrity of the levee and/or floodwall abutting the

Lower Ninth Ward, and identify any and all documents, evidence or other similar materials in your

possession or under your control to support any such factual basis.

**RESPONSE TO INTERROGATORY NO. 22:**

See Plaintiffs' response to Interrogatory No. 9, supra.

Plaintiffs' further object to the request to produce a narrative as FRCP, Rule 33 (d) sets forth

that a party has no right to require his opponent to make compilations of information in response to

interrogatories when documents containing material necessary for the compilations are available to

the first party.

**INTERROGATORY NO. 23:**

Specify in detailed narrative form the factual basis for your allegation in **Paragraph 44** of the Complaint that WGII's work along the eastern shoreline of the IHNC/Industrial Canal, resulted in "underseepage-induced erosion and other damage" to the levee and/or floodwall abutting the Lower Ninth Ward, and identify any and all documents, evidence or other similar materials in your possession or under your control to support any such factual basis.

**RESPONSE TO INTERROGATORY NO. 23:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

Plaintiffs' further object to the request to produce a narrative as FRCP, Rule 33 (d) sets forth that a party has no right to require his opponent to make compilations of information in response to interrogatories when documents containing material necessary for the compilations are available to the first party.

**INTERROGATORY NO. 24:**

What do you contend to be the "jurisdiction" of the LBLD, as that term is specifically used by you in Paragraph 51 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 24:**

See Plaintiffs' response to Interrogatory No. 9, *supra.* See also the Constitution of the State of Louisiana and enabling laws pertaining to the LBLD.

**INTERROGATORY NO. 25:**

With respect to each and every MRGO Defendant, individually, define "responsibility for the care and inspection of the levees," as that term is specifically used by you in Paragraph 51 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 25:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 26:**

Identify all persons and/or entities who you contend had ownership, care, custody, control, and/or *garde* of MRGO, the GIWW, the East Bank Industrial Area, the 40 Arpent Canal and/or the Florida Walk Canal at any time prior to August 29, 2005, and specify the corresponding time period for each such person and/or entity identified.

**RESPONSE TO INTERROGATORY NO. 26:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 27:**

With respect to each MRGO Defendant, individually, identify the "statutorily mandated responsibilities" you contend apply, as that term is used in Paragraph 53 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 27:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 28:**

Identify the "proper procedures" and "appropriate regulations and standards" you contend apply to WGII's work at the IHNC/Industrial Canal and identify any and all documents, evidence or other similar materials in your possession or under your control relating to such procedures and standards.

**RESPONSE TO INTERROGATORY NO. 28:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 29:**

Specify in detailed narrative form the factual basis for each of the conclusions set forth in Paragraph 45 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 29:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 30:**

Define "Hurricane Alley" and "Hurricane Highway," as those terms are specifically used by you in Paragraphs 60 and 61 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 30:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 31:**

Identify and describe the boundaries of the levees and floodwalls as those terms are used in Paragraphs 41–45 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 31:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 32:**

Specify in detailed narrative form the factual basis for allegations made by you that any MRGO Defendant, individually, failed to ensure the use of proper materials in constructing the levees or any subsequent lift, and identify any and all documents, evidence or other similar materials in your possession or under your control to support any such factual basis.

**RESPONSE TO INTERROGATORY NO. 32:**

See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 33:**

Specify in detailed narrative form the factual basis for allegations made by you that any MRGO Defendant, individually, failed to adequately evaluate the potential damage to the levee and/or floodwall structure by storm surges, and identify any and all documents, evidence or other similar materials in your possession or under your control to support any such factual basis.

14

**RESPONSE TO INTERROGATORY NO. 33:**

 See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 34:**

 Specify in detailed narrative form the factual basis for allegations made by you that any MRGO Defendant, individually, failed to correct known or identifiable defects in the levee system, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 34:**

 See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 35:**

 Specify in detailed narrative form the factual basis for allegations made by you that any MRGO Defendant, individually, failed to discharge its duty to maintain the integrity of the levee and/or the floodwall system and to comply with Congressional and other legal mandates, and identify any and all or under your control documents, evidence or other similar materials in your possession or under your control to support any such factual basis.

**RESPONSE TO INTERROGATORY NO. 35:**

 See Plaintiffs' response to Interrogatory No. 9, *supra.*

**INTERROGATORY NO. 36:**

 Specify in detailed narrative form the factual basis for allegations made by you of "negligent acts and omissions" against each and every MRGO Defendant, individually, under each Louisiana Civil Code Article referenced by you in Paragraph 75 of the Complaint, and identify any and all documents, evidence or other similar materials in your possession or under your control to support any such factual basis.

15

**RESPONSE TO INTERROGATORY NO. 36:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 37:**

Specify in detailed narrative form the factual basis for allegations made by you of "strict liability" against each and every MRGO Defendant, individually, as alleged in Paragraph 77 of the Complaint, and identify any and all documents, evidence or similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 37:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 38:**

Specify in detailed narrative form the factual basis for allegations made by you of "Res Ipsa Loquitur" against each and every MRGO Defendant, individually, as alleged in Paragraph 79 of the Complaint, and identify any and all documents, evidence or similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 38:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 39:**

Specify in detailed narrative form the factual basis for allegations made by you that any portion of the Hurricane Protection System either was, was not and/or should have been "armored" as alleged in the Complaint, and identify any and all documents, evidence or similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 39:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 40:**

Specify in detailed narrative form the factual basis for any allegations made by you against the LBLD with respect to the authorization, design, construction, operation or maintenance, of any portion of the 40 Arpent Canal, the Florida Walk Canal and/or any levees, flood walls, spoil banks, etc. associated therewith as referenced in the Complaint, and identify any and all documents, evidence or other similar materials to support such factual basis

**RESPONSE TO INTERROGATORY NO. 40:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 41:**

Specify in detailed narrative form the factual basis for allegations made by you that any MRGO Defendant, individually, failed to preserve, maintain, rebuild, or otherwise exercise appropriate care for marshes and/or swamps to act as a buffer from storm surges as alleged in the Complaint, and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 41:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 42:**

Specify in detailed narrative form each source of waters or flooding you contend caused damage to plaintiffs, and with respect to each such source identify the affected geographical area within the New Orleans East Sub-Class and the affected geographical area within the Lower Ninth Ward and St. Bernard Sub-Class, as referenced by you in the Complaint.

**RESPONSE TO INTERROGATORY NO. 42:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY NO. 43:**

Identify any and all documents, evidence or other similar materials in your possession or under your control relating to any "independent studies" or other similar documents from any "independent engineers," as those terms are specifically used by you in Paragraph 52 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 43:**

See Plaintiffs' response to Interrogatory No. 9, *supra*.

**INTERROGATORY 44:**

Specify in detailed narrative form the factual basis for asserting in Paragraph 77 of the Complaint that any MRGO Defendant had "at all relevant times, the care, custody and control, and thus the *garde* of the IHNC/Industrial Canal . . . including such other levees/floodwalls and/or spoil banks in Orleans Parish (East of the IHNC/Industrial Canal)," and identify any and all documents, evidence or other similar materials in your possession or under your control to support such factual basis.

**RESPONSE TO INTERROGATORY NO. 44:**

See Plaintiffs' response to Interrogatory Nos.5 and 6, *supra*.

**INTERROGATORY 45:**

Identify any and all persons who you contend expressed complaints and/or concerns of any kind regarding demolition and/or remediation activities conducted by or on behalf of the United States Army Corps of Engineers in the East Bank Industrial Area.

**RESPONSE TO INTERROGATORY NO. 45:**

See Plaintiffs' response to Interrogatory Nos. 5 and 6, *supra*.

**INTERROGATORY NO. 46:**

Identify any and all persons who you contend have knowledge or other evidence of ponding and/or pooling of water, leaks, and/or sand boils on any residential and/or commercial property near

18

the levees and/or flood walls, etc. abutting IHNC/Industrial Canal, MRGO, the GIWW, the 40

Arpent Canal and/or the Florida Walk Canal prior to August 29, 2005.

**RESPONSE TO INTERROGATORY NO. 46**

See Plaintiffs' response to Interrogatory Nos. 5 and 6, *supra*

**INTERROGATORY NO. 47:**

Define "Standard Project Hurricane," as that term is used by you in the Complaint.

**RESPONSE TO INTERROGATORY NO. 47**

Objection, this term is a reference for hurricane protection planning and/or modeling utilized

by the Corps of Engineers. Plaintiffs have no other definition but what the Corps of Engineers

defines it to be.

<strong>REQUESTS FOR PRODUCTION OF DOCUMENTS</strong>

**REQUEST FOR PRODUCTION NO. 1:**

Produce any and all documents, materials or other information identified in your Answers to

Defendants' Interrogatories or Responses to Defendants' Requests for Admissions, or used by you

to answer Defendants' Interrogatories or respond to Levee Defendants' Requests for Admissions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

In addition to the General Objections set forth above, Plaintiffs object as the definitions and

instructions accompanying this request render it vague, ambiguous, incomprehensible, or otherwise

objectionable. Plaintiffs further object as this request is overly broad, unduly burdensome and/or

oppressive and requests information that is irrelevant to the subject matter of this action and/or is

not reasonable calculated to lead to the discovery of admissible evidence.

