Aaron L. Agenbroad (State Bar No. 242613)
alagenbroad@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:   (415) 626-3939
Facsimile:   (415) 875-5700

Attorneys for WASHINGTON GROUP INTERNATIONAL, INC., A DIVISION OF URS CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION**<br><br>**PERTAINS TO: MRGO**<br><br>**(PENDING IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AS CIVIL ACTION NO. 05-4182 "K" (2) BEFORE HON. STANWOOD R. DUVAL, JR.),**<br><br>**Defendant.** | Case No. MISC. NO. 08-CV-80007MISC (PJH)<br><br>**WASHINGTON GROUP INTERNATIONAL, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF CROSS-MOTION TO COMPEL COMPLIANCE WITH A THIRD-PARTY SUBPOENA**<br><br>Date:     March 5, 2008<br>Time:    10:00 a.m.<br>Courtroom: G, 15th Floor<br>Judge:   Mag. Bernard Zimmerman |

SFI-579140v1

WASHINGTON GROUP'S REPLY MEMORANDUM IN FURTHER SUPPORT OF CROSS-MOTION

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1
FACTS AND BACKGROUND ............................................................................................. 1
ARGUMENT .......................................................................................................................... 6
CONCLUSION ..................................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

**CASES**

*In re Folding Carton Antitrust Lit.*
   76 F.R.D. 420 (N.D. Ill. 1977) .................................................................................... 12

*Legato Systems, Inc. Sec. Litig.*
   204 F.R.D. 167 (N.D. Cal. 2001) ................................................................................ 11

*McCoy v. Southwest Airlines Co.*
   211 F.R.D. 381 (C.D. Cal. 2002) .................................................................................. 6

*Micron Tech., Inc. v. Tessara, Inc.*
   2006 U.S. Dist. LEXIS 42072, at *5-6 (N.D. Cal. June 14, 2006) ................... 11, 12, 13

*Miller v. IBM*
   2006 U.S. Dist. LEXIS 27649, at *8 (N.D. Cal. May 1, 2006) ............................. 10, 11

*Thomas v. Hickman*
   2007 WL 4302974, *14 (E.D. Cal. Dec. 6, 2007) ....................................................... 11

*United States v. TRW, Inc.*
   211 F.R.D. 388 (C.D. Cal. 2002) .............................................................................. 3, 7

*Uzzell v. Teletech Holdings, Inc.*
   2007 WL 4358315, at *1 (W.D. Wash. Dec. 7, 2007) .................................................. 6

*Visto Corp. v. Smartner Info. Sys.*
   2007 U.S. Dist. LEXIS 8481, at *6-7 (N.D. Cal. Jan. 29, 2007) ................................... 6

**RULES**

Federal Rule of Civil Procedure 34 .................................................................................. 10

Federal Rule of Civil Procedure 45(c)(2)(b) ...................................................................... 6

## INTRODUCTION

Washington Group International, Inc. ("WGII"), a division of URS Corporation, has filed a cross-motion ("WGII Cross-Mot.") to compel the University of California at Berkeley ("UC-Berkeley"), either itself or through an entity of the University, the University of California at Berkeley Center for Information Technology Research in the Interest of Society ("CITRIS"), to produce documents sought by WGII from the Independent Levee Investigation Team ("ILIT") in a November 19, 2007 Subpoena that WGII directed to ILIT, the University, and CITRIS ("ILIT Subpoena"). The University, apparently on behalf of CITRIS only, has opposed WGII's cross-motion ("UC-B Opp."). For the reasons set forth in WGII's cross-motion, as well as the further reasons set forth below, UC-Berkeley, which has admittedly led and funded ILIT, and cannot now deny its right to obtain documents from the ILIT members employed by the University, should be ordered to produce documents responsive to the ILIT Subpoena.

## FACTS AND BACKGROUND

While much of UC-Berkeley's opposition is spent on hyperbole and arguments belied by the record facts and even by its own actions, and while WGII will do its best in this reply to avoid the same, there are several glaring factual misstatements that demand clarification:

*First Misstatement of Fact:* UC-Berkeley starts its opposition by arguing that it "is, frankly, at a loss to understand why [WGII] has put the Court and the parties to the time and expense of dealing with this cross-motion or even to understand what relief WGI is seeking." UC-B Opp. at 1. Yet, UC-Berkeley knows *exactly* the relief requested by WGII because UC-Berkeley counsel suggested it back in December, 2007. *See* Kasley Dec., Ex. 7 (C. Patti 12/6/07 E-mail wherein UC-Berkeley counsel explains to WGII counsel that while CITRIS "is believed not to be in possession of substantial responsive documents . . . [the University], however, will canvass UC Berkeley personnel who were members of the ILIT team [sic] to locate responsive documents").[1] This is the relief currently sought by WGII—that the Court order the University,

---

[1] Citations to "Kasley Dec." herein refer to the February 5, 2008 Declaration of Shannon M. Kasley, which accompanied WGII's cross-motion, and the exhibits attached thereto. Citations to "Kasley Supp. Dec." herein refer to the accompanying February 27, 2008 Declaration of Shannon M. Kasley, and the exhibits attached thereto.