19

Plaintiffs have not completed their investigation of the facts relating to this action, have not interviewed all potential witnesses, have not completed discovery and have not completed their preparation for the trial or any evidentiary hearing in this matter. Accordingly, the response provided is given without prejudice to Plaintiffs' rights to produce, at any time, subsequently discovered evidence relating to presently known material facts and to produce all evidence, whenever discovered, relating to subsequently discovered material facts. Plaintiffs further object as this request seeks the mental impressions and/or work product of Plaintiffs counsel, all of which is privileged and protected from disclosure. Plaintiffs further object on the grounds that this Request also requires disclosure of expert opinions and reliance materials, all of which is not yet due under the deadlines established by the CMO # 4, as amended.

Subject to these objections, Plaintiffs respond as follows: Plaintiffs refer Defendants to the IPET Report, Team Louisiana Report, and the Independent Levee Investigation Team report, any document identified in Plaintiffs' Superseding Master Consolidated Class Action Complaint filed in this action, and all discovery provided by any party to this Litigation, all of which is publicly available and incorporated herein by reference. See also those documents listed on Exhibit "A" annexed hereto and incorporated herein by reference.

Discovery is ongoing and Plaintiffs will supplement their response as required

**REQUEST FOR PRODUCTION NO. 2:**

Produce any and all documents, materials or other information identified in your Federal Rule of Civil Procedure 26(A)(1)(a) and (b) Initial Disclosures to MRGO Defendants, including the Declaration of Dr. Robert Glenn Bea, filed on April 16, 2007.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 3:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control considered, reviewed or relied upon by your expert, Dr. Robert Glen Bea, for his April 16, 2007 Declaration.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 4:**

Produce any and all witness statements, summaries, affidavits, deposition transcripts or other similar documents in your possession or under your control and in any way related to the facts and/or circumstances surrounding the above-referenced litigation and/or Hurricanes Katrina and Rita, including but not limited to any such materials from any other litigation or proceeding relating to or involving Hurricanes Katrina and/or Rita.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita.  Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 5:**

Produce any and all resumes, Curriculum Vitaes, case lists, fee schedules, retention agreements, and/or any other documents identifying or describing the qualifications or work of any expert you may or will call at the trial of this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

See Plaintiffs' response to Request No.1, *supra.*

21

**REQUEST FOR PRODUCTION NO. 6:**

Produce any and all documents or materials provided to, received from, considered by, or reviewed by any expert in connection with the above-captioned litigation who you may or will call at the trial of this matter, as well as any and all documents or materials reviewed or relied upon by any such expert in formulating his or her opinion in connection with this litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 7:**

Produce any and all meteorological, hydrological, wind speed, weather modeling or monitoring or other similar data in your possession or under your control in any way related to the above-referenced litigation and/or Hurricanes Katrina and/or Rita, including but not limited to any such materials from any other litigation or proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita.  Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 8:**

Produce any and all geological, topographical or other similar data, compilations of data, reports, or other similar information in your possession or under your control related to the above-referenced litigation and/or Hurricanes Katrina and/or Rita, including but not limited to any such materials from any other litigation or proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 9:**

Produce any and all "LIDAR" or other similar data in your possession or under your control in any way related to the above-referenced litigation and/or Hurricanes Katrina and/or Rita, including but not limited to any such materials from any other litigation or proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 10:**

Produce any and all photographs, videos, computer animations, aerial photographs, satellite photographs, maps or other images of any kind or type in your possession or under your control related to the above-referenced litigation and/or Hurricanes Katrina and/or Rita, including but not limited to any such materials from any other litigation or proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10 :**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 11:**

Produce any and all reports, affidavits, deposition transcripts or other similar documents (including drafts regardless of the form of the media) of any expert you have retained in connection

with the above-referenced litigation who you may or will call at the trial of this matter and which are related in any way to the issues underlying the above-referenced litigation, including but not limited to any such materials from any other litigation or proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 12:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to or evidencing the "tidal surge" and/or "storm surge" of Hurricanes Katrina and/or Rita, as those terms are used by you in the Complaint, and how such "tidal surge" or "storm surge" of Hurricanes Katrina and/or Rita may have, in any way, impacted the Hurricane Protection System and caused plaintiffs' damages.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 13:**

Produce any and all data, compilations of data, documents, blueprints, plans, schematics, design memoranda, as built drawings, reports or other information of any kind or type in your possession or under your control related to the design, construction, implementation, operation and/or maintenance of any portion of the drainage and/or sewerage systems you allege in any way caused plaintiffs' damages.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents that relate or refer to the boundaries of the levee and floodwall, as those terms are used in Paragraphs 41-45 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 15:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related specifically to allegations made by you in Paragraph 23 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 16:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related in any way to a possible combination, convergence or mixing of storm related surges, flooding and/or waters from the MRGO, Lake Borgne and/or the Industrial (IHNC) Canal within the interior boundaries of the Hurricane Protection System, including but not limited to any data, compilations of data or documents referencing the location of any failures or breaches of the Hurricane Protection System, the sources of any waters flowing through those failures or breaches, and hydrological or other data as to where those waters may have traveled within the interior boundaries of the Hurricane Protection System.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

See Plaintiffs' response to Request No.1, *supra.*

25

**REQUEST FOR PRODUCTION NO. 17:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control in any way related to soil composition, soil analysis, soil testing, soil sampling, soil strength, pore pressure or other soil related measurements of the Hurricane Protection System.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 18:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control in any way related to soil composition, soil analysis, soil testing, soil sampling, soil strength, pore pressure or other soil related measurements of the Hurricane Protection System.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 19:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to overtopping, scouring, under seepage or any other alleged failure mechanism, as those terms are used by you in the Complaint, of any portion of the Hurricane Protection System.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 20:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any contention or allegation that any

26

portion of the Hurricane Protection System either was, was not, or should have been, "armored," as alleged by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

    See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 21:**

    Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any allegation that any MRGO Defendant failed in any duty to ensure that any portion of the Hurricane Protection System either was, was not, or should have been, "armored," as alleged by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

    See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 22:**

    Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control relating in any way to the "Standard Project Hurricane" referenced by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

    See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 23:**

    Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you that the LBLD is "...responsible for the creation, maintenance and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in St. Bernard Parish..."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

    See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 24:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you that dredging at any time of any portion of the IHNC, the GIWW or the MRGO in any way caused or contributed to any of the damages referenced by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

See Plaintiffs' response to Request No.1, *supra*

**REQUEST FOR PRODUCTION NO. 25:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to the "MRGO Authorization Report," as referenced by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 26:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related in any way to any and all "warnings of impending disaster" to any MRGO Defendant by any private person, government or other entity, as alleged by you in Paragraphs 32 through 35 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 27:**

Produce any and all data, compilations of data, documents or other information of any kind or type related to the "accelerated/enhanced hurricane surge" and/or other specific allegations made by you in Paragraph 34 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 28:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you in the Complaint against any MRGO Defendant, individually, for "nuisance."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 29:**

Produce any and all data, compilations of data, documents or other information of any kind or type related specifically to allegations made by you against all MRGO Defendants in Paragraphs 39 through 50 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 30:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you against the LBLD with respect to the authorization, design, construction, operation, maintenance, etc. of any portion or part of the 40 Arpent Canal, the Florida Walk Canal, the 40 Arpent Canal levees, the Florida Walk Canal Levees, or any other pertinent components of the Hurricane Protection System as referenced in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

See Plaintiffs' response to Request No.1, *supra.*

29

**REQUEST FOR PRODUCTION NO. 31:**

      Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any MRGO Defendant's "failure to ensure the use of proper materials" in constructing any levees, floodwalls, etc. as alleged by you in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

      See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 32:**

      Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any MRGO Defendant's failure to preserve, maintain, rebuild, or otherwise exercise appropriate care for marshes and swamps to act as a buffer from storm surges.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

      See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 33:**

      Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you that any MRGO Defendant failed to "adequately evaluate the potential damage to the levee and/or floodwall structure by storm surges," as alleged in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

      See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 34:**

Produce any and all data, compilations of data or other information of any kind or type in your possession or under your control related to allegations made by you that any MRGO Defendant failed to "correct known defects in the levee system," as alleged in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 35:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you that any MRGO Defendant failed to discharge its duty to maintain the integrity of the levee and/or floodwall system and to comply with Congressional and/or other legal mandates, as alleged in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 36:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to the "factual background of the navigation canals involved," as referenced specifically in Paragraphs 59, 60, 61 and 62 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 37:**

Produce the 1965 United States Army Corps of Engineers "Report on Hurricane Betsy," as referenced specifically in Paragraph 61 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 38:**

Produce any and all data, compilations of data, documents or other information of any kind or type related to the "Standard Project Hurricane," as referenced specifically in Paragraphs 63 through 74 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 39:**