1  either on its own or through CITRIS, to produce documents collected from those "UC Berkeley

2  personnel" who undeniably hold responsive documents—documents clearly within the

3  "possession, custody, or control" of the University.[2]

4        ***Second Misstatement of Fact:***  UC-Berkeley next states "that WGI subpoenaed CITRIS

5  in hopes of avoiding the trouble of subpoenaing individual members of the ILIT team [sic] who

6  might have documents."  UC-B Opp. at 1.  This is a complete reversal of UC-Berkeley's prior

7  position.  Indeed, UC-Berkeley and WGII counsel discussed the option of serving individual UC-

8  Berkeley professors (something WGII ultimately did in a different case) and others, and ***UC-***

9  ***Berkeley counsel agreed*** that this was not a desirable solution.  *See* Kasley Dec., Ex. 13 (S.

10 Kasley 1/22/08 Ltr. at 2).  UC-Berkeley's assertions to the contrary (*see* UC-B Opp. at 3), WGII

11 was ***not*** attempting to use the ILIT Subpoena as a "short-cut" or to somehow make life easier for

12 itself.  Instead, as the irrefutable record evidence clearly demonstrates, WGII's counsel discussed

13 the personal service option with UC-Berkeley counsel, and UC-Berkeley counsel agreed the

14 option was not desirable.  *See* Kasley Dec., Ex. 13 (S. Kasley 1/22/08 Ltr. at 2).  UC-Berkeley's

15 arguments now to the contrary should therefore be disregarded.[3]

---

[2] As to why WGII has filed its cross-motion, WGII believes the reason is obvious—the University still has not produced a single page to WGII in response to the ILIT Subpoena, while UC-Berkeley represented weeks ago that it was readying a production to another party in response to a subpoena that repeats ***verbatim*** the very document specifications contained in the ILIT Subpoena.  *See* Kasley Dec., Ex. 19 (C. Patti 1/23/08 Ltr.); *see also infra.* at 6.  On the eve of the due date for this reply, UC-Berkeley counsel informed WGII that the University had indeed produced documents in response to a subpoena nearly identical to the ILIT Subpoena.  *See* Kasley Supp. Dec., Ex. F (C. Patti 2/26/08 E-mail).  Considering the difficulty WGII has encountered securing responsive documents from UC-Berkeley, WGII believed it prudent to file this reply, particularly given that a dispute as to Prof. Bea remains.  In an effort to possibly narrow the issues before this Court, WGII will endeavor to obtain the documents identified by UC-Berkeley counsel.

[3] In light of the discussion that occurred between counsel for WGII and UC-Berkeley, the assertion that WGII has "conceded that it knowingly mis-addressed its subpoena" (*see* UC-B Opp. at 3) borders on the offensive and has absolutely no basis in fact.  In this regard, UC-Berkeley makes far too much out of one-half of a single sentence in a December 6, 2007 e-mail sent by WGII counsel in response to the positions initially asserted by the University.  *See* UC-B Opp. at 3 (citing Kasley Dec., Ex. 8).  WGII's counsel is guilty, at most, of inartfully re-stating the University's position with respect to ILIT.  As further reflected in that e-mail, counsel was not adopting that position on behalf of WGII.  *See* Kasley Dec., Ex. 8 (arguing ILIT "did receive funding from, and according to the UC-Berkeley website, was sponsored by CITRIS, which is a University entity").  Moreover, as clear from the totality of the evidence in the record, WGII has always maintained that while it understood UC-Berkeley to be taking the position that ILIT was

1     *Third Misstatement of Fact:*  UC-Berkeley also asserts, repeatedly, that the recent subpoenas WGII served on five UC-Berkeley professors in a different matter "call[] for the same documents WGI sought from CITRIS" and "would seem to render any dispute about the CITRIS subpoena moot."  UC-B Opp. at 2.  *See also* UC-B Opp. at 4 (repeating argument).  A simple comparison of the ILIT Subpoena (*see* Kasley Dec., Ex. 1) with, for example, the subpoena WGII directed to Robert G. Bea (*see* Kasley Supp. Dec., Ex. A) ("Bea Subpoena") clearly demonstrates that the subpoenas are different in several material respects.

    Initially, as plainly denoted on its cover page, the ILIT Subpoena identifies that it "Pertains to: MRGO" (Kasley Dec., Ex. 1 at 1), while the Bea Subpoena's cover page reflects that it "Pertains to: BARGE" (Kasley Supp. Dec., Ex. A at 1).  Understanding that the distinction may not be clear to those not involved in the litigation, WGII provides the following admittedly thumb-nail explanation of the MR-GO and Barge cases currently pending in the Eastern District of Louisiana in the *In re Katrina Canal Breaches Consolidated Litigation* matter (Civil Action No. 05-4182 E.D. La.) ("*In re Katrina*").