Produce any and all data, compilations of data, documents or other information of any kind or type relied upon by you for any allegations made against any MRGO Defendant specifically in Paragraphs 63 through 66 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 40:**

Produce Engineering Regulation ER1 110-2-1453, as referenced specifically in Paragraph 64 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 41:**

Produce Technical Report NWS 23, as referenced specifically in Paragraph 64 of the Complaint.

to the "High-Level Plan," as specifically referenced by you in Paragraphs 69 through 70 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 46:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any alleged violations by the United States Army Corps of Engineers of its "...own design, engineering and construction criteria for levees, floodwalls and/or spoil banks..." as specifically referenced by you in Paragraph 74 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 47:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to allegations made by you of "negligence" against each and every MRGO Defendant, individually, as specifically referenced by you in Paragraph 75 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 48:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control related to any allegations made by you of "strict liability" against each and every MRGO Defendant, individually, as specifically referenced by you in Paragraphs 15(f) and 77 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 49:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control supporting your plea of "Res Ipsa Loquitur" against any MRGO Defendant, individually, as specifically referenced by you in Paragraph 79 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 50:**

Produce any and all "IPET" data, compilations of data, documents or other information of any kind or type in your possession or under your control related to the underlying litigation and/or Hurricanes Katrina and/or Rita.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 51:**

Produce any and all "Independent Levee Investigation Team" data, compilations of data, documents or other information or any kind or type in your possession or under your control related to the underlying litigation and/or Hurricanes Katrina and/or Rita.

35

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 52:**

Produce any and all "Team Louisiana" data, compilations of data, documents or other information of any kind or type in your possession or under your control related to the underlying litigation and/or Hurricanes Katrina and/or Rita.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

Plaintiffs specifically object to any discovery of common liability issues relating to Hurricane Rita. Without waiving that objection, Plaintiffs respond: See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 53:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control, including but not limited to audio and visual media, relating to the condition of the levees and floodwalls along IHNC/Industrial Canal, MRGO, and/or GIWW prior to August 29, 2005

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 54:**

Produce any and all data, compilations of data, documents or other information, including but not limited to audio and visual media, of any kind or type in your possession or under your control relating to the condition of the levees and floodwalls along the IHNC/Industrial Canal, MRGO,

and/or GIWW on August 29, 2005 (including but not limited to any such materials depicting the actual overtopping, breach, and/or failure of the levees and/or floodwalls in those areas).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 54:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 55:**

Produce any and all data, compilations of data, documents or other information, including but not limited to audio and visual media, of any kind or type in your possession or under your control relating to the condition of the levees and floodwalls along IHNC/Industrial Canal, MRGO, and/or GIWW after August 29, 2005, but prior to September 24, 2005.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 56:**

Produce any and all data, compilations of data, documents or other information, including but not limited to audio and visual media, of any kind or type in your possession or under your control related to the condition of the levees and floodwalls along the IHNC, MRGO and/or GIWW after September 24, 2005.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 57:**

Produce any and all data, compilations of data, documents or other information of any kind or type in your possession or under your control, including but not limited to audio and visual media, that discuss, analyze, depict, illustrate, simulate or otherwise reflect the depths of any flooding or waters, originating from any breach, overtopping or other failure of any portion of the Hurricane

Protection System, within the geographical areas encompassed by the New Orleans East Sub-Class and the Lower Ninth Ward and St. Bernard Sub-Class on or after August 29, 2005.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 58:**

Produce any and all data, compilations of data, documents or other information of any kind or type, including but not limited to audio and visual media, that discuss, analyze, depict, illustrate, simulate or otherwise reflect the duration of any flooding from waters, originating from any breach, overtopping or other failure of the Hurricane Protection System, within the geographical areas encompassed by the New Orleans East Sub-Class and the Lower Ninth Ward and St. Bernard Sub-Class on or after August 29, 2005.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 58:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 59:**

Produce any and all "independent studies," as referenced specifically by you in Paragraph 52 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 59:**

See Plaintiffs' response to Request No.1, *supra.*

**REQUEST FOR PRODUCTION NO. 60:**

Produce all documents, exhibits or other materials regarding any reports, complaints, concerns, or evidence of any kind regarding ponding or pooling of water, leaks, and/or sand boils on any residential and/or commercial property located near the IHNC, GIWW and/or MRGO prior to August 29, 2005.

38

**RESPONSE TO REQUEST FOR PRODUCTION NO. 60:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 61:**

Produce all documents, exhibits or other materials regarding any assessments, complaints, problems, flaws and/or concerns of any kind expressed to any MRGO Defendant at any time by any person(s) or entities relating to the design, construction, maintenance, monitoring or inspection of the levees, floodwalls or other structures along the IHNC and/or the MRGO prior to August 29, 2005.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 61:**

See Plaintiffs' response to Request No.1, *supra*.

**REQUEST FOR PRODUCTION NO. 62:**

Produce any and all documents relating to the depths of any flood water and/or the duration of any floods resulting from tropical storms, hurricanes and/or rain events within the geographical areas encompassed by the New Orleans East Sub-Class and the Lower Ninth Ward and St. Bernard Sub-Classes prior to August 29, 2005

**RESPONSE TO REQUEST FOR PRODUCTION NO. 62:**

See Plaintiffs' response to Request No.1, *supra*.

## RESPONSES TO REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:**

Admit that at no time relevant hereto did the LBLD have responsibility for, or control over, the authorization, specification, design or construction of any part or lift of the Hurricane Protection System alleged by you in the Complaint to have failed and/or caused damage.

39

**EXHIBIT 25**



# Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**







surge to flow virtually unimpeded across the open swampland before the storm surge had begun to subside significantly.

The Forty Arpent levee was only a "secondary" levee, with crest heights on the order of Elev. + 7.5 to + 10 feet (MSL), and it was not intended to have to face the full brunt of a largely undiminished rising storm surge. As a result, the storm surge passed easily over this secondary levee, and pushed rapidly into the populated areas of St. Bernard Parish, as described previously in Chapter 2. As is arrived rapidly, and prior to significant abatement of the storm surge, the floodwaters ponded to an unexpectedly high elevation of approximately +12 feet above mean sea level. Homes and businesses on "high ground" (at elevations several feet and more above sea level) were thus unexpectedly flooded, and the depth of flooding in lower-lying areas was especially severe. The massive inrushing floodwaters also had large lateral force, and pushed homes aside from their foundations (as shown previously in Figure 2.19), tossed cars like toys (see Figure 6.15), deposited large fishing boats in residential neighborhoods (Figure 6.16), and left large branches of trees on the roofs of numerous homes (e.g.: Figure 6.17).

Interestingly, the smaller (secondary) Forty Arpent levee was severely overtopped along much of its length, but it suffered relatively little erosional damage as a result. This appears to be because it was constructed of significantly better materials than the outer (MRGO frontage) levees; the Forty Arpent levee appears to have been constructed primarily of clay, with good intrinsic resistance to erosion. Figure 6.14 shows a section of the Forty Arpent levee that was apparently significantly overtopped, but which suffered only slight "cosmetic" erosional damage as a result.

The use of highly erodeable sand and shell sand fill was unfortunate along the exposed MRGO frontage levee section, and the consequences were severe. Damage to the populated areas of St. Bernard Parish was catastrophic, and the floodwaters from this populous area next began to make their way westwards towards what was now the already doomed Lower Ninth Ward.

## 6.3 The Two large Breaches on the East Bank of the IHNC at the Lower Ninth Ward

As the storm surge from Lake Borgne pushed westward along the east-west trending channel of the GIWW/MRGO that separates the St. Bernard and New Orleans East protected basins, it raised the water levels in the IHNC and produced two massive breaches on the east bank of the IHNC (at the western edge of the Lower Ninth Ward). These two breaches occurred at approximately 7:30 to 7:45 a.m., at an IHNC water level of approximately Elev. + 14 to +14.5 feet (MSL), as shown in Figure 6.18 (which shows a hydrograph of measured water levels vs. time in the IHNC channel.)

### 6.3.1 The IHNC East Bank (South) Breach at the Lower Ninth Ward

The larger of these two breaches was the south breach, and this is shown in Figure 6.19 (which is a repeat of Figure 2.13). This was a very long breach, nearly 900 feet in length, and the inrushing waters entered the adjacent community with great force. As shown

in Figure 6.17, homes for several blocks were ripped from their foundations and scattered, usually in splinters, eastward across the inboard neighborhood.

Figure 6.19 also shows the sheetpile curtain that had supported the floodwall at the crest of the earthen levee at this section. It is interesting to note that the sheetpiles (which were cold-rolled steel sections) remained interlocked throughout the cataclysmic failure and the ensuing hydrodynamic loading of the massive inrushing floodwaters. The concrete floodwall is largely absent from the tops of these sheetpiles, as the sheetpiles have been stretched out (like an accordion), flattening their bent flanges in order to accommodate the extension imposed on them by the inrushing flow.