### MR-GO

    WGII, as well as other parties including the United States Army Corps of Engineers, have been named as defendants in a number of cases that the Eastern District of Louisiana has labeled "MRGO."  *See* Case Management and Scheduling Order No. 4 ("CMO No. 4") entered March 1, 2007 at 1 (E.D. La. Civil Action No. 05-4182, Docket Record No. 3299) (noting that "approximately 170 separately filed civil actions, including about four dozen putative class actions" had been consolidated before the court and identifying six "categories" of such cases: i) Levee; ii) Insurance; iii) Responder; iv) Dredging Limitations; v) St. Rita's Nursing Home; and

---

(continued…)

not a "University entity," WGII did not agree.  *See, e.g.,* Kasley Dec., Exs. 9 (S. Kasley 1/18/08 Ltr.) (stating "we are requesting discovery from University of California-Berkeley employees, including Prof. Bea and others, who were a part of the ILIT"); 13 (S. Kasley 1/22/08 Ltr.) (stating "[w]hile you have stated your opinion that ILIT is not a 'University entity,' this is belied by the facts"); and 18 (S. Kasley 1/23/08 Ltr.) (stating "[y]ou continue to return to the argument that 'ILIT is not and never was a UC entity.  **WGII understands your position and disagrees** and believes that the facts belie your position.") (emphasis added).

SFI-579140v1

- 3 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

1  vi) MRGO (an acronym for "Mississippi River Gulf Outlet")).  Put rather simply, the MRGO

2  category of cases involve allegations of the faulty design, construction and maintenance of either

3  the MRGO and related projects, the eastern Industrial Canal floodwall and related projects, or

4  both (the "MRGO Claims").  *See also* WGII Cross-Mot. at 15-16 (discussing MR-GO Plaintiffs'

5  allegations concerning an area along the Industrial Canal against WGII in particular); Kasley Dec.,

6  Ex. 23 (attaching excerpts of allegations against WGII from the MR-GO Consolidated Class

7  Action Complaint).

8      Barge

9      The Eastern District has since added a seventh *In re Katrina* category, now known as

10 "Barge," which is currently subject to its own scheduling order—Case Management and

11 Scheduling Order No. 5 entered September 18, 2007 ("CMO No. 5").  *See* E.D. La. Civil Action

12 No. 05-4182, Docket Record No. 7724.  WGII is also a defendant in the Barge category of cases.

13 As best explained by the Eastern District itself, these Barge cases "all involve claims that a

14 breakaway barge was either the cause or a contributing cause of a breach of the levee/floodwall

15 on the east side of the Industrial Canal during Hurricane Katrina" (the "Barge Claims").  *Id.* at 1.

16 As the Court further explained:  "[The Barge] cases also include third-party and (in one case,

17 *Parfait Family*, C.A. No. 07-3500) direct claims that other fault caused or contributed to the

18 breach, claims similar to those asserted in the . . . MRGO case categories in the consolidated

19 litigation."  *Id.*

20     Therefore, as detailed above, WGII is currently a defendant in two distinct actions in

21 connection with claims stemming from the damage attributed to the flooding following Hurricane

22 Katrina:  MR-GO and Barge.  Two ***different sets of plaintiffs' counsel*** are litigating MR-GO and

23 Barge.[4]  These actions have been instituted asserting ***very different***, and quite frankly, contrary,

---

[4] Indeed, counsel for Barge plaintiffs apparently have no objection to either the ILIT Subpoena or the Bea Subpoena, as Barge plaintiffs have also served ILIT with a subpoena at the ***exact same address*** used by WGII.  *See* Kasley Supp. Dec., Ex. C (Barge Plaintiffs' ILIT subpoena) and *compare* to Kasley Dec., Ex. 1 (ILIT Subpoena).  An examination of the Barge plaintiffs' subpoena to ILIT reveals that it is arguably much broader (*see, e.g.,* Kasley Supp. Dec., Ex. C at Specification Nos. 2, 3) than WGII's ILIT Subpoena, and therefore, far more unduly burdensome.  Oddly though, to WGII's knowledge, UC-Berkeley has not objected to the Barge plaintiffs' subpoena to ILIT.