Figure 6.19 also shows a large steel barge that passed inward through this section, and came to rest near the southern end of the breach. This raised the question as to which came first; the barge or the breach?

Figure 6.20 shows the large barge, in its final resting position (prior to being cut apart with torches to remove it) atop a small yellow bus. This was not the initial resting location of this barge immediately after hurricane Katrina, however. Initially, after Katrina, the barge had come to rest a bit farther to the east. It was then re-floated several weeks later when the temporary breach repair failed during the second hurricane surge produced by hurricane Rita on September 24, 2005 (see Chapter 11), and came to rest at its current position at that time. The small yellow school bus also arrived between hurricanes Katrina and Rita, having been appropriated and used for interim transport and then abandoned in its location as shown.

There is a single large dent low on the side of the barge just around the left side of the bow (not quite visible in Figure 6.20), and a pronounced scrape on the bottom of the barge at that same location. Most of the concrete floodwall was failed in extension and flexure, with its reinforcing steel (rebar) fairly extended. There was one single section of wall which clearly evinced a major impact, however, and that was at the extreme southern end of the breach. Figure 6.21 shows a close-up view of the floodwall at this location. The rebar is compressed and bent, and the concrete crushed at this location. It was the consensus view of our investigation team that the barge had scraped along the wall and then impacted the end of the wall at this location.

As this was the extreme southern end of the very long breach; this impact was not the cause of the breach and failure. Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in.

That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach, but our investigation's view is that there are other modes of failure that would have been expected to fail this section without any need for help from the barge, so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed.

Figure 6.22 shows the trench that was eroded by water that passed over the top of the concrete floodwall at the south end of the large breach. (The barge can be seen at the right in this photo.) Overtopping and scour occurred at both ends of this breach feature, and the resulting scoured trenches reached depths of up to 5.5 feet in sections that did not subsequently fail. It is, of course, not possible to determine whether deeper scouring/trenching might have occurred at the actual breach inception location, as the embankment and foundation soils at the center of the breach were deeply scoured out by the massive flows in through the breach. One of the potential failure modes evaluated by our (ILIT) studies was the possibility that this scour had sufficiently laterally unbraced the concrete floodwall (and its supporting sheetpile curtain) that the lateral force of the elevated canal water was able to displace it laterals and foment a resulting breach.

Figure 6.23 shows our ILIT re-interpretation of the original boring data along this section of the east bank of the IHNC, with the locations of the two large breaches indicated. The boring data was far too sparse along this section for the importance of the design (the inboard population and properties being protected) and for the complexity of the local geology. In addition, widely spaced borings along the approximate levee centerline do not provide an adequate basis for development of appropriate cross-sections for analysis and design. An effort was made to perform pairs of borings (one roughly at the crest and another at the inboard toe) at selected locations so that cross-sections could at least be attempted, but this was still an inadequately sparse investigation. The foundation investigation for the design of these levees and floodwalls was inadequate for a project of this scope and importance, and the minor savings in drilling, sampling and testing are now dwarfed by the massive costs of the failures that resulted; both property damages and loss of life.

Figure 6.24 shows the cross-section used for our analyses of this south breach. The two pre-Katrina ("initial design") borings, Borings B-4 and B-4T, were supplemented by three additional CPT probes performed by the IPET investigation (IHBR-6.05C, 5.05C and 16.05C), and two additional borings and a CPTU probe that were performed by our ILIT investigation (Borings IHNC-S-BOR-1 and CON-1, and CPTU IHNC-S-CPT-1). The cross-section of Figure 6.24 shows the tragic failure to extend the sheetpile curtain to sufficient depth as to cut off underseepage flow through the laterally pervious "marsh" deposits at this site.

The upper embankment fill is a moderately compacted imported clay, which is underlain by an older "fat clay" (CH) fill apparently comprised of locally available lacustrine clays. The upper foundation soils are then dominated by thick deposits of high plasticity clays (CH), punctuated by two layers of marsh deposits, and there is a relatively thin but continuous stratum of low plasticity silt (ML) underlying the lower marsh unit.

Subsequent to the completion of the levee embankment and floodwall, additional sandy fill was placed on the outboard (water) side of the levee to raise the ground surface slightly above mean canal water level. Some buildings and facilities had been constructed on this made ground, but these had been removed prior to hurricane Katrina.

Figure 6.25 shows plots of data regarding strength properties vs. depth for the soils from the silt layer down (from Elevations -19 to -50 feet, MSL) beneath (a) the levee crest,

and (b) at the inboard toe of the levee (under far lesser embankment overburden). The detailed procedures and relationships used to process the CPTU data, and then to overlay the additional UUTX data to develop these plots, are presented and discussed in detail in Chapter 8, and this will not be repeated here. The lower unit of lacustrine clay clearly shows two overconsolidation "crusts" as a result of surface desiccation during early "stands" in the accretion of these deposits, and they are more normally consolidated at greater depth. These clays, in the end, do not appear to have participated in the failure that occurred.

Similarly, the relatively thin silt stratum (ML) also shows evidence of overconsolidation, and this gives it sufficient strength that it too is uninvolved the failure.

Figure 6.26 shows similar plots regarding strength properties of the far more critical upper foundation soil strata between elevations of approximately +0 to -20 feet (MSL). These deposits, consisting of interlayered marsh and clay units, are the critical soils at this site.

As described in detail in Chapter 8, a number of different approaches were taken to the processing of the available field and laboratory test data in order to evaluate and characterize these soils. Based on the CPTU measurements within the marsh deposits (both at this site, and at the 17th Street canal breach site) values of $B_q$ were developed, and then based on the relationships of Lunne et al. (1994) and Karlsrud et al. (1996), a value of $N_{kt} = 15$ was selected for transposing the CPTU tip resistance values to the estimates of undrained shear strength that are plotted in Figure 6.26. The resulting values were then converted to values of Su/P as shown in the far right figure of Figure 6.26, and these appear to infer three desiccation-induced overconsolidation profiles corresponding to surface exposure at three times during the evolution of these deposits. The relationship of Mayne and Mitchell (1988) was then used, again as described in Chapter 8, to cross-check the resulting relationship between Su/P vs. OCR as a function of Plasticity Index (PI, %) for these deposits using the available UUTX laboratory test data. These were found to be consistent. Finally, the limited available in situ vane shear test data, and the UUTX laboratory test data, was co-plotted with the CPTU-based strengths, and these too were judged to be consistent (with allowances for sample disturbance and vane insertion disturbance in these soils of variable fibrous organic content).

Similar processing resulted in selection of a value of $N_{kt} = 15$ for processing of the CPTU data for the silty clay (CH/CL) stratum lying between the two "marsh" deposits. This differs from the value of $N_{kt} = 12$ that was used to process the CPTU data for the deeper layer of gray lacustrine clay of high plasticity, and it reflects the lower plasticity of this upper clay unit. Once again, the limited available in situ vane shear test data and UUTX laboratory test data were then co-plotted with the strengths as interpreted by the CPTU, and were found to be consistent (as shown).

Figure 6.27 shows the geometry and principal input parameters used to model and analyze this section using the finite element analysis program PLAXIS (2004). The "soft soil" constitutive model within PLAXIS was used to model all of the uppermost soil strata, so that both undrained and partially drained conditions could be studied within an effective stress framework. Shear strengths from Figures 6.25 and 6.26 were reduced by 15% in the marsh strata, and by 20% in the clay strata, to account for differences between the field (in situ) test

conditions and the laboratory test conditions, and the direct simple shear (DSS) conditions expected to dominate the critical field performance behavior in these analyses.

Initial analyses were performed to model the incremental construction of the levee embankments in order to establish the initial stress conditions for the subsequent analyses of the overall section performance and stability during hurricane Katrina's storm surge loading. Figure 6.28 shows the deformed mesh at the end of staged construction and consolidation under the levee embankment loads. Overconsolidation stress profiles beneath the crest, and beneath the inboard levee toe, well matched those from the available field data, and the consolidation properties were iterated slightly until the final (post-consolidation) settled profile matched well with the observed field configuration.

Analyses were then performed in which the water level within the canal was progressively raised. Transmission of pore pressures beneath the wall (and beneath the sheetpiles) was very rapid, and nearly "steady state" pore pressure conditions developed very rapidly beneath the inboard side of the levee after each increase in water levels as the lateral transmissivity of the marsh deposits was high, and the system was initially well saturated. The rate of water level rise (and subsequent decline) in the canal was based on the hydrograph of Figure 6.18.

Figure 6.30 shows conditions calculated just as the canal water level reached the top of the concrete floodwall. Plotted in this figure (as color contours) are levels of relative shear strain (shear strain developed, divided by shear strain to failure) within the levee embankment and foundation soils. As shown clearly in this figure, two distinct failure mechanisms are beginning to develop. The lower one is a shear surface concentrated at the interface between the base of the upper gray clay (CH/CL) layer and the underlying layer of marsh deposits, and the upper failure surface attempting to develop is concentrated at the interface between the top of the upper marsh stratum and the lower levee embankment fill section. Both of these mechanisms represent the results of underseepage-induced increases in pore pressures being "trapped" at the bases of less pervious overlying strata. These pore pressure increases are decreasing the strength and stiffness of the soils at these two critical interfaces.