SFI-579140v1

- 4 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

*causation theories*: faulty design and/or construction (MR-GO) as opposed to a run-away barge crashing through the Industrial Canal floodwall (Barge). So the record is absolutely clear, WGII issued the ILIT Subpoena in connection with the MR-GO category of cases and seeks documents responsive to ten (10) specifications crafted to collect information concerning the MR-GO theory of flood wall and/or levee failure in the case. *See* Kasley Dec., Ex. 1 at 6-7. While there is an admitted overlap between the ILIT Subpoena in MR-GO and the individual professor subpoenas in Barge (*see, e.g.,* Kasley Supp. Dec., Ex. A at 6-8), WGII added nine (9) specifications of documents in the individual professor subpoenas in Barge—crafted to collect information concerning the Barge theory of flood wall and/or levee failure in the case—that were ***not included*** in the ILIT Subpoena (*id.* at Specification Nos. 11-19). Therefore, UC-Berkeley's somewhat cursory arguments to the contrary (*see, e.g.,* UC-B Opp. at 2, 4), the ILIT Subpoena in MR-GO is ***not*** identical to the individual professor subpoenas served by WGII in Barge, and as such, the Barge subpoenas ***do not*** "render any dispute about the CITRIS subpoena moot."

***Fourth Misstatement of Fact:*** While UC-Berkeley repeatedly states that CITRIS "is in possession of none of the documents [WGII] requested" (UC-B Opp. at 1, 3, and 4), the University's actions completely undermine this assertion. Specifically, UC-Berkeley counsel has represented to WGII that someone—whether it is the University, ILIT, or CITRIS—was planning weeks ago to produce documents in response to the subpoena of another party in the Barge cases, Lafarge North America, Inc.—a subpoena that repeats ***verbatim*** the ten (10) specifications contained in the ILIT Subpoena now disputed by the University. *See* Kasley Dec., Ex. 19 (C. Patti 1/23/08 Ltr.) (informing WGII that "UC Berkeley personnel who were on the ILIT (with the exception of Prof. Bea) will continue to collect documents responsive to the similar subpoena issued by Lafarge North America, Inc., which has agreed to a February 8, 2008, response date"). *See also* Kasley Supp. Dec., Ex. B (Lafarge North America, Inc. 12/4/07 Subpoena) and *compare* to Kasley Dec., Ex. 1 (ILIT Subpoena).[5] Therefore, someone at UC-Berkeley has possession,

---

[5] Other than seeking additional time to respond, WGII is not aware of any assertion by the University in response to the Lafarge subpoena to ILIT, as it now does in its opposition to WGII's cross-motion, that "the documents [sought] were never provided to CITRIS," and therefore, there is nothing to produce. UC-B Opp. at 4. Thus, despite the fact that WGII's ILIT Subpoena and

SFI-579140v1

- 5 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

1  custody, and/or control of the exact documents (except those from Prof. Bea) responsive to the
2  ILIT Subpoena.  In light of this fact, UC-Berkeley should not be permitted to play semantic
3  games about whether "ILIT was not a part of CITRIS nor a University . . . entity."  *See* UC-B
4  Opp. at 2.  This is particularly true where, as here, this is the ***only*** objection UC-Berkeley has
5  offered in response to the ILIT Subpoena, the University has agreed to produce the exact same
6  documents to another party, and the University has apparently conceded the relevance and critical
7  importance of these documents to WGII.  *See, e.g.,* WGII Cross-Mot. at 15-18 (explaining the
8  relevance of the documents sought in the ILIT Subpoena, to which the University has offered no
9  response).

## ARGUMENT

11  As to actual legal arguments offered in opposition to WGII's cross-motion, UC-Berkeley
12  offers only one—that "to the extent WGI seeks to compel, through a subpoena directed to
13  ***CITRIS***, production of documents from the individual members of ILIT, its cross-motion must be
14  denied."  UC-B Opp. at 4 (emphasis in original).[6]

---

(continued…)

the Lafarge subpoena were served ***at the exact same service address*** and the subpoenas are ***virtually identical*** (*compare* Kasley Dec., Ex. 1 to Kasley Supp. Dec., Ex. B), it appears that UC-Berkeley has now made a production to Lafarge, while asserting now that no such responsive documents exist in response to the WGII ILIT Subpoena.  This position is mutually inconsistent with how UC-Berkeley has proceeded in response to the Lafarge subpoena, and therefore, should not be credited by this Court.

[6] Relegated to a footnote, UC-Berkeley half-heartedly argues that it has not waived its objections to the ILIT Subpoena because WGII failed to meet "the requirement of issuing the subpoena to the technically correct entity."  UC-B Opp. at 4, n.3 (*citing Visto Corp. v. Smartner Info. Sys.*, 2007 U.S. Dist. LEXIS 8481, at *6-7 (N.D. Cal. Jan. 29, 2007)).  Of course, unlike the subpoenaing party in *Visto*, who clearly served the wrong party and later served an identical subpoena ***in the same case*** "to obviate the issue" (*see id.* at 6), WGII in fact correctly served the ILIT Subpoena.  *See infra* at 7-10.  But more importantly, *Visto* simply does not support UC-Berkeley's suggestion that the requirement of issuing a subpoena to the correct entity somehow relieves UC-Berkeley of its duty to make timely objections.  *See Visto*, 2007 U.S. Dist. LEXIS 8481, at *7 (suggesting in dicta, "without reaching [the] argument," that it would be unjust for a subpoenaing party to argue lack of timeliness while having subpoenaed the wrong party).  The purpose of the Rule 45(c)(2)(b)'s objection requirement is clear:  it "require[s] the recipient of the subpoena to raise all objections at once, rather than in staggered batches [as UC-Berkeley has attempted here], ***so that discovery does not become a 'game***.'"  *McCoy v. Southwest Airlines Co.*, 211 F.R.D. 381, 385 (C.D. Cal. 2002) (citation omitted) (emphasis added).  *See also Uzzell v. Teletech Holdings, Inc.*, 2007 WL 4358315, at *1 (W.D. Wash. Dec. 7, 2007) (noting that a "party who does not timely object to a Rule 45 subpoena waives any objection to the subpoena")