At the water stage shown in Figure 6.30, a gap has begun to form at the outboard side of the floodwall and its supporting sheetpile curtain. When effective tensile stress was calculated between the floodwall/sheetpile wall and the adjacent soils, the analysis was temporarily stopped, the tension was eliminated by changing the mesh details to insert a small gap (and to insert hydrostatic water pressures within the gap), and the analysis was resumed. This was done iteratively, as water levels continued to rise, so that the progressive development of a water-filled gap between the floodwall/sheetpile curtain and the outboard section of the levee embankment could be modeled. At this section, within reasonable parameter variations modeled, gap formation generally initiated at canal water levels on the order of Elev. +11.5 to +13 feet (MSL), and the gap then tended to progress fairly rapidly to the base of the sheetpiles (within the next 1 to 2 feet of water level rise in the canal).

Figure 6.31 shows calculated conditions for a canal water level at Elev. +14 feet (MSL). At this stage, water is now overtopping the floodwall, the gap at the outboard side of the sheetpile wall is developed to full depth, and stability failure is occurring on the

uppermost of the two potential failure surfaces. This upper failure is serving to "protect" against further development of the lower failure surface (which can also be seen in this figure.) If the upper failure surface is strengthened a bit, to prevent the upper failure, then the lower failure becomes critical.

Figure 6.32 shows the postulated path to failure based on the finite element (PLAXIS) analyses performed. In this figure, the Factor of Safety at any given surge height was assessed by stopping the analysis at each stage of water level rise, and evaluating Factor of Safety by means of progressive c − Ø reduction. Two sets of conditions were analyzed; conditions in which a "gap" was allowed to form on the outboard side of the sheetpile/floodwall (and the gap was allowed to fill with water as it opened), and a second set of analyses without allowing the opening of this gap. The light blue diamonds in Figure 6.32 represent conditions without gapping, and the yellow circles represent conditions with progressive opening of a water-filled gap.

As shown in this figure, the gap begins to open as the storm surge rises near to the top of the floodwall (at a surge elevation of about +11 to +12 feet, MSL), and the increasing lateral push of the rising surge waters finally destabilizes the system at a surge elevation of approximately +12 to +13 feet, MSL. This appears to agree closely with the observed field timing and surge levels at failure.

These analyses also include the "excavation" of a trench at the levee crest at the rear side of the floodwall representing the results of overtopping erosion at the north and south ends of the breach. The depth of this eroded trench was taken as rapidly increasing from none to 5 feet in depth as overtopping began to pass over the top of the floodwall. Additional analyses were performed for eroded trench depths of up to 7.5 feet, but this did not significantly affect the overall results; simple erosion of a scoured trench behind the floodwall, even as deep as 7.5 feet, was not sufficient as to cause the observed failure and breaching of this levee/floodwall section. The scoured trench behind the floodwall did contribute a bit to the enhancement of lateral displacement (and resultant water-filled gapping) on the outboard side, but it does not appear to have been the principal factor at this failure and breach site.

Additional analyses were performed to further evaluate both the seepage flow vs. time, and the overall stability of this levee and floodwall section. Seepage analyses, as well as conventional Limit Equilibrium analyses (by several methods, but these agreed closely and results presented herein are for Spencer's Method) were performed using the program package GEO-SLOPE/W.

Figures 6.33 and 6.34 show the cross-sections and meshes used for conventional limit equilibrium and coupled seepage analyses of this same breach section. As shown in Figure 6.35, the rapid lateral flow through the main marsh stratum distorts the flownet, carrying pressures and equipotential contours along as it passes beneath the embankment. Figure 6.36 shows a close-up view of calculated pore pressure contours for a storm surge elevation of +14 feet (MSL). Over a considerable area at and inboard of the levee toe the net pore pressure uplift forces are slightly greater then the weight of the relatively light soils present, representing conditions prone to potential "uplift" or "blowout" at this critical location.

6 - 11

Figure 6.37 shows a close-up view of hydraulic gradients at this same canal surge stage. As expected, the exit gradients calculated at the toe are slightly unstable with regard to initiation of seepage erosion and piping for the relatively lightweight soils present.

A key question in these analyses is the rate at which rises in outboard side canal water levels manifest themselves in the form of increased pore pressures beneath the inboard side of the levee embankment. That, in turn, is largely a function of the lateral permeability modeled within the marsh strata, and assumptions regarding degree of initial saturation.

It was our investigation team's observation that lateral permeability was very high within at least some of the sub-strata of these variable marsh deposits, both at the two east bank IHNC breach sites at the edge of the Lower Ninth Ward, as well as at sites along the drainage canals at the north end of the main (downtown) New Orleans protected basin. Hydraulic response at nearby boreholes was very rapid, and evidence of the occurrence of high water pressures and underseepage was noted at several locations. Investigators from the IPET team were surprised by difficulties in dewatering a very shallow excavation to recover large block samples of peaty "marsh" deposits at the 17th Street canal breach site for subsequent centrifuge testing. In addition, persistent reports of underseepage and ponding of waters along this IHNC frontage at the west edge of the Lower Ninth Ward, and contractor's significant problems with dewatering of excavations along this same frontage, all bespoke of high lateral permeability within these strata.

The values of lateral permeability used in these analyses were based on experience with similar geologic units from other regions, our own field observations, and the accumulated reports indicating high lateral permeability. A best-estimated coefficient of lateral permeability of $k_h \approx 10^{-2}$ cm/sec was modeled for the most open of the marsh sub-strata, and parametric sensitivity analyses were performed for values of $k_h$ that were five times higher, and values that were an order of magnitude (factor of 10) lower.

Figures 6.38 and 6.39 show results of these sensitivity analyses. Transient flow analyses were performed in which canal water levels were raised progressively, beginning with assumed fully equilibrated ("steady state") conditions with a canal water elevation of about +5 feet (MSL) at ~11:00 p.m. on the night of August 28th (after many hours of relatively slow surge rise to that level), then rising progressively to elevation +9 feet (MSL) by about 3:30 a.m. on the morning of August 29th, and then rising a bit more rapidly to elevation +14.4 feet (MSL) by about 8:30 a.m. (It should be noted that the failure and breach occurred at about 7:45 a.m., but that these transient flow analyses were carried forward to at least 9:00 a.m. to more fully examine progressive flow and pore pressure development.)

Figure 6.38 shows calculated pore pressures vs. time at location 1, at the top of the lower marsh stratum, directly below arrow "D" near the inboard toe of Figures 6.35 through 6.37. The horizontal light blue line at the top of this figure represents the "steady state" conditions that would eventually develop for a canal water level rise to Elevation +14.4 feet (MSL) if infinite time were allowed for full equilibration and development of steady state flow. The lower diamonds represent calculated transient pore pressures at Location 1 for the best-estimated lateral permeability of the marsh deposits, and for the upper and lower bound permeabilities. As shown in this figure, the variation in permeability does not exert a major

influence on the pore pressures, given the relatively slow rate of canal water level rise, and pore pressures within the main marsh deposit at the base of the inboard levee toe are on the order of about 85% to 92% of full "steady state" pressures at the apparent time of failure (at about 7:45 a.m.)

Figure 6.39 shows similar transient flow analyses to calculate pore pressure development at various depths beneath the location of arrow "D" in Figures 6.35 through 6.37, using the best-estimated permeabilities. Again, pore pressure development is fairly rapid, and lags only moderately behind outboard side canal water level rise.

Figure 6.40 shows the calculated gradients at the top of the lower marsh stratum (the blue line) at about 7:45 a.m., based on best-estimated permeabilites, and the exit gradients at this time as well (the red line.) The toe exit gradients are marginally unstable, given the lightweight materials present, and represent conditions likely to give rise to the inception of piping erosion.

Figure 6.41 shows the progressive development of pore pressures at the top of the lower marsh stratum vs. time. As shown, there is a considerable area over which the hydraulic uplift forces progressively grow to become somewhat larger than the total overburden stresses; representing a condition that could lead to uplift and "blowout" at this location.

Finally, Figures 6.42 and 6.43 shows analyses of limit equilibrium (Spencer's Method) for failure surfaces passing (a) along the interface at the top of the upper marsh stratum, and (b) along the interface at the top of the (lower) main marsh stratum, for a canal water elevation of +14 feet (MSL). Both sections are marginally unstable at this condition with regard to lateral translation of the inboard portion of the levee embankment, pushed sideways by the outboard side canal water pressures (including a water-filled gap at the outboard side of the sheetpiles), and in both cases the foundation soil strengths have been critically reduced by underseepage-induced pore pressure increases.

Figures 6.42 and 6.43 likely overestimate the overall lateral translational stability at this stage of canal water level rise, as it is likely that piping erosion would have at least initiated at the inboard toe region by this stage, and the calculated hydraulic uplift pressures in the inboard toe region are high enough that "buckling" of the passive toe block helping to restrain the lateral translations of Figures 6.42 and 6.43 might further reduce the overall stability.