SFI-579140v1

- 6 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

As an initial matter, the ILIT Subpoena was clearly not directed solely to CITRIS. Indeed, the express language of the ILIT Subpoena reflects that WGII directed it not only to CITRIS, but also to ILIT, which includes the University specifically. *See* Kasley Dec., Ex. 1. In particular, the ILIT Subpoena clearly defines ILIT to include *not only* the University, but also UC-Berkeley professors and students who were ILIT members—many of whom clearly have responsive documents within their possession, custody, and/or control, as evidenced by UC-Berkeley's recent production of these very documents to Lafarge:

> 3. "ILIT" means the Independent Levee Investigation Team, *led by the University of California at Berkeley* and funded in part by the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"); any of ILIT's *members*, employees, affiliates, *representatives*, *advisors*, agents, attorneys or associates; *or any other person acting on behalf of the ILIT* in any capacity.
>
> 4. "You," or "Your" means *the ILIT* [which as identified above, includes UC-Berkeley] and/or the University of California at Berkeley's Center for Technology Research in the Interest of Society ("CITRIS"), its predecessors, parents, subsidiaries, affiliates, and any of its present or former directors, officers, agents, employees, designees, assignees, *representatives or other persons acting on its behalf*.

Kasley Dec., Ex. 1 (Subpoena at Schedule A at 2) (emphasis added).[7]

---

(continued…)

(citation omitted); *United States v. TRW, Inc.*, 211 F.R.D. 388, 392 (C.D. Cal. 2002) (noting that "[u]nder Rule 45, the nonparty served with the subpoena . . . must make objections to it within 14 days after service . . . . ***Failure to serve timely objections waives all grounds for objection*** . . . .") (citations omitted) (emphasis added). To this day, UC-Berkeley still has not objected in writing to the ILIT Subpoena. As such, any attempt at objection now should be flatly rejected by this Court.

[7] If for whatever reason, UC-Berkeley now attempts to argue that it did not understand the

SFI-579140v1

- 7 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

Moreover, in an apparent attempt to support its position with respect to the "non-relationship" between ILIT and the University (through CITRIS or otherwise), UC-Berkeley has provided the Declaration of Raymond B. Seed ("Seed Dec."). This declaration is interesting in several respects. First, UC-Berkeley sought Prof. Seed's declaration that "CITRIS's only connection to ILIT is that CITRIS provided approximately $50,000 in funding for the Team's study" and "CITRIS was not involved in ILIT's research work." Seed Dec. at ¶ 3. UC-Berkeley was obviously foreclosed from obtaining similar declarations from Prof. Bea, a close colleague of Prof. Seed as well as the co-author with Prof. Seed of the ILIT reports, because just sixteen (16) days after Hurricane Katrina passed New Orleans, Prof. Bea was prominently quoted on the UC-Berkeley website touting the critical role the University, *through CITRIS*, would play in connection with ILIT's efforts in New Orleans. *See* Kasley Dec., Ex. 4 (www.berkeley.edu/ news/media/ releases/2005/09/12_katrina.shtml) ("We need to go to ground zero to gather data and preserve the things that can get trashed or lost (in the recovery effort) . . . . *CITRIS can help to preserve and analyze this data*.") (quoting Prof. Robert Bea at 2) (emphasis added). This statement about what the University would do, through CITRIS, was made within days of Hurricane Katrina. Interestingly, UC-Berkeley has chosen in its opposition to ignore it, rather than address its implications. *See* WGII Cross-Mot. at 15. In any event, WGII submits that such a timely statement is far more compelling than a self-serving declaration of Raymond Seed made nearly three years after the fact.[8]

---

(continued…)

ILIT Subpoena to reach the University and/or its professors and students, this argument is completely undermined by UC-Berkeley counsel's position since December, 2007, that the University, in response to the ILIT Subpoena, would "canvass UC Berkeley personnel who were members of the ILIT team [sic] to locate responsive documents." Kasley Dec., Ex. 7 (C. Patti 12/6/07 E-mail). Any such argument is also undermined by the University's response to the Lafarge subpoena. *See* Kasley Supp. Dec., Ex. F.