As shown by these analyses, as the canal water level rises above about + 13 to +14 feet (MSL) this section becomes analytically unstable by a number of potential mechanisms, all of them associated with underseepage flow passing beneath the sheetpile curtain. These potential mechanisms are:

1. Seepage erosion and piping due to excessive exit gradients at the inboard toe.

2. Hydraulic uplift or "blowout" at the inboard toe.

3.  Translational stability failure, as a result of reduction in strength of the foundation soils at the inboard side due to underseepage-induced pore pressure increases.

Based on the length of the breach feature (approximately 900 feet), it is most likely that the mechanism that won the race to failure at this site was translational instability due to underseepage-induced pore pressure increases, and resulting strength reduction within the inboard side foundation soils. It is certainly possible, however, that all three mechanisms contributed at least in part. Figure 6.44 shows the postulated most likely path to failure, based on both the finite element and the coupled transient flow/limit equilibrium analyses. The postulated failure path proceeds up the "un-gapped" limit equilibrium path at the right of Figure 6.44 until a gap on the outboard side of the sheetpiles begins to open and fill with water at a canal water elevation of about +12 to +13 feet (MSL). The failure mechanism then transitions to the "water-filled gap" limit equilibrium case (the left-most line in Figure 6.44), and as the canal water level continues to rise the overall section becomes unstable (in underseepage-induced lateral translational foundation instability) at a canal water level of approximately +14 feet (MSL).

This contradicts the initial conclusions of the Draft Final Report by the IPET investigation (IPET; June 1, 2006), and also the initial hypotheses of the ASCE and NSF-sponsored field investigation teams; all of which favored the hypothesis that the failure and breach at this site had resulted from overtopping flow over the floodwall which eroded a trench along the back side of the wall (as shown previously in Figure 6.22), resulting in laterally unbracing the wall so that it was then pushed over by the surge water pressures on its outboard side.

Our investigation's view is that, while overtopping and trenching were in fact occurring, it was underseepage-induced instability that actually developed the more critical mechanism that led to failure at this site.

The depth of overtopping-induced trench erosion at the north and south shoulders of the breach never reached depths greater than 4.5 to 5 feet. It might be inferred that a low spot along the crest of the floodwall occurred at the breach location, and that somewhat deeper erosional trenching resulted, but our finite element analyses show that even excavation of a trench as deep as 7 to 8 feet by overtopping erosion does not sufficiently unbrace the wall as to foment a lateral wall failure at surge heights overtopping the wall by as much as 1.5 feet. Instead, the contribution of overtopping and erosion of a trench at the inboard toe of the floodwall was more likely to have, at best, slightly accelerated the timing of this failure by adding to the propensity of the floodwall to deflect laterally slightly and thus develop a "gap" into which water could flow and then apply additional lateral pressure against the sheetpile curtain to promote the lateral translational stability of the inboard side of the levee embankment.

Our finite element analyses, performed with eroded "trenches" of various depths (from none, to as much as 8 feet) suggest that the trench erosion likely helped to exacerbate the initiation of "gapping" at the outboard side of the floodwall at a slightly lower canal water elevation than would have occurred without this erosion, but that it was not the critical contributor to this failure.

This is an important issue with regard to repair and reconstruction. The USACE has expended considerable effort and resources to replace "I-walls" with "T-walls", and to install concrete splash pads behind additional I-wall sections, in order to prevent failures due to the mechanism of overtopping, erosion of a trench at the rear side of the I-walls, and failure due to the resulting unbracing of the wall sections. Although also useful, this will not also deal effectively with the underseepage issues that appear to have been the actual cause of failure at this site; and there appear to be unreasonably short sheetpile curtains (insufficient as to effectively cut off underseepage flows) at other locations throughout the New Orleans regional flood defense system. This is a potentially pervasive problem throughout the system, and it should be evaluated system-wide, and remedied as necessary.

The IPET Final Draft Report notes that possible modes of failure initially considered at this site included "sliding instability and piping and erosion from underseepage." The report then goes on to say

> *Piping erosion from underseepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeabilities of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure.*

This greatly underestimates the permeability, and especially the laterally permeability of the marsh deposits. It also continues the very dangerous assumption that underseepage was not a serious problem for "short duration" storm surge loading that plagued the original design of many sections of the New Orleans regional flood defense system, and led to use of sheetpile curtains that were far too short to effectively (and safely) cut off underseepage flows. At least four major failures (and breaches) that caused large portions of the overall flooding damage and loss of life during hurricane Katrina appear to have been principally due to lack of appreciation of underseepage, and resulting inadequate (short) sheetpile cut-offs. These are the major breach at the west bank near the north end of the London Avenue drainage canal (see Section 8.3.9), the major breach at the east bank of the London Avenue drainage canal farther to the south (see Section 8.3.8), and the two breaches on the east bank of the IHNC at the west end of the Lower Ninth Ward discussed in this current section and in Section 6.3.2. Exoneration, a priori, of underseepage dangers should be discontinued immediately, and underseepage analyses should be required for the full regional flood protection system.

Demonstration that underseepage occurred at this site can be based on arguments of analogous conditions and levee performance at this site, and at the London Avenue drainage canal breach sites, as well as at the site immediately to the north (as described in the next section.) It can also be based on the observed difficulties encountered by McElwee Construction in dewatering an excavation near the breach site immediately to the north (due to massive underseepage flow through the marsh deposits that were not adequately cut off at that site either.)

In addition, as noted in the IPET Draft Final Report in discussion of the two massive breaches at the west end of the Lower Ninth Ward:

*Although it is clear that the walls were overtopped, and that their stability was compromised by the erosion that occurred, it is also clear that one of the east side breaches occurred before the wall was overtopped. Eyewitness reports indicate that the water level in the 9th ward near Florida Avenue was rising as early as 5:00 AM, when the water level in the IHNC was still below the top of the floodwall. Stability analyses indicate that foundation instability would occur before overtopping at the north breach on the east side of the IHNC. This breach location is thus the likely source of the early flooding in the 9th Ward. Stability analyses indicate that the other three breach locations would not have failed before they were overtopped.*

Unfortunately, even IPET's own analyses do not suggest a high likelihood of failure of the north breach section at the canal water levels present as early as 5:00 a.m. (approximately Elev. + 9 feet, MSL), so this would not appear to be the explanation for the observed water in the neighborhood. Instead, it is proposed that the observed water rise on the inboard (protected) side near Florida Avenue was more likely the result of large underseepage flows through the highly pervious "marsh" deposits along this frontage.

Finally, clear and uncompromising evidence of the high lateral permeability of these deposits **at this site** is presented in Figure 6.45, which shows a well-developed classic crevasse splay that resulted from reverse underseepage through these same highly pervious marsh deposits as the ponded floodwaters drained out from the Lower Ninth Ward after the hurricane passed.

The New Orleans District of the USACE must stop "assuming" that short-term storm surges do not pose a significant risk associated with underseepage, and should instead begin assuming that such underseepage is a potential risk and that it must be addressed either: (1) with testing and analyses, (2) by means of sheetpile curtains extended deeply enough to effectively cut off potentially dangerous underseepage, or (3) by means of wider and heavier levee embankments (including inboard side stability berms) and the use of filtered drains at the inboard toe of the levee to "vent" and thus draw down the potentially dangerous pore pressures in that vicinity.

6.3.2    The IHNC East Bank (North) Breach at the Lower Ninth Ward

Figure 6.46 shows an aerial view of the partially repaired breach that occurred just to the north of the breach discussed in the preceding Section 6.3.1. This second breach feature was a much shorter feature, with a length of only approximately 250 feet.

This narrower, deep failure had similar initial geometry and stratigraphy to that of the far longer section immediately to its south, as shown by the cross-section in Figure 6.47. At this section, there is only the one main marsh layer, but most of the other soil conditions are very similar to those at the adjacent breach section to the south.

Figures 6.47 and 6.48 show the cross-section and finite element mesh used for limit equilibrium and coupled seepage analyses of this section.

Soils data at this site were sparse, and consisted of a single pre-Katrina boring (located nearby but just off-site, and with higher embankment overburden loads than at the breach site), two ILIT borings and one ILIT CPTU probe, and several additional IPET CPT probes. We were never able to fully determine the locations of the IPET CPT's in plan view, but it was assumed that they were located in adequate proximity as to be "representative", and their elevations were known with good precision so that these data could be used to at least cross-check the other data available. Cross-checking the limited data (mainly from two CPTU probes) with the data from the breach site immediately to the south showed strong compatibility; accordingly similar properties (and OCR profiles, etc.) were modeled for similar soil units at this section.

Figure 6.49 shows the calculated flownet equipotential lines for a canal water surge elevation of +14 feet (MSL). Once again, as with the larger breach just to the south, the flow travels through the continuous marsh layer that was left frustratingly open to flow by the shallow sheetpiles that were an inadequate cut-off at this site.