[8] By his own admission, Prof. Seed is not capable to offer competent testimony as to CITRIS. *See* Seed Dec. at ¶ 3 (declaring that "none of ILIT's members [including presumably Prof. Seed himself] were members or affiliated with CITRIS"). Maybe Prof. Seed is unaware, but contrary to Prof. Seed's declaration, Robert Bea is indeed "affiliated with CITRIS." Specifically, Prof. Bea, who, as noted above, just days after Hurricane Katrina touted the vital role the University, through CITRIS, would play in connection with ILIT's efforts in New Orleans, is a

SFI-579140v1

- 8 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

1    Further, Prof. Seed's declaration not only confirms some of the positions WGII has taken, but also provides additional support for WGII's argument.  ***First***, Prof. Seed confirms that ILIT was "led" by UC-Berkeley, and by no other entity.  Seed Dec. at ¶ 2.  ***Second***, Prof. Seed confirms that ILIT "included a number of U.C. Berkeley personnel" (*id.*)—fifteen (15), to be exact, or nearly 50% of the 35 total members on ILIT.  *See* WGII Cross-Mot. at 2-3; Kasley Dec., Ex. 2.  While Prof. Seed also offers that the ILIT "included members from six states, from a number of universities, private engineering firms, and state and federal agencies" (Seed Dec. at ¶ 2), he conveniently fails to mention:  i) whether any of these "universities, private engineering firms, and state and federal agencies" led ILIT, as UC-Berkeley did; ii) whether any of the "universities, private engineering firms, and state and federal agencies" he mentions had more than five (5) ILIT representatives, as compared to UC-Berkeley's *fifteen* representatives (*see* Kasley Dec., Ex. 2); iii) whether any university, other than UC-Berkeley, provided almost 20% of ILIT's funding (*id.*, Ex. 21); iv) whether any university, other than UC-Berkeley, or private engineering firm for that matter, maintained an "ILIT DOWNLOAD CENTER" on its university's website (*id.*, Ex. 5); v) whether any ILIT member, other than those from UC-Berkeley like Robert Bea, directed citizens of New Orleans to their university's website to download the various ILIT reports (*id.*, Ex. 27); or vi) whether any university, other than UC-Berkeley, issued press releases within days of Hurricane Katrina offering ILIT members as "available for media interviews related to the aftermath of Hurricane Katrina" (*id.*, Ex. 22).  Despite all this, and apparently despite being mistaken about CITRIS' relationship with at least one of his ILIT colleagues, Prof. Seed continues the all-too-familiar-drumbeat that ILIT "was not a U.C. Berkeley entity."  ***Third***, Prof. Seed confirms what WGII already knew from Robert Bea's sworn deposition testimony in November 2007—that, apparently even to this day, "some

---

(continued…)

Co-Director of the Center for Catastrophic Risk Management ("CCRM").  *See* Kasley Supp. Dec., Ex. D (http://risk.berkeley.edu/faculty_and_researchers.html).  CCRM, incidentally, is identified by CITRIS as an "Affiliate Center."  *See* Kasley Supp. Dec., Ex. E (http://www.citris-uc.org/partners/centers).  As such, contrary to Prof. Seed's declaration, Prof. Bea is certainly "affiliated with CITRIS."

SFI-579140v1

- 9 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

1  members of the team continue to perform related work" for ILIT and that "follow-on work [has]
2  been] performed by some of the original team members."  Seed Dec. at ¶ 2.  *See also* WGII
3  Cross-Mot. at 6; Kasley Dec., Ex. 14.  Interestingly, Prof. Seed does not declare further that these
4  "original team members" who "continue to perform [ILIT] related work" are not UC-Berkeley
5  professors like Robert Bea, Jonathan Bray, Michael Reimer, Juan Pestana, or even Prof. Seed
6  himself.  Thus, WGII is left to conclude that in addition to Robert Bea, who has already testified
7  ***under oath*** that he continues his ILIT work as recently as November, 2007, other UC-Berkeley
8  personnel similarly continue their ILIT work.  The Court should similarly conclude.

9     ***Fourth***, Prof. Seed's declaration adds a fact to the analysis that WGII did not know—that
10 "graduate students . . . received compensation for their ILIT work."  Seed Dec. at ¶ 2.  Again,
11 interestingly, Prof. Seed does not distinguish these graduate students who were paid for their ILIT
12 work from the six (6) UC-Berkeley graduate students identified in the ILIT Report.  *See* WGII
13 Cross-Mot. at 2-3.  Thus, WGII can only conclude that at least some of the UC-Berkeley graduate
14 students were compensated for their time spent working on the ILIT, and further, given that UC-
15 Berkeley was the only university to fund ILIT, that their compensation was paid, at least in part,
16 by the University.  Again, UC-Berkeley has given the Court no reason to conclude otherwise.

17    Finally, UC-Berkeley also wants this Court to accept its argument that it is somehow
18 relieved of the obligation to produce responsive documents because "[t]he subpoena at issue was
19 served only on CITRIS" (which is facially incorrect as discussed above) and that the University,
20 either itself, or through CITRIS, does not have the "legal right" to demand the documents from
21 ILIT members who are employees of the University.  UC-B Opp. at 4.  These arguments,
22 however, are unavailing as set forth below.