Figure 6.50 shows pore pressure contours for the same conditions as Figure 6.49. Once again the hydraulic uplift pressures represent potential instability with regard to lifting or "blowout" of the thin surficial strata of impervious and relatively lightweight soils overlying the marsh stratum at and near the inboard toe.

Similarly, as shown in Figure 6.51, seepage exit gradients at and near the inboard toe are massively unsafe with regard to the initiation of seepage erosion and piping in these relatively lightweight soils.

And finally, as with the adjacent breach section to the south, the section is also marginally unstable with regard to limit equilibrium (Spencer's method), as shown in Figure 6.52, as a result of underseepage-induced pore pressures and resultant loss of strength. The most critical failure surface this time passes through (and largely within) the main marsh layer, though a secondary failure surface concentrated near the interface between this marsh layer and the overlying clay layer has a nearly similar (unstable) factor of safety.

Figures 6.53 and 6.54 show calculated transient pore pressures (6.53) at the top of the marsh stratum beneath the inboard toe of the levee, and (6.54) at various depths beneath the inboard levee toe. As for the breach section immediately to the south, the upper and lower bound lateral permeability estimates are also shown in Figure 6.53; and again a large fraction of the overall rise in canal water levels has resulted in corollary water pressure increases at the inboard toe region by about 7:00 to 8:00 a.m.

Figure 6.55 shows the progressive increase in pore pressure at the top of the marsh stratum vs. time, and the pore pressures are high enough to pose a very high risk of hydraulic uplift (or "blowout") at the inboard toe region.

Figure 6.56 shows a potential path to failure by means of lateral translational foundation instability; reaching a condition of marginal lateral instability (with full

development of a water-filled gap at the outboard side of the sheetpile curtain) at a canal water elevation of approximately +13 to +14 feet (MSL).

Here again, as with the larger breach section immediately to the south, this breach section is analytically unstable by a number of potential mechanisms, all of them associated with underseepage flow passing beneath the sheetpile curtain. These potential mechanisms are:

1. Seepage erosion and piping due to excessive exit gradients at the inboard toe.

2. Hydraulic uplift or "blowout" at the inboard toe.

3. Translational stability failure, as a result of reduction in strength of the foundation soils at the inboard side due to underseepage-induced pore pressure increases.

As with the larger breach to the south, it is our investigation's position that despite the fact that overtopping (and resultant erosion at the inboard toe of the floodwall) was also occurring, this failure was the result of one or more of the underseepage-induced mechanisms above. (Two or more of these may have acted in concert.)

This site has a well-documented history of underseepage problems; McElwee Construction had great difficulty dewatering an excavation at this site during earlier construction, and residents of the neighborhood had also previously reported problems with seepage at the inboard toe.

Based on the geometry of the post-failure configuration (see Figure 6.46), this narrow, deep failure appears to have most likely caused by either by seepage erosion and piping, or by a combination of hydraulic uplift ("blowout") followed by piping. The calculated high exit gradients, and the hydraulic uplift pressures at the inboard toe region, would strongly support this.

The IPET interim draft report also concluded that foundation instability was the cause of the failure and breach at this site. The failure mechanism favored in those analyses, however, was based on a semi-rotational failure dominated by undrained shear failure through the soft clays underlying the marsh stratum, as shown in Figure 6.58. IPET concluded that this failure occurred at a relatively early stage, at a canal water level of only Elevation +9 feet (MSL), and that this early failure accounted for observations of ponding of water along this general levee frontage well in advance of the failure of the larger breach section to the south.

Figure 6.59 shows the IPET interpretation of shear strength data for this section, and the red lines are the IPET shear strength profiles for stability analyses (IPET: June 1, 2006.) In this figure, the values of undrained shear strength based on the CPT tip resistance data are based on a CPT tip factor of $N_k = 15$. This appears to be an overly conservative value of $N_k$ within the lower clay stratum, as the CPT-based shear strengths within this stratum are significantly lower then the trend based on the unconsolidated-undrained triaxial tests on "undisturbed" samples obtained with a 5-inch diameter thin-walled fixed-piston sampler. In

any case, the shear strength profile used by the IPET analyses within this layer is well to the left (lower than) the vast majority of the data available.

Our own studies determined (based on $B_q$ values from the CPTU) indicated that values of $N_{kt} = 12$ were more appropriate for this lower soft clay (CH) layer, and the resulting re-interpretation of this CPT data based on $N_{kt} = 12$ is shown (with a dark blue trace) super-posed over the previous Figure 6.59 in Figure 6.60. Similarly, the dark blue lines in Figure 6.60 show our (ILIT) interpretation of the layering at this location, and the light blue dashed lines show our interpretations of shear strength vs. depth at this section. The IPET shear strength interpretation, in addition to being low, was also based on the assumption that this lower clay stratum was normally consolidated over its full depth. As shown previously in Figures ·6.25 and 6.26, our own interpretations showed several clear desiccation-induced overconsolidation profiles near the middle and top of this clay layer, and additional moderate overconsolidation near the base (likely to the base being well-drained and thus partially overconsolidated due to secondary compression), and these are reflected in our ILIT shear strength profile. In this figure, the CPTU-based shear strengths (based on $N_{kt} = 12$) can be seen to be in better agreement with the other shear strength data, and the overall shear strength vs. depth profile is more consistent with this data.

Repetition of the limit equilibrium analysis (Spencer's Method) of the failure surface shown in Figure 6.58, but using our own (ILIT) interpretation of undrained shear strengths within the critical lower clay layer (Figure 6.60) results in a calculated factor of safety, even conservatively assuming the presence of a water-filled gap on the outboard side of the sheetpile curtain, of FS = 1.89. This underestimates the actual overall Factor of Safety, which should actually be on the order of 10% to 15% higher based on three-dimensional considerations for this narrow, deep failure. It is therefore not likely that a deep, semi-rotational failure occurred, early on and at a relatively low canal water level, at this site.

The need of the IPET analyses to provide an early failure at this north breach site in order to explain the significant observed ponding of waters along this frontage prior to the occurrence of the large breach farther to the south, and to do so without consideration of underseepage as a potential source of this water, resulted in an apparently unrealistic analysis and an indefensible failure mechanism.

If the IPET team had been made aware of the pervasive history of underseepage problems along this frontage, they would surely have considered and analyzed underseepage-related failure modes for the two large breaches along this section of the east bank of the IHNC. This information was apparently not available to the IPET analysis team, however, reflecting insufficient communication between groups and teams across the overly modular, sub-team-organized IPET studies. In addition, the pervasive failure of the New Orleans District of the USACE to adequately consider and analyze underseepage during pre-Katrina design of considerable portions of the regional flood protection system was continued in the post-event IPET studies of these two failed sections.

The New Orleans regional flood protection systems need to be thoroughly re-assessed, and re-analyzed as necessary, with regard to potential additional underseepage-related

vulnerabilities. And then these must be mitigated in order to develop a safe and reliable overall system..

6.3.3   Summary

The two large breaches on the east bank of the IHNC (at the west end of the Lower Ninth Ward) both occurred at sites where overtopping occurred. Despite the occurrence of overtopping, and resultant erosion of trenches at the inboard sides of the concrete floodwalls, this overtopping does not appear to have been the cause of the two failures. Instead, these two failures appear to have resulted from underseepage-induced instability; either due to erosion and piping at the inboard toe, "blowout", or translational instability due to strength reduction in the inboard side foundation soils due to underseepage-induced pore pressure increases.

This represents a potentially critical difference from the findings to date from the Corps' IPET study; as the remedy for overtopping, trench erosion, and unbracing at the top of the floodwalls is very different from the remedy for underseepage-induced instability problems. The USACE has invested large resources to replace "I-walls" with "T-walls", and to install concrete splash pads behind additional "I-wall" sections. This is laudible, but it will not also effectively mitigate underseepage-related problems.

Remedies for the underseepage related problems revealed by these analyses would include either extension of the sheetpile curtains to greater depths in order to more effectively "cut off" underseepage, or widening of the levee embankments to the inboard side and installation of filtered drains at the inboard toes in order to safely draw down the underseepage-induced high pore pressures in that area.

Analyses of the IHNC failure sections, and of sections of the three drainage canals in the main (downtown) New Orleans protected basin (see Chapter 8), have shown that unreasonably short sheetpile curtains of too limited penetration as to effectively cut off underseepage are likely to be endemic throughout many parts of the New Orleans regional flood protection system. Indeed, the USACE at a number of breach repair sites is replacing sheetpiles with (pre-Katrina) lengths of 18 to 24 feet with far longer (deeper penetrating) sheetpiles with lengths of 60 feet and greater as part of the repair operations; an unusually frank admission that significantly deeper sheetpiles were warranted at those sections.

There is now a need to review, and to re-analyze as necessary, essentially the entire regional flood protection system with regard to potential vulnerability associated with underseepage (and inadequately deep sheetpiles), and to remedy these problems at sites where necessary in order to ensure overall safety of the system.