23    ***First***, while UC-Berkeley is correct that "[c]ontrol is defined as the legal right to obtain
24 documents upon demand," *Miller v. IBM*, 2006 U.S. Dist. LEXIS 27649, at *8 (N.D. Cal. May 1,
25 2006) (citations omitted), what UC-Berkeley has failed to include for the Court's consideration is
26 that just three (3) sentences after this quote, the Northern District further elaborated that "[f]ederal
27 courts construe 'control' ***very broadly*** under FRCP 34."  *Id.* (emphasis added).  Indeed,
28 demonstrating the "very broad[]" treatment of the concept of "control," a "party ***need not have***

SFI-579140v1

- 10 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

1    *actual possession* of documents to be deemed in control of them." *In re Legato Systems, Inc. Sec.*

2    *Litig.*, 204 F.R.D. 167, 168-69 (N.D. Cal. 2001) (citation omitted) (emphasis added).  Thus, UC-

3    Berkeley's argument that CITRIS, or even the University for that matter, may not be in physical

4    possession of the subpoenaed documents (a proposition in serious doubt given the University's

5    representations about its response to the Lafarge subpoena), is irrelevant.[9]

6    *Second*, while UC-Berkeley notes that the "legal right to obtain documents on demand [or

7    control] . . . suggests an ownership interest, a binding contract, a fiduciary duty, or some other

8    legally enforceable arrangement" (UC-B Opp. at 4 (citing *Micron Tech., Inc. v. Tessara, Inc.*,

9    2006 U.S. Dist. LEXIS 42072, at *5-6 (N.D. Cal. June 14, 2006)), the analysis does not end with

10   this statement.  In *Micron*, the court considered a motion to compel SUI, a U.S. "marketer of . . .

11   semiconductors," to produce documents arguably in the possession of SPIL, the "Taiwan

12   manufacturer" of the semiconductors.  *Micron*, 2006 U.S. Dist. LEXIS 42072, at *2.  The court,

13   in granting in part the motion to compel, found that the moving party had not "pointed to any

14   statute or ***binding principle of law*** that grants SUI th[e] right" to demand documents from SPIL.

15   *Id.* at 5 (emphasis added).  In stark contrast here, WGII points to at least two "binding principle[s]

16   of law" that grant the University, either itself or through CITRIS, the right to demand the

17   documents from certain ILIT members:  i) the employer/employee relationship; and ii) affiliation.

18   *See, e.g.*, *In re Legato*, 204 F.R.D. at 170 ("Decisions from within [the Ninth Circuit] have noted

19   the importance of legal right to access documents created by statute, ***affiliation or employment***.")

20   (emphasis added) (citations omitted); *Thomas v. Hickman*, 2007 WL 4302974, *14 (E.D. Cal.

21   Dec. 6, 2007) ("The position of control is usually the result of statute, affiliation or employment.")

---

[9] Importantly, UC-Berkeley's reliance on *Miller* for anything other than a general proposition of law is misplaced as the facts of *Miller* stand in stark contrast to those present before the Court here.  Specifically, in *Miller*, plaintiff moved to compel IBM to produce documents related to certain of IBM's Chinese subsidiaries.  *Miller*, 2006 U.S. Dist. LEXIS 27649, at *3.  The Northern District, however, did not deny the motion to compel because IBM did not "control" or have the legal right to demand the documents subpoenaed.  In fact, the court found "that IBM may have control over the Chinese subsidiaries."  *Id.* at *9.  Instead, the court denied the motion because the Chinese subsidiaries from which the plaintiff sought production (through IBM) had been IBM's co-defendants, but had been dismissed *Id.*  As such, "[w]hile IBM might have legal control over its subsidiaries, the Court already determined that IBM is not responsible for the claims [plaintiff] makes against them."  *Id.*

1  (citations omitted).

2  As to the employment point, UC-Berkeley cannot deny that as the employer of Professors
3  Bea, Seed, Bray, Reimer, Pestana and any other UC-Berkeley professors who served on the ILIT,
4  as well as graduate students that UC-Berkeley **paid** for their ILIT work, the University can
5  demand its employees to provide it with documents responsive to the ILIT Subpoena. *See, e.g.,*
6  *In re Folding Carton Antitrust Lit.*, 76 F.R.D. 420, 423 (N.D. Ill. 1977) (holding that plaintiffs
7  could compel defendants to produce documents in the possession of current and past employees
8  over whom defendants exercised control, "especially . . . where, as here, defendants do not assert
9  that the former employees are unwilling or unable to cooperate"). In fact, this has already
10 apparently occurred in response to the Lafarge subpoena, which, as noted, is **virtually identical** to
11 the ILIT Subpoena. Thus, unlike in *Micron*, this is not a situation where "an order compelling
12 SUI [the University] to produce SPIL's [the ILIT members] documents could be futile, since
13 there is no mechanism for SUI [the University] to compel SPIL [the ILIT members'] to produce
14 those documents, and SPIL [the ILIT members] could legally continue to refuse to turn over
15 further documents." *Micron*, 2006 U.S. Dist. LEXIS 42072, at *2. While UC-Berkeley may not
16 want to demand these documents, it nevertheless has the right to, and apparently has done exactly
17 that in response to the Lafarge subpoena. As such, UC-Berkeley cannot argue that it does not
18 have "control" over these subpoenaed documents.

19 Regarding affiliation, WGII has provided extensive record evidence of the many ways in
20 which UC-Berkeley led the public to believe, contrary to its position now, that ILIT is a UC-
21 Berkeley entity or at least affiliated therewith. *See, e.g.,* WGII Cross-Mot. at 2-4; 14-15. WGII
22 will not belabor the record with evidence it has already detailed, but submits that the affiliation
23 between ILIT and UC-Berkeley and/or CITRIS goes far beyond "the fact that ILIT was led by
24 U.C. Berkeley faculty and sponsored, in part, by funding from CITRIS," as now downplayed by
25 the University. *See* UC-B Opp. at 5. In fact, Prof. Robert Bea, a Co-Director of CCRM, is
26 clearly "affiliated" with CITRIS. *See* Kasley Supp. Dec., Exs. D and E. Moreover, it appears
27 that the University's affiliation with CITRIS and ILIT, which UC-Berkeley promoted extensively
28 via its website (*see* Kasley Dec., Exs. 3, 4, 5, 6, 21, and 22), has provided at least some of its

SFI-579140v1

- 12 -

WASHINGTON GROUP'S REPLY
MEMORANDUM IN FURTHER
SUPPORT OF CROSS-MOTION

faculty, including Robert Bea, with additional sources of income as experts in this very litigation. Indeed, UC-Berkeley, within days of the disaster, issued a press release making its "experts," Robert Bea, Arthur Reingold, Severin Borenstein, Dan Kammen, and Mary Comerio "available for interviews." *Id.*, Ex. 22. In light of the foregoing, unlike in *Micron*, WGII has clearly pointed to a "binding principle of law" which grants UC-Berkeley the right to demand documents from members of ILIT—especially those who are University employees or those who UC-Berkeley paid for their ILIT work. As such, UC-Berkeley should be ordered to produce documents responsive to the ILIT Subpoena.

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in its Cross-Motion to Compel, UC-Berkeley should be ordered to comply with the Subpoena directed to ILIT and produce all responsive documents, many of which have apparently already been gathered, to WGII in an expeditious fashion.

Dated: February 27, 2008

Respectfully submitted,

   /S/ Aaron L. Agenbroad
Aaron L. Agenbroad (State Bar No. 242613)
alagenbroad@jonesday.com
Jones Day
555 California Street
26th Floor
San Francisco, CA  94104-1500
Telephone:  (415) 626-3939
Facsimile:  (415) 875-5700

Of Counsel

Adrian Wager-Zito
Shannon M. Kasley
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
   Of
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street

SFI-579140v1

- 13 -

WASHINGTON GROUP'S REPLY MEMORANDUM IN FURTHER SUPPORT OF CROSS-MOTION

| | |
|---|---|
| 1 | New Orleans, Louisiana 70130 |
| 2 | Telephone: (504) 581-3200<br>Facsimile: (504) 581-3361 |
| 3 | Attorneys for Washington Group |
| 4 | International, Inc., a division of URS<br>Corporation |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th of February, 2008, I caused to be served a true and correct copy of the foregoing Washington Group International, Inc.'s Reply Memorandum in Further Support of Cross-Motion to Compel Compliance With a Third-Party Subpoena by e-mail in PDF format to:

| | |
|---|---|
| Christopher M. Patti (christopher.patti@ucop.edu) <br> University Counsel <br> 1111 Franklin Street, 8th Floor <br> Oakland, California 94607-5200 <br> (510) 987-9739 (telephone) <br> (510) 987-5757 (facsimile) | Joseph M. Bruno (jbruno@jbrunolaw.com) <br> Scott Joanen (scott@jbrunolaw.com) <br> The Law Offices of Joseph M. Bruno <br> 855 Baronne Street <br> New Orleans, Louisiana 70113 <br> (504) 525-1335 (telephone) <br> (504) 561-6775 (facsimile) |

Dated: February 27, 2008

Respectfully submitted,

Jones Day

By:   /S/ Aaron L. Agenbroad
         Aaron L. Agenbroad

WASHINGTON GROUP INTERNATIONAL, INC., A DIVISION OF URS CORPORATION

SFI-579140v1

WASHINGTON GROUP'S REPLY MEMORANDUM IN FURTHER SUPPORT OF CROSS-MOTION