6.4   Summary and Findings

The catastrophic flooding of the St. Bernard and Lower Ninth ward protected basin was primarily due to: (1) catastrophic erosion of the MRGO frontage levees, and (2) a pair of large failures (and breaches) on the east bank of the IHNC at the west end of the Lower Ninth Ward.

The catastrophic erosion of large portions of the nearly 11-mile long MRGO frontage levees was the result in large part of the use of unsuitable sand and shell sand fills (with low resistance to erosion) for major portions of these embankments. Large portions of these fill materials came from spoils dredged from the excavation of the adjacent MRGO channel, and the short-term savings achieved by the use of these soils now pale in comparison to the massive damages and loss of life that resulted. Because these levees eroded so rapidly, and so massively, the storm surge was able to push largely undiminished across a wide area of undeveloped swampland behind the main frontage levees, cross a lower secondary levee (the Forty Arpent levee) that has not been intended to have to face an undiminished rising storm surge, and then charged into the populated zones of St. Bernard Parish with catastrophic consequences.

Because it passed so quickly and so completely through the frontage levees, the surge filled the St. Bernard basin to an elevation of +12 feet above sea level; inundating homes and businesses located well above sea level that had expected to be safe, and inundating lower lying properties to great depths.

The use of intrinsically highly erodeable fills, especially clean sands, and the even more dangerous lightweight shell sands, should be reconsidered. The use of such materials as levee embankment fill, especially without taking appropriate measures to mitigate the erosional hazards associated with these (e.g.: sheetpile cutoff, erosion protection and armoring of exposed slope faces and crests, etc.) is inadvisable when constructing levees intended to protect large populations at risk.

The two large breaches at the east bank of the IHNC (at the west end of the Lower Ninth Ward) both appear to have resulted not from overtopping, but rather from underseepage beneath the inadequately deep sheetpile curtains at these two sections. Overall, four of the eight most significant failures (breaches) that occurred during hurricane Katrina (the eight breaches that caused the greatest damages and loss of life) appear to have been due to inadequate attention to underseepage during initial design, and resulting sheetpile curtains that were far too short as to suitably cut-off or minimize these underseepage flows (see also Sections 8.3.8 and 8.3.9). This appears to be a widespread problem throughout the New Orleans regional flood protection system; the entire system should be re-evaluated with respect to this potential hazard, and mitigation implemented as necessary.

## 6.5    References

GEO-SLOPE/W (2004) "Complete Set of Manuals", John Krahn (Edit.), Calgary, Alberta, Canada.

IPET – Interagency Performance Evaluation Task Force (2006) *Performance Evaluation Status and Interim Results*, Report 2 of a Series, Performance Evaluation of the New Orleans and Southeast Lousiana Hurricane Protection System, March 10, US Army Corps of Engineers.

**EXHIBIT 26**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

*In re: KATRINA CANAL*
*BREACHES CONSOLIDATED LITIGATION*

*CIVIL ACTION NO. 05-4182*

*VERSUS*

*SECTION "K"*

*Pertains to: All MRGO*

*Judge  Standwood R. Duval, Jr.*
*District Judge*

*Judge Joseph C. Wilkinson, Jr.*
*Magistrate 2*

## RESPONSES TO SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS

## DATED NOVEMBER 18, 2007

**NOW INTO COURT**, in Proper Persona, comes a respondent, Melvin M.L. McElwee, Sr. pursuant to Federal Rule of Civil Procedure 45, who in response to Defendant Washington Group International, Inc. (hereinafter, "WGII") request of subpoena *duces tecum* (subpoena) being issued by the United States District Court for the Eastern District of Louisiana upon McElwee Brothers, Inc. (hereinafter, "McElwee Bros."). McElwee Bros. located at 14154 Rev. Joseph White Road, Independence, Louisiana 70443.  The subpoena was received by Melvin M. L. McElwee, Jr. 14150 Rev. Joseph White Road, Independence, Louisiana 70443.

Respondent provides the following:

## RESPONSE TO SPECIFICATIONS OF DOCUMENTS TO BE PRODUCED

### NO. 1

Attached has exhibits A, B, C, D, and E. These documents are not all inclusive. McElwee Brothers, Inc. was not required and did not keep on file a complete list of communications held between it and any member of the Independent Levee Investigation Team.

### NO. 2

McElwee Bros. has some photos that it is willing to email WGII upon it furnishing an electronic mailing address for receipt. McElwee Brothers, Inc. did not keep on file a complete list of documents provided to Professor Robert Bea (PhD, P.E.), of the University of California Berkeley, a purported member of the Independent Levee Investigation Team. Dr. Robert Bea is the best source for this information.

### NO. 3

Please reference exhibits A, B, C, D, and E respectively, and exhibits F, G, and H. McElwee Bros., was also referred to a link to obtain a copy of the draft report, "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005", completed by the Independent Investigation Team. McElwee Bros. is willing to email WGII upon it furnishing an electronic mailing address for receipt.

<u>NO. 4</u>

Please reference item number 2 above.

<u>NO. 5</u>

McElwee Bros. has not requested any documents with the Interagency Performance Evaluation Task Force. McElwee Bros. has no knowledge of sharing any documents with the Interagency Performance Evaluation Task Force.

<u>NO. 6</u>

McElwee Bros. has not conducted or attempted to conduct dewatering procedures along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has conducted dewatering procedures along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **<u>objects</u>** to the production of documents associated with its dewatering procedure as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

<u>NO. 7</u>

McElwee Bros. has not conducted or attempted to conduct excavation along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has conducted excavations along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **<u>objects</u>** to the production of documents associated with its excavations as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

## NO. 8

McElwee Bros. has not reported under seepage, ponding, or pooling of waters along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has reported under seepage, ponding, or pooling of waters along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **objects** to the production of documents associated with its excavations as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

## NO. 9

McElwee Bros., have not made any efforts to remedy or otherwise limit under seepage, ponding, or pooling of waters along the Industrial Canal.

## NO. 10

McElwee Bros., have not received any complaints or expressions of concern from residents of the Lower Ninth Ward and/or St. Bernard Parish neighborhoods concerning under seepage, ponding, or pooling of waters along the Industrial Canal.

## NO. 11

McElwee Bros., has no documentation evidencing sink holes along the Industrial Canal.

## NO. 12

McElwee Bros., has no documentation reflecting the identities of any person or entity that has made or threatened to make a claim against it for any damage alleged to have been caused during Hurricane Katrina.

## NO. 13

McElwee Bros., has no documentation reflecting the identities of any residents of the Lower Ninth Ward and/or St. Bernard Parish with whom it have settled or otherwise resolved litigation or anticipated litigation against it in connection with Hurricane Katrina.

**I PRAY THAT THIS COURT**, will find that the defendant has completed the requirement of Federal Rule of Civil Procedure 45, and deem this information to be sufficient.

_(signature)_

Melvin M. L. McElwee, Sr.
In Proper Persona
Director of McElwee Brothers, Inc.
P. O. Box 1410
14154 Rev. Joseph White Road
Independence, LA 70443
Telephone    (985) 878-0280
Facsimile    (985) 878-0064

## CERTIFICATE OF SERVICE

I certify that a copy of the above "RESPONSES TO SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS DATED NOVEMBER 18, 2007" has been facsimiled to all counsel of record on this 19th day of December 2007.

_(signature)_

Melvin M. L. McElwee, Sr.
In Proper Persona

**EXHIBIT 27**

## Melvin M. L. McElwee, Sr.

**From:** Robert Bea [bea@ce.berkeley.edu]
**Sent:** Thursday, June 22, 2006 12:24 PM
**To:** Melvin M. L. McElwee, Sr.
**Subject:** RE: you are invited

Hi Melvin,

you can access our report at:

www.ce.berkeley.edu/~new_orleans

(no underline under 'orleans')

more developing on going forward.

thanks for your help.

bob

> Thanks for the invitation. Sorry I was out of town during the week of May 21, 2006.

> Is it possible to that I may receive a copy of the report, at our mailing address which is P. O. Box 1410, Independence, LA 70443.

> I still haven't received any of your attachments on your last email correspondence.

> Again, thanks for the invitation, and if there is anything else I can help with, let me now.

> -----Original Message-----
> **From:** Robert Bea [mailto:bea@ce.berkeley.edu]
> **Sent:** Wednesday, May 17, 2006 10:42 AM
> **To:** Melvin M. L. McElwee, Sr.
> **Subject:** you are invited

> Announcement

> You are invited to attend

Exhibit "C"
page 1 of 2

The National Science Foundation
Independent Levee Investigative Team
(Dr. Bob Bea)
(Dr. Ray Seed)
And many Other Volunteers
Will present their report on Katrina
Levee Failures

May 22nd, 2006

9:00 A.M. to 12:00 Noon

Sheraton New Orleans Hotel
500 Canal Street
New Orleans, Louisiana 70130

Grand Ballroom
5th Floor


Please feel free to invite anyone who is interested in attending.


i think we got it put together correctly. thanks for your help. but, it is not over – only started.



bob

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503


--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California

Exhibit "C"
page 2 of 